UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 11-20470-CR-LENARD/GOODMAN

UNITED STATES OF AMERICA,

v.

ALVARO LOPEZ TARDON,

    Defendant.
_____/

re:

MIAMARK LLC and MURANO 908 LLC,

    Petitioners,

and

KYTE SCHOOLL, THE COLLECTION MOTOR
SPORTS MADRID, MARIA TARDON TORREGO,
and ARTEMIO LOPEZ TARDON,

    Petitioners.
_____/

**REPORT AND RECOMMENDATIONS ON PETITIONS
TO SET ASIDE FORFEITURE OF SUBSTITUTE ASSETS**

## I.    Introduction

    This Report and Recommendations ("Report") concerns petitions filed by third

parties who assert interests in both real and personal properties which the United States

seeks to forfeit as substitute assets following (1) the criminal conviction of Defendant

Alvaro Lopez Tardon ("Alvaro") and (2) a forfeiture judgment concerning Alvaro's interest in those properties. Although this Report concerns the facts developed at the criminal trial and through later proceedings in the instant post-trial ancillary forfeiture proceedings, the parties (i.e., the United States and the third parties) have spent a considerable amount of time litigating here over *another* criminal forfeiture proceeding in a completely unrelated case: *United States v. Silva*, U.S. District Court for the Southern District of Florida, Case No. 15-20727-CR-DPG. The third-party petitioners rely on *Silva* while the United States describes *Silva* as a non-binding district court case which reached a result the United States deems incorrect (even though it never pursued an appeal).

Although the Undersigned readily agrees, as I must, that *Silva* is non-binding, the parties' views about that case and their penchant for extensively discussing it here compel me to assess it in this Report. As this Report outlines below, the Undersigned does not find *Silva* persuasive. *Silva* would immunize all record title owners from scrutiny over their standing and prevent the United States and the Court from determining whether a record title owner is a mere nominee or straw owner lacking standing to challenge a proposed forfeiture.

Therefore, this Report will substantively evaluate the United States' related standing arguments that (1) the third parties do not meet the statutory definition of being someone "other than the Defendant" and (2) these third-party petitioners hold only bare

2

legal title to the properties at issue -- and therefore cannot, as mere nominal title owners, establish the requisite standing.

By way of additional introductory background, following the trial and conviction of Defendant Alvaro on 14 counts of money laundering, Murano 908, LLC; Miamark, LLC; Maria Tardon Torrego; Artemio Lopez Tardon; and Kyte Schooll (a Spanish corporation) ("Petitioners") filed petitions to determine their respective ownership interests in vehicles and condominium units forfeited to the United States as Alvaro's substitute property. *See* ECF Nos. 601; 613. United States District Judge Joan A. Lenard then presided over an ancillary hearing on their petitions and dismissed their claims without prejudice. *See* ECF Nos. 722; 729; 732. The Petitioners subsequently re-filed their claims through amended motions to assert third party interests in forfeited property. [ECF Nos. 734; 735].

The United States sought denial of these petitions on summary judgment. [ECF Nos. 776; 825; 826]. Judge Lenard referred the pending petitions and related motions to the Undersigned. [ECF No. 813]. The parties have fully briefed the matters, and on February 19, 2019, the Undersigned held an evidentiary hearing. [ECF No. 863].

Petitioners, which include Artemio Tardon, an indicted co-defendant, have asserted that they have ownership interests in the properties which were vested in them (rather than Alvaro) and that their rights were superior to Alvaro's at the time of the commission of the facts giving rise to the forfeitures. Petitioners say they are entitled

under 21 U.S.C. § 853(n)(6)(A) to have the forfeiture orders amended in order to prevent their interests from being improperly forfeited.

In response, the United States has consistently argued that Petitioners are precluded from relief because they are not someone "other than defendant" (as required by 21 U.S.C. § 853(n)(2) to file a third-party claim to forfeited assets) and (alternatively) because they hold only naked legal title and lack standing. [ECF Nos. 716; 725; 776; 825; 826; 855].

At the evidentiary hearing, which was scheduled seven months earlier, Petitioners presented no witnesses and submitted a total of nine exhibits (a handful of title records and company records) in support of their claims. *See* ECF No. 874; *see also* ECF Nos. 876 (2/19/19 Evidentiary Hr'g Tr. 41:24-46:18, 47:12-21, 135:3-19). Sitting at counsel's table for Petitioners was Richard Klugh, their former counsel, who appeared as the corporate representative of Murano, Miamark, and Kyte Schooll. The United States presented Special Agent Daniel Gaitan of the Federal Bureau of Investigation as a witness and submitted more than 100 exhibits in support of its defense. *See* ECF Nos. 863; 864; 880; 884.

At a prior hearing concerning the ancillary hearing scheduled for Petitioners' claims to the substitute assets which Judge Lenard ordered forfeited to the United States, Petitioners' counsel waived the presence of Petitioners and their principals. [ECF No. 744,

4

pp. 54-56]. Although their presence was waived, Petitioners could have presented live witness testimony at the evidentiary hearing. As noted, they did not.

In post-hearing submissions, the United States took the position that none of the Petitioners established statutory standing or Article III standing (and asked the Court to reject their petitions and deny their claims). On the other hand, Petitioners took the position that they are entitled to the proceeds from the sales of the three parcels of real estate and **half** of the proceeds of the sales of the two vehicles (with half going to the United States and the other half going to some of the petitioning third parties). [ECF No. 905].

For the reasons provided below, the Undersigned **respectfully recommends** that Judge Lenard **deny** the petitions because Petitioners have not established that they are "other than" the Defendant Alvaro, which means they lack statutory standing. Alternatively, Petitioners have not established that they have Article III constitutional standing because they are mere nominee owners with formal record title but without sufficient dominion or control over the properties. For all practical purposes, the facts demonstrating that Petitioners failed to establish statutory standing are the same ones which reveal that they lack Article III standing.

Finally, the Undersigned **respectfully recommends** that Judge Lenard **deny** the following additional motions for the reasons mentioned: (1) the United States' summary judgment motion concerning the vehicles [ECF No. 776] because they are now moot,

given this Report and Recommendations; (2) the United States' summary judgment motions concerning the real properties [ECF Nos. 825; 826] because they are now moot, given this Report and Recommendations; (3) the United States' motion for a show cause order concerning Petitioners' standing [ECF No. 760] because this Report and Recommendations is based on a lack of standing and renders the motion moot; (4) the United States' motion to dismiss regarding the petition for the Mercedes [ECF No. 737] because it is moot; (5) the Petitioners' amended motions to assert third party interests in property [ECF Nos. 734; 735] because those requests are moot; and (6) the United States' motion for a hearing to inquire about a potential conflict [ECF No. 714] because Judge Lenard already had the hearing [ECF No. 717] and ruled on the purported conflict issue.

## II.    Procedural History

### a.  Criminal Proceedings and Forfeiture of Subject Assets

On June 11, 2014, Defendant Alvaro was found guilty of all 14 counts of federal money laundering charged in the Second Superseding Indictment. [ECF Nos. 483; 484; 203].

Concerning the real and personal property at issue in this Report, the jury found (by a preponderance of the evidence) that the properties were **not** "*traceable* to property that was involved in the money laundering offense charged in Count I of the Second Superseding Indictment." [ECF No. 487, pp. 7-9 (emphasis added)].

On October 22 and 30, 2014, the Court entered an order imposing a forfeiture money judgment against the Defendant in the amount of $14,358,639.64 and the forfeiture of certain assets in partial satisfaction of the forfeiture money judgment, including the following substitute assets[1] that are the subject of these ancillary proceedings:

**The "Forfeited Vehicles"**:

One (1) 2006 Mercedes-Benz SLR McLaren (VIN: WDDAJ76F06M000724) (the "Mercedes Benz" or the "Mercedes");

One (1) 2010 Rolls-Royce Ghost (VIN: SCA664S50AUX48905) (the "Rolls-Royce");

**The "Forfeited Mark Units"**:

Real property known and numbered as 1155 Brickell Bay Drive, Unit 202, Miami, FL 33131, with all appurtenances, improvements, and attachments thereon ("Mark Unit 202");

Real property known and numbered as 1155 Brickell Bay Drive, Unit 502, Miami, FL 33131, with all appurtenances, improvements, and attachments thereon ("Mark Unit 502");

Real property known and numbered as 1155 Brickell Bay Drive, Unit 2703, Miami, FL 33131, with all appurtenances, improvements, and attachments thereon ("Mark Unit 2703"); and

**The "Murano Unit 908"**:

Real property known and numbered as 1000 South Pointe Drive, Unit 908, Miami, FL 33139, with all appurtenances, improvements, and attachments thereon ("Murano Unit 908").

---

[1]     Because the jury found that the properties were not subject to forfeiture, Judge Lenard refers to the substitute assets properties as the "non-traceable property." *See, e.g.*, ECF No. 601, p. 3.

*See* ECF Nos. 601; 613.

The Court released a portion of the net seller proceeds from the interlocutory sale of Mark Unit 202**,** approximately $104,308.73, to satisfy the Defendant's outstanding trial attorney fees in the underlying criminal case. *See* ECF Nos. 613; 703. The remaining balance of the Mark Unit 202's net seller proceeds is approximately $133,188.83 (the "Mark Unit 202 Forfeited Proceeds" and part of the "Forfeited Mark Units").

### b. *Maria Tardon, Artemio Tardon and Kyte Schooll's Claims to Forfeited Vehicles*

On December 7, 2014, Kyte Schooll, Maria Tardon, and Artemio Tardon jointly filed their Petition to Assert Third-Party Interest in Forfeited Property, and on December 14, 2014, they filed a Supplemental Petition Asserting Third-Party Interest in Forfeited Property.  [ECF Nos. 631; 638]. After the start of an evidentiary hearing on their claims in December 2015, the Court dismissed their petition without prejudice. *See* ECF Nos. 722; 729; 732; 745.

On January 14, 2016, Artemio Tardon, Maria Tardon, and Kyte Schooll jointly re-filed their pending Amended Petition for Third-Party Interest in Forfeited Property [ECF No. 735] (hereinafter, the "Vehicle Petition"), in which they asserted: "Florida car title records and other transactional records show that [the Rolls Royce] is owned by Maria [Tardon] and Artemio [Tardon]; [and the Mercedes Benz] is owned by Maria [Tardon], Kyte Schooll, and Artemio [Tardon]." [ECF No. 735, p. 2]. Additionally, they claimed that "interest in [the Forfeited Vehicles] is vested in the Petitioners, not the defendant, and

Petitioners' interest is superior to any claimed by the defendant." *Id.* Artemio Tardon, Maria Tardon, and Kyte Schooll "claim[ed] all legal right, title and interest in [the Forfeited Vehicles]," and asserted that "any claim of the defendant was extinguished prior to the forfeiture judgment." *Id.* at pp. 2-3.

On April 21, 2016, upon motion by the United States, the Court dismissed with prejudice Artemio Tardon's claim to the Mercedes Benz because Florida Department of Highway Safety and Motor Vehicles ("DMV") records showed that he was not a titled owner of the vehicle. *See* ECF No. 762. Instead, DMV records indicated that the Defendant, Kyte Schooll, *or* Maria Tardon are the current titled owners of the Mercedes Benz. *See id.* at p. 10.

### c. *Miamark's and Murano's Claims to Forfeited Mark Units and Murano Unit 908*

On December 2, 2014, Miamark and Murano jointly filed their Petition to Assert Third-Party Interest in Forfeited Property, and on December 14, 2014, they filed a Supplemental Petition Asserting Third-Party Interest in Forfeited Property. [ECF Nos. 623; 637]. After the start of an evidentiary hearing on their claims in December 2015, the Court dismissed their petition without prejudice. *See* ECF Nos. 722; 729; 732; 745.

On January 14, 2016, Miamark and Murano jointly re-filed their pending Amended Petition for Third-Party Interest in Forfeited Property [ECF No. 734] (hereinafter, the "Condominium Petition"), in which they asserted an ownership interest in "condominiums described as 1155 Brickell Bay Drive, Units 202, 502, and 2703, Miami,

Florida 33132, and 1000 S. Pointe Dr., Unit 908, Miami Beach, Florida 33139." [ECF No. 734, p. 1]. They claimed that "[Miamark] is the record title owner via purchase of 1155 Brickell Bay Drive, Units 202, 502, and 2703, Miami, Florida 33131 [or the Forfeited Mark Units]." *Id.* Additionally, Miamark claimed "all legal right, title and interest in the property, with no viable prior interest or claim of the defendant having ever existed prior to the forfeiture judgment." *Id.* at 2.

In addition, Murano asserted that it "holds ownership of [the Murano Unit 908] by virtue of purchase and satisfaction of all mortgages on the property . . ." *Id.* Additionally, Murano claimed "all legal right, title and interest in [the Murano Unit 908], with no viable prior interest or claim of the defendant having ever existed prior to the forfeiture judgment." *Id.*

During a status hearing on May 25, 2018, before the Undersigned, Miamark's counsel clarified that Miamark is claiming only the Mark Unit 202 Forfeited Proceeds, and not all of the net seller proceeds from the interlocutory sale of Mark Unit 202, which included funds released to satisfy the Defendant's outstanding trial attorney fees in the underlying criminal case.  [ECF No. 817 (Evidentiary Hr'g Tr. 49:9-15)].

No other third-party claimants have filed a judicial claim to the Forfeited Vehicles, Forfeited Mark Units, Mark Unit 202 Forfeited Proceeds, or Murano Unit 908, and the time for filing a claim has expired.

### d. Summary Judgment Motions

On October 6, 2016, the United States filed a motion for summary judgment against the claims made by Artemio Tardon, Maria Tardon, and Kyte Schooll to the Forfeited Vehicles, which has since been fully briefed. [ECF Nos. 776; 777; 778].

On May 14, 2018, Judge Lenard referred the Vehicle Petition, Condominium Petition, and all pending motions, which included the motion for summary judgment regarding the Forfeited Vehicles, to the Undersigned. [ECF No. 813].

On May 30, 2018, after a status conference on May 25, 2018, the Undersigned set June 25, 2018 as the deadline for additional motions for summary judgment and scheduled a two-day evidentiary hearing for February 19 to 20, 2019. [ECF Nos. 817; 820]. On June 22, 2018, the United States filed a motion for summary judgment against Miamark's claim to the Forfeited Mark Units, which has since been fully briefed. [ECF Nos. 825; 827; 834]. And on June 25, 2018, the United States filed a motion for summary judgment against Murano's claim to the Murano Unit 908, which has since been fully briefed. [ECF Nos. 826; 832; 835].

### e. Evidentiary Hearing

The Undersigned held an evidentiary hearing on Petitioners' claims on February 19, 2019. During the evidentiary hearing, Petitioners presented no witnesses, and they submitted nine exhibits, which included title documentation and a selection of company records. [ECF Nos. 876; 877 (41:24-46:18, 47:12-21, 135:3-19)]. At the conclusion of

Petitioners' case, the United States requested, pursuant to Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law and renewed the pending motions for summary judgment against Petitioners' claims to the Forfeited Vehicles, Forfeited Mark Units, and Murano Unit 908.  *See* ECF No. 877, 48:6-50:24. The Undersigned reserved ruling on the Rule 50 motion, and the United States presented FBI Special Agent Daniel Gaitan. The United States submitted more than 100 exhibits in support of its defense. *See id.* at 50:25-134:11; [ECF Nos. 880; 884].

After the evidentiary hearing, the Undersigned required [ECF No. 889] the parties to attend a mediation with United States Magistrate Judge Chris M. McAliley, who mediated the case on July 11 and July 22, 2019 [ECF Nos. 898; 900]. The case did not settle.

The Undersigned also required the parties to each submit a proposed Report and Recommendations and a rebuttal to the opposing party's proposal. The parties complied. [ECF Nos. 885; 886; 904; 905]. The rebuttal memoranda were filed on October 21, 2019.

## III.    Applicable Legal Standards

Following the entry of a preliminary order of forfeiture, a person, "**other than the defendant**, asserting a legal interest in property which has been ordered forfeited . . . may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property."  21 U.S.C. § 853(n)(2) (emphasis added).

Section 853(n) provides, in relevant part, as follows:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

12

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant **or** was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; **or**

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6) (emphasis added).

Thus, there are three grounds on which a petitioner can defeat the United States' entitlement to property under the forfeiture order: (1) title to the property was vested in the petitioner rather than the defendant at the time of the act which made the property subject to forfeiture; (2) the petitioner's title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture; **or** (3) that the petitioner purchased his interest without reasonable cause to know that the property was subject to forfeiture.

A third-party petitioner bears the burden of proof in the forfeiture ancillary proceeding to demonstrate by a preponderance of the evidence one of these grounds. *See* 21 U.S.C. §853(n)(6); *see also United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001). In determining whether a petitioner has met this burden, the district court must consider

13

relevant portions of the criminal record, including the forfeiture phase of the trial, and additional evidence presented at a hearing. *See* 21 U.S.C. § 853(n)(5); *see also United States v. Cohen*, 243 F. App'x 531, 533-34 (11th Cir. 2007) (upholding court's reliance on facts established in criminal case in considering third-party claim).[2]

The ancillary proceeding is not a forum in which third parties can re-litigate issues that were already determined in the criminal case. *See United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012) (stating a third-party claimant "may not relitigate the merits of a forfeitability determination" and upholding district court's finding that claimant lacked standing to challenge the validity of the preliminary order of forfeiture); *see also United States v. Cooper*, 679 F. App'x 738, 742 (11th Cir. 2017) (affirming order dismissing third party petition and noting that petitioner lacked standing to challenge the legality of the seizure which purportedly gave rise to the forfeitures).

But that same principle also means that the United States cannot relitigate the issue of whether the properties are traceable to the money laundering offenses on which Alvaro was convicted. The jury already resolved that issue in its special verdict on the proposed forfeitures. [ECF No. 487].

---

[2]    In their proposed Reports and Recommendations and rebuttal memoranda, the United States and Petitioners refer to exhibits and testimony from the criminal trial, the forfeiture portion of the trial, discovery depositions and testimony and exhibits from the evidentiary hearing held by the Undersigned.

The jury did not, however, determine whether (1) Alvaro was the actual owner of the properties at issue (even though they are titled in Petitioners' names, not his name); (2) the Petitioners are parties "other than" Alvaro (and therefore cannot successfully pursue their petitions); and (3) the Petitioners hold merely naked title and therefore lack standing.

### a. Constitutional and Statutory Standing

Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *United States v. 960,000 Dollars in U.S. Currency*, 307 F. App'x 251, 255 (11th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also United States v. Henry*, 621 F. App'x 968, 971-72 (11th Cir. 2015) (quoting *United States v. Weiss*, 467 F.3d 1300, 1307-08 (11th Cir. 2006)) ("If a claimant lacks Article III standing to challenge a forfeiture, this Court does not have jurisdiction to consider the claim.").

"The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Henry*, 621 F. App'x at 972; *Gilbert*, 244 F. 3d at 911.

Thus, the burden of proof rests on the third-party petitioner throughout the forfeiture ancillary proceeding. *See United States v. Coffman*, 612 F. App'x 278, 284 (6th Cir. 2015). If a petitioner lacks standing, then the Court need not address the substantive

merits of its claim. *See United States v. Masilotti*, 510 F. App'x 809, 2013 WL 646375, at *1 n.2 (11th Cir. Feb. 22, 2013).

The Court looks to state law to determine the nature of a Petitioner's interest in the property, but federal law determines whether the Petitioner's interest in the forfeited property is superior and requires an amendment to the forfeiture order. *United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008); *see also United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) ("Standing in forfeiture cases has both constitutional and statutory aspects.").

Constitutional standing, also referred to as Article III standing, requires a petitioner to establish an "injury-in-fact" that is connected to the complained-of conduct, and to show that such injury is likely to be redressed by a favorable decision. *Henry*, 621 F. App'x at 971-72 (citing *Lujan*, 504 U.S. at 560-61).

Statutory standing requires compliance with the prerequisites of 21 U.S.C. § 853(n)(2), which oblige a claimant to be a person **"other than the defendant"** asserting a "legal interest in the property which has been ordered forfeited to the United States." *See United States v. Parenteau*, 647 F. App'x 593, 598 (6th Cir. 2016) (upholding dismissal of third-party petition on standing because claimant was not a person "other than the defendant" and lacked statutory standing); *see also Timley*, 507 F.3d at 1129-30 (claimant must show that he has a "legal interest" under 21 U.S.C. § 853(n)(2) to have standing).

16

Consequently, a defendant's nominee or straw man, lacking injury-in-fact, cannot establish *constitutional* standing to claim forfeited property, whereas a person who is "other than the defendant" can satisfy *statutory* standing under 21 U.S.C. § 853(n)(2).[3]

"[E]ach element of standing must be supported in the same way as any other matter on which the [party] bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Bischoff*, 222 F.3d at 878 (internal citation omitted). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the [opposing party's] conduct may be sufficient to show standing. However, when standing is raised at the summary judgment stage, the [party whose standing is in question] can no longer rest on mere allegations." *Id.* (internal citation omitted); *see also Henry*, 621 F. App'x at 972.

**"Bare legal title** . . . in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture." *Coffman*, 612 F. App'x at 286 (internal quotations omitted) (emphasis added). "In short, **courts look behind the formal title** to determine whether

---

[3]     The United States has previously argued that Petitioners should be precluded from relief under 21 U.S.C. § 853(n)(2) as defendant's alter ego, which the United States concedes would require the piercing of the corporate veil. [ECF No. 885, p. 12, n. 5]. But the Undersigned finds that the requirement that Petitioners be parties "other than the defendant" is a matter of statutory interpretation, so these additional theories from the United States and associated case law do not directly apply here. The United States did not attempt to demonstrate the alter ego theory through a piercing-the-corporate-veil analysis.

the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings of someone else." *Id.* (quoting *United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001)) (emphasis added).

In *Coffman*, the Sixth Circuit held that the petitioners (nominal account holders) failed to carry the burden that "they asserted primary dominion or control over the [forfeited] funds in the accounts." *Coffman*, 612 F. App'x at 286. The Court found the petitioner's husband "had primary control of the money coming into the accounts, the money when it was in the accounts, and the money going out of the accounts." *Id.* Because the defendant exercised dominion and control over the forfeited property, the Sixth Circuit upheld the district court's decision to deny the wife's petition claiming forfeited funds. *See id.*; *cf. Henry*, 621 F. App'x at 972-73 (finding in "close case" at the summary judgment stage, that third-party claimant sufficiently established standing where petitioner held nominal title of forfeited vehicle even though another person was listed on bill of sale and insurance, as there was a possibility that petitioner received payments for the vehicle from the defendant).

But at an evidentiary hearing, as opposed to a hearing on a motion to dismiss or one seeking summary judgment, a third-party petitioner must demonstrate, by a preponderance, "***primary*** dominion or control" over the property to establish standing. *Coffman*, 612 F. App'x at 286 (emphasis added).

18

### b.  *Silva* and the "other than the defendant" principle

On the morning of the evidentiary hearing, petitioners filed, as supplemental authority [ECF No. 862], a decision from the third-party ancillary proceedings held in *United States v. Silva*, U.S. District Court for the Southern District of Florida, Case No. 15-20727-CR-DPG ("*Silva*").

In *Silva*, the Court forfeited real properties owned by the defendant, Silva. Shortly thereafter, Maisons Floride LLC ("Maisons Floride") filed a third-party petition, executed by the defendant's daughter, claiming a superior interest in the net proceeds of the assets, which had been sold in a court-ordered interlocutory sale. *See Silva*, ECF No. 120, pp. 4-7.

After an evidentiary hearing held by Magistrate Judge Alicia Otazo-Reyes, United States District Judge Darrin Gayles adopted Judge Alicia Otazo-Reyes' Report and Recommendations, and, over the objections of the United States, found that (1) based on public records filed with the Florida's Department of State, Maisons Floride is *someone other than the defendant* under 21 U.S.C. § 853(n)(2), and (2) that the "Government failed to meet its 'very heavy burden' to pierce the corporate veil" under Florida law. *Silva*, ECF No. 123, pp. 2-3 (citing *Johnson v. New Destiny Christian Center Church, Inc.*, 303 F. Supp. 3d 1282, 1287 (M.D. Fla. 2018) (quoting *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994)). The *Silva* Court then recognized the claim of Maisons Floride in

part and forfeited only a third of the net proceeds from the sale of the real properties.[4]
*See Silva*, ECF No. 123, p. 3.

In *Silva*, the United States argued that Maisons Floride was not a party "other than
the defendant." It argued that Silva was in total control of the entity, that no one else
played a role in its activities and that no corporate formalities were followed. The United
States relied on the following factors to support its position:

1.  Silva's admission, in her factual proffer for her change of plea, that "as a result
of [her] illegal conduct in the immigration fraud scheme, she derived over $1,500,000
during the period of the charged conspiracy[;]" and that she "used funds, in part to
maintain and pay mortgages on her real properties, including [the Williams Island
Property and the Bay Drive Property]." [ECF No. 48, p. 4].

---

[4]     Judge Otazo-Reyes recommended dividing the remaining two thirds among the
defendant's children, who were the other members of Maisons Floride. *See Silva*, ECF No.
120, pp. 12-13. The United States took (and still takes) issue with that relief, but it never
pursued an appeal of Judge Gayles's Order adopting the Report and Recommendation.
Because the issue of piercing the corporate veil and the Florida law doctrine that a
corporate officer or shareholder lacks standing to personally contest a forfeiture of
property owned by the corporation is not involved in the instant case, the Undersigned
has no reason to discuss those concepts in detail here. *See United States v. Devlin*, No. 6:11-
CR-56-ORL-28KRS, 2013 WL 275968, at *8 (M.D. Fla. Jan. 22, 2013) (quoting *United States
v. DeGregory*, No. 05-60201-CR, 2007 WL 949804, at *1 (S.D. Fla. March 19, 2007) ("Under
Florida law, a corporate officer or shareholder does not have standing to contest a
forfeiture of property owned by the corporation.").

2.   Silva, as Member, was the only signatory for the Maisons Floride bank accounts accounts ending in 7462 and 9259.

3.   Maisons Floride's Answer to Plaintiff's Interrogatories, executed by Silva's daughter, Andreina Colmenares, states: "There are no accounts in Claimant's name," and "Claimant has no accounts." [ECF No. 121, p. 5].

4.   Maisons Floride did not produce any evidence to show that anyone other than Silva performed any actions for Maisons Floride, which makes the corporate entity "truly the Defendant" and therefore not entitled to assert a claim. *Id.* at p. 7.

5.   Silva's daughter presented no evidence showing that she played any role in the operation of Maisons Floride -- and, in fact, did not testify at the hearing.

But in her Report and Recommendations, Judge Otazo-Reyes focused only on record title to reject the United States' arguments. Specifically, Judge Otazo-Reyes explained that "Claimant has produced the State of Florida corporation records for Maisons Floride, showing it to be an active corporation from its inception in 2012 through 2017." *Silva*, ECF No. 120, p. 11. And based solely on that, Judge Otazo-Reyes concluded that "because Maisons Florida has been documented to constitute a legal entity in Florida, it cannot be said that it is 'truly the Defendant'" for purposes of 21 U.S.C. § 853(n)(2). *Id.*

Not surprisingly, the United States filed Objections to this Report and Recommendations. *Silva*, ECF No. 121. In its Objections, the United States emphasized

several facts which it believed demonstrated Silva's control over Maisons Floride and established that the entity was not someone other than the defendant.

For example, the United States highlighted a substantial amount of evidence: (1) Silva formed Maisons Floride; (2) Silva was the principal manager member/manager and registered agent; (3) Silva signed the original documentation forming the corporation and verifying subsequent annual reports; (4) Silva was the sole signatory on financial accounts held in the name of Maisons Floride; (5) Silva purchased the condominium unit in Aventura and then transferred the property to Maisons Floride by quitclaim deed for $10; (6) Silva was a managing member/manager of Maisons Floride at the time of the quitclaim deed; (7) Silva used the same mailbox address used by Maisons Floride for the Aventura condominium and another condominium it purchased in Miami Beach; (8) Silva acknowledged in her factual proffer (supporting her guilty plea) that she used funds derived from the offenses to make mortgage payments and other payments for the real properties at issue in the forfeiture proceeding; and (9) although Silva's daughter's title changed to director/manager of Maisons Floride over the years, she did not become a signatory on its bank accounts -- and did not even know about them.

In sum, the United States urged the District Court to conclude that the sole piece of evidence in Maisons Floride's favor is bare, naked legal title. And it argued that the Court was required to "go 'behind the formal title' and not rely solely on the names as written in the public records." *Silva*, ECF No. 121, p. 6. Similarly, it argued that "sole

reliance . . . on the Petitioner's electronic filings with the State of Florida should not be dispositive of whether or not the Petitioner is "someone other than the Defendant" within the meaning of Section 853(n)(2), and therefore, has standing to challenge forfeiture of the subject properties." *Id.* at p. 8. The United States took the position that Colmenares was "no more than a nominee director for Petitioner [Maisons Floride], and that Petitioner was solely controlled by the Defendant." *Id.* at p. 10.

Despite the circumstances outlined above, the District Court adopted in its entirety the Report and Recommendations. In a two-and-a-half-page Order [ECF No. 123], the Court addressed the "other than the defendant" issue in a one-sentence observation, noting that Florida's corporation records "clearly show Claimant as a legal entity separate and distinct from Silva." *Silva*, ECF No. 123, p. 2.

The Undersigned has several observations and conclusions to make about *Silva*.

First, at the risk of stating and repeating the obvious, the Undersigned is not bound by *Silva*. The Undersigned is bound only by decisions of the United States Supreme Court and the Eleventh Circuit Court of Appeals. The decision of a federal district judge is not binding precedent in a different judicial district, the same judicial district -- or even upon the same judge in a different case. *Camreta v. Greene,* 563 U.S. 692, 709 n.7 (2011); *Dow Jones & Co., Inc. v. Kaye,* 256 F.3d 1251, 1258 n.10 (11th Cir. 2001); *Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co., Ltd.*, 240 F.3d 956, 965 n.14 (11th Cir. 2001); *see also Martins v. Royal Caribbean Cruises Ltd.*, 174 F. Supp. 3d 1345, 1351 n.4 (S.D. Fla. 2016).

Second, neither the Report and Recommendations nor the Order adopting it cite to any law to support the notion that a corporate filing is always sufficient to, by itself, establish statutory or Article III standing at an evidentiary hearing in an ancillary forfeiture proceeding.

Third, if the *Silva* ruling were to be followed by this Court (or other Courts), the United States would be foreclosed from challenging the standing of all corporate petitioners and claimants who took the strategic step of filing incorporation records with the State.

Fourth, *Silva* would permit criminals to act with impunity and protect their assets and substitute assets by simply taking the administrative step of incorporating (while still maintaining dominion and control of the assets technically listed in the name of another). That one strategic step would be sufficient to establish standing and prevent further inquiry -- because corporate records would show the entity as technically separate from the convicted criminal defendant. *See generally United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000) ("Failing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity.").

This, in my view, makes no sense. And it would render superfluous the statutory requirement that a petitioner be someone "other than the defendant."

Although the Eleventh Circuit Court of Appeals has not squarely considered how to interpret "other than the defendant" under 21 U.S.C. § 853(n)(2), the Undersigned is persuaded by the Sixth Circuit Court of Appeals' careful review of standing and this statute-based limitation in *United States v. Parenteau*, 647 F. App'x 593 (6th Cir. 2016).

In *Parenteau*, a case similar to the one presented here, the Sixth Circuit found that interpreting 21 U.S.C. § 853(n)(2)'s requirement that petitioner be a person "other than the defendant" is one of "ordinary statutory construction," and not governed by federal common law or state law. *See id.* at 598-99 (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989)) ("[T]he presumption is that 'in the absence of a plain indication to the contrary,' a federal statute's application 'is not . . . dependent on state law.'"). The issue "is not whether [petitioner] has a property right in the first place but rather *who* is eligible to petition for relief . . ." *Id.* at 598 (emphasis in original).

The *Parenteau* Court rejected the notion that record title ownership is sufficient to confer statutory standing: "the fact that an ancillary petition is not in the name of the criminal defendant is **not**, by itself, enough to conclude that the petitioner is a **person other than the defendant**." *Id*. at 596. (emphasis added).

In interpreting 21 U.S.C. § 853(n)(2), the Sixth Circuit focused on defendant's ownership and control of the third-party petitioner, a limited liability company, as well as the facts of the underlying criminal case, which established that the company's assets were "involved in [the defendant's] schemes." *See id.* at 596-98. The Sixth Circuit cited

petitioner's failure, aside from incorporation documents, to introduce evidence at the ancillary hearing that it had an identity separate from the defendant or that it had followed any corporate formalities, including recordkeeping. *See id.* at 596.

Moreover, the Sixth Circuit noted that it was undisputed the petitioner was "completely dominated" by the defendant, was a "mere façade" for the defendant, and that defendant "diverted funds" from the company for personal use. *Id.* The Court observed that "[n]othing suggests that [the company's] legal existence ever stood in the way of [the defendant's] manipulation of [the company's] assets." *Id.* at 598.

The *Parenteau* Court also reasoned that affording standing to "a corporate entity solely because that entity is legally distinct from a natural person" would undermine two policies that underpin the federal forfeiture scheme, that of defendant's punishment and of the United States' interest in finality in the defendant's sentence. *See id.* at 596. "Section 853(n)(2) is best read to preclude such a result." *Id.*

The title-focused approach rejected by *Parenteau*[5] is, however, the precise perspective used by the Court in *Silva*.

The Undersigned agrees that the Sixth Circuit's approach is supported by the language of 21 U.S.C. § 853(o), which specifically provides that the statute's provisions "shall be liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(o). In

---

[5]     The United States cited *Parenteau* in *Silva,* but neither the Report and Recommendations nor the Order adopting it discussed it at all.

other words, it would be inconsistent with the forfeiture statute's remedial purposes to enable a defendant to avoid forfeiture by simply establishing a shell company.

Moreover, requiring the United States to sustain a "heavy burden" for piercing the corporate veil under Florida law is also inconsistent with the petitioners' burden of proving standing "with the manner and degree of evidence required at the successive stages of litigation." *See Bischoff*, 222 F.3d at 878; *see also Henry*, 621 F. App'x at 972; *Gilbert*, 244 F. 3d at 911; *Coffman*, 612 F. App'x at 284.[6]

Although nominal title may survive summary judgment, petitioners are required to produce more than a handful of company records to prove their standing at the evidentiary hearing. *Accord Coffman*, 612 F. App'x at 286; *cf. Henry*, 621 F. App'x at 972-73 (finding by Eleventh Circuit that nominal title sufficient at summary judgment stage to sustain title when there was a possibility petitioner paid for vehicle).

If "merely evidence of title was dispositive, [determining whether petitioner had statutory or constitutional standing] would be an easy matter." *United States v. Reed*, No. 1:10cr133-1, 2015 WL 1809343, at *2 (S.D. Ohio, April 21, 2015) (noting that title alone will not suffice and explaining that the Court must evaluate facts concerning domain and control over the property at issue).

---

[6]     The United States did not pursue the alter ego theory in its proposed Report and Recommendations.

Therefore, as outlined above, the Undersigned will not rely solely on the mere record title ownership of Petitioners. Instead, the Court will look behind title (which is, to be sure, *a* factor to consider) to see whether Petitioners have met their burden of establishing statutory standing by demonstrating that they are parties "other than the defendant." *See United States v. Gamory*, No. 08-CR-153-1-TWT, 2010 WL 3880880, at *1, *4 (N.D. Ga. Sept. 28, 2010) (finding defendant's father lacked standing to contest forfeiture of vehicle titled in his name because undisputed evidence was that he exercised no dominion and control); *see also United States v. Hovind*, No. 06-CR-83/MCR, 2009 WL 2369340, at *1, *5 (N.D. Fla. July 29, 2009) (finding nominee who exercised no dominion or control over the forfeited property lacks a legal interest under state law, and therefore lacks standing, even though he was the titled owner); *United States v. Gomez*, No. 98-CR-3002, 2000 WL 34029288, at *1, *2 (N.D. Iowa Aug. 3, 2000) ("Possession of mere legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture."); *United States v. Rogers*, No. 94-CR-138(FJS), 1996 WL 252659, at *5 (N.D.N.Y. May 8, 1996) (finding nominee's name on title to car was a sham to protect true owner from forfeiture).

The Undersigned's conclusions about the standing requirements for Petitioners in ancillary proceedings following a preliminary forfeiture order in a criminal case are entirely consistent with a comprehensive ruling which Judge Lenard entered [ECF No. 762] when the Court granted the United States' motion to dismiss Artemio Lopez

Tardon's ("Artemio") Petition claiming an interest in the Mercedes Benz because he is not listed as a titled or registered owner of the Mercedes. Although Artemio claimed to have "sufficient ties to ownership of the vehicle" such that he should have an opportunity to establish that interest, Judge Lenard rejected that theory. *Id.* In doing so, Judge Lenard emphasized the significance of standing and a petitioner's inability to contest the forfeiture without standing.

Specifically, the Court issued several holdings relevant to the standing requirement. Although the Court did not specifically discuss the issue of whether Artemio was a person "other than the defendant," it *did* emphasize the Court's obligation to scrutinize a petition to determine if the petitioner did more than simply allege an interest in property. The following holdings entered earlier in this case inform the Undersigned's analysis of whether Petitioners have met their burden of establishing that they are parties "other than the defendant" and therefore have statutory standing:

1. [I]f a claimant is unable to establish that he has an interest in the forfeited property under state law, the **"inquiry ends**." *United States v. Ramunno*, 599 F.3d 1269, 1272 (11th Cir. 2010). This is because "in order to contest a forfeiture, a claimant **first** must demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no 'case or controversy,' in the constitutional sense, capable of adjudication in the federal courts." *United States v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1543 (11th Cir. 1987.)

2. "Standing . . . 'is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.'" *AT & T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007) (quoting *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)). In fact, "every court has

an independent duty to review standing as a basis for jurisdiction at any time, for every case it adjudicates." *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999).

3. "[T]he plain language of 21 U.S.C. § 853(n)(3) requires that a claimant do more than simply allege that he has an ownership interest in forfeited property—he must, inter alia, "set forth the nature and extent of [his] right, title, or interest in the property," and "the time and circumstances of the [his] acquisition of the right, title, or interest in the property[.]"[7] The **vague and conclusory** assertions made in the instant Petition are simply **insufficient.** *See United States v. Kokko*, No. 06-20065-CR, 2007 WL 2209260, at *5 (S.D. Fla. July 30, 2007) ("Consistent with § 853(n)(3), a claimant of some interest in property must do more than state that interest in a conclusory fashion[.]").

[ECF No. 762, pp. 8-10 (emphasis added)].

### c. *Alleged Distinction Between Forfeiture of Substitute Assets and Forfeiture of Tainted Property*

Petitioners' proposed report implies a distinction between applicable rules and procedure for forfeited assets that are substitute property (or so-called "untainted" property) and assets which are directly forfeited property (or facilitating and/or derived "tainted" property). [ECF No. 886, pp. 3-4]. The Undersigned does not find this purported distinction to exist.

---

[7]     The word, "interest," is from Section 853(n)(2), which authorizes "any person, other than the defendant, asserting a legal interest in property" to petition for a hearing to "adjudicate the validity of his alleged interest in the property." As noted, subsection (3) mentions the petitioner's "right, title, or interest" in the property -- which means that an "interest" may well be different than title ownership or some other type of right. The statute does not, however, define "interest."

First, the Eleventh Circuit has made it clear that the purpose of the ancillary proceeding is to determine the ownership of the forfeited property, which makes it akin to a quiet title proceeding. *See, e.g., Gilbert*, 244 F.3d at 911 (stating that the ancillary proceeding is "essentially a quiet title proceeding"); *see also United States v. Amodeo*, 916 F.3d 967, 972 (11th Cir. 2019) ("Although it occurs in the context of criminal forfeiture, the ancillary proceeding is civil in nature.").

Second, the nature of the proceeding remains a quiet title proceeding regardless of whether the forfeited assets are substitute or directly forfeited property. *See generally* 21 U.S.C. § 853(n) (providing no distinction between forfeited property); *see also United States v. Fleet*, 498 F.3d 1225, 1228 (11th Cir. 2007) (holding provisions in the subsection pertaining to forfeiture of facilitating and derived property, 21 U.S.C. § 853(a), apply in the same way to the subsection pertaining to forfeiture of substitute property, § 853(p)).[8]

Third, regardless of whether forfeited assets are so-called "untainted" property or facilitating or derived "tainted" property, a petitioner in an ancillary proceeding has the same threshold burden of establishing that a petitioner has standing to contest the forfeiture. Once standing is established, a petitioner has the burden of meeting one of the criteria listed in 21 U.S.C. § 853(n)(6) by a preponderance of the evidence. Neither the

---

[8]     *Fleet* noted that (1) statutory language mandating the forfeiture of substitute property "does not convey discretion" and (2) the word "any" is "not susceptible to fudging either. *Id.* at 1229. Therefore, the Court held, there is no stated exception for homestead property or entireties property from the substitute property provision of the federal criminal forfeiture statute, 21 U.S.C. § 853(p).

burden to establish standing nor the requirement to establish the statutory criteria is affected by the nature of the assets (i.e., substitute proceeds or tainted property).

### d. *Standing v. Merits*

Although standing to contest the forfeiture may sometimes overlap with the merits of a petitioner's claim, that is not always correct. For example, a third party may have an ownership interest in the property sufficient to establish standing under Section 853(n)(2) and Article III of the Constitution, but he may not have, for example, acquired that interest before the time when the property became subject to forfeiture and thus fail to prevail on the merits under Section 853(n)(6)(A). *See, e.g., United States v. Oregon*, 671 F.3d 484, 490 (4th Cir. 2012) (finding possession of a "legal interest" in the property is sufficient and allowed States, as obliges of an escrow account, to have standing -- but their interest was not superior to that of the defendant tobacco company); *see also Timley*, 507 F.3d at 1130 n. 2 (emphasis added) (stating section 853(n)(2) requires initial showing of a "legal interest" to obtain an ancillary hearing but section (n)(6) requires a showing of a "*superior* legal interest" to actually prevail at the hearing).

As a practical matter in this case, however, this distinction is academic, as the United States is pressing only the standing issue, albeit both the statutory and constitutional standing theories. If the United States is correct and (1) Petitioners lack statutory standing because their record title ownership is insufficient to establish that they are "other than the defendant" or (2) Petitioners are mere naked title holders and

cannot establish Article III constitutional standing, then they lack the requisite "legal interest" to amend the forfeiture order. *See Morgan*, 224 F.3d at 343 (finding claimant -- the wife of the criminal defendant -- who had no dominion or control over joint bank account had no "legal interest" under federal law, despite state law interest)[9]; *cf. United States v. Weiss*, 467 F.3d 1300, 1303 n. 1, 1311 (11th Cir. 2006) (emphasis in original) (discussing standing and citing U.S. Supreme Court precedent for principle that "federal courts have consistently adhered to one major proposition [about standing] without exception: *One who has no interest of his own at sake always lacks standing*" and mere nominee lacks the legal interest to establish standing).

## IV.   Analysis

Although state law determines the nature of a claimant's interest in forfeited property, "**straw owners** and persons who might have unknowingly been in possession of property that is seized **do not** necessarily suffer an injury that is sufficient to demonstrate standing." *Henry*, 621 F. App'x at 972 (emphasis added). Likewise, "[**n]ominee** connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does **not** connote the transfer or assignment to the nominee

---

[9]   The *Morgan* Court explained that "failing to look beyond bare legal title . . . would foster manipulation of ownership by persons engaged in criminal activity." *Morgan*, 224 F.3d at 343. It also stated that Congress noted that Section 853(n)(6) "should be construed to deny relief to third parties acting as nominees of the defendant." *Id.*

of any property in, or ownership of, the rights of the person nominating him." *Id.* (emphasis added).

Therefore, because there is no dispute that Petitioners are in fact listed as the record title owners of the properties at issue, the Undersigned will evaluate the facts to determine if Petitioners have established statutory standing by demonstrating primary dominion or control over the properties (i.e., whether they are "other than" Alvaro).

Because Petitioners bear the burden of establishing standing, this analysis will first discuss the facts which they rely on, other than record title, and then it will outline the United States' factual arguments. The evaluations will begin with the real properties.

### a. Petitioners' Position Re: The Real Properties

From an overarching perspective, Petitioners contend that the documents establish that (1) the LLCs exist and are validly-formed entities under Florida law; (2) the owners of the LLCs, as expressly stated in the attorney-drafted corporate documents that the individuals personally signed, are Maria Tardon, Artemio and Nieves Tardon, in equal one-third shares; (3) the LLCs own the real estate; (4) the deeds, mortgages, and other documents establish that the LLCs own the properties; (4) the LLCs have power to dispose of the real estate; and (5) the forfeiture order adversely affects them and impedes the exercise of their property rights.

In other words, Petitioners say they are "clearly 'other' than the defendant." [ECF No. 905, p. 6].

Recognizing that the United States contends that the LLCs have mere naked title and lack dominion or control, the LLC Petitioners say they are relying on more than the undisputed corporate and real estate records. Because no live witness testified at the evidentiary hearing on Petitioners' behalf, they rely on evidence from the criminal trial and other pre-hearing evidence. They point to the following factors:

1.  The presence and participation of the family members in traveling from Spain to Miami and meeting with corporate counsel to establish the LLCs in order to acquire the real estate;[10]

2.  The fact that family members would manage the real estate assets when necessary;

3.  The family members used the condominiums for their stays in the United States;

4.  "Substantial financial contributions made by family members other than the defendant to the acquisition of the real estate at issue";[11]

5.  The absence of any showing that Defendant caused any diminution of the

---

[10]    Attorney Peter Lopez's deposition testimony shows that realtor Daisy Martins was responsible for introducing Artemio to Lopez in Miami, and that the purpose of the LLCs was to purchase the Murano 908 property. [ECF No. 702-4, pp. 18-20]. In addition, Lopez said he met with Artemio several times that week and that he understood that the LLC was the buyer in the transactions. *Id*.

[11]    The Undersigned will outline the specifics of Petitioners' presentation on this point later in the Report.

LLCs' assets;

6.      The Tardon family members in Spain were very wealthy and had extensive property interests;

7.      When the rent did not cover expenses, "the money for the homeowner associate fees, the property taxes, . . . came from Spain" [ECF No. 524, pp. 83-84][12];

8.       All distributions were used to pay the expenses of managing the LLCs and there was no showing of any excess compensation or reimbursement to the Defendant;

9.    The LLC entities are family-owned businesses, a fact the agent confirmed [ECF No. 143, p. 124], and that it was reasonable to use family members living in the United States, such as Alvaro, for day-to-day management of the rentals and payments to the LLCs, including the use of professionals to assist in real estate activities.

### b.    *Petitioners' Position Re: Their Financial Contributions to Acquire the Real Estate*

Petitioners' latest articulation of their arguments concerning the funding for the acquisition of the real properties at issue here was asserted in their Rebuttal to the United States' Proposed Report and Recommendations. [ECF No. 905]. They rely on the following points:

> With regard to the condominium units at The Mark, the government showed that the down payment money was provided by a group of investors that included members of the Tardon family and Fabiani Krentz in what was then called Luxhouse International Rent Apartments Corp.

---

[12]      This testimony came from Sharon Cohen, who, at the time of her testimony in the criminal trial, was married to Defendant Alvaro.

ECF # 535:66–67 (testimony of Agent Gaitan: "'Yes, there's two, the Spanish one and then there's the Luxhouse International Rent Apartments Corp., which is the U.S. LLC.'"); *id*. at 69 (Gaitan: "This one, there was a series of escrow deposits made from Krentz, another wire from Valladares Garcia, and a wire from Artemio Lopez Tardon totaling $52,180 in the escrow account.'"); *see also* ECF #75-1:15-16 (affidavit of FBI Agent Madeleine Albrecht stating: "'In January of 2002, Lux House International Rent Apartments Corp., (Lux House Miami) was incorporated in Florida. Krentz, Artemio and Maria Lopez, ... Artemio's sister, were the officers and shareholders"'; "'Artemio deposited almost 600,000 Euros ... into the Lux House Spain account. These funds were wired to the Lux House Miami account on April 4, 2002"'; "'[m]ost" of approximately 3 million Euros sent for Krentz to purchase real estate in Miami was deposited by Artemio Tardon). ECF # 536:78–79 (government indicates that the purchase money for the units at The Mark may have "'come from The Collection's account"' as well as several "'third parties"'). At the ancillary hearing, Agent Gaitan confirmed this funding of purchases of the relevant units at The Mark. ECF # 877-1:82, 84, 89, 92. Similarly, the defendant's testimony, ECF Nos. 702-1, 702-2, Krentz sentencing transcript, ECF # 805-2, and forfeiture trial transcript, ECF Nos. 535, 536, 713, all confirm this financial history.

[ECF No. 905, p. 8].

Concerning Unit 908 at Murano Portofino, Petitioners say:

> [M]ortgages taken out by Artemio Tardon and Krentz on a property owned by Contion LLC (an entity whose membership was identical to the membership of Murano 908 LLC) funded the purchase.[13] Agent Gaitan

---

[13]     The Petitioners further explain in a footnote [ECF No. 905, p. 9, n. 8]:

*See* ECF # 536:79 (government closing argument describing evidence regarding obtaining an equity line of credit from another apartment to purchase Murano 908); *see also* ECF # 713:74 (showing principal payoff check for purchase of Murano 908 was from an account "'in the name of Alvaro Lopez Tardon, Artemio, **and** Maria D. Tardon Lopez ... in the amount of $483,355.75"'). On the other hand, the prosecutor's closing also argued that the other apartment (i.e., "The Continuum") (from which the line of credit was obtained) was "bought with dirty money." [ECF No. 536, 79].

explained at the criminal trial: "'Artemio Lopez Tardon is the one who's making a 798,000-plus loan payment on that mortgage.'" ECF # 525:26 (cited at ECF # 826-4:19). Agent Gaitan stated: "'Artemio, who had bought the [Contlon] property along with Fabiani,'" transferred title to the LLC as owner. ECF # 525:35 (cited at ECF # 826-4:28). Agent Gaitan's testimony at the evidentiary hearing included charts showing the acquisition and purchase of the relevant assets. ECF # 877-1:61–92. The testimony confirmed the transactions described in the forfeiture jury trial as to Murano 908, including the use of equity from an apartment purchased principally by Artemio Tardon in Miami Beach. *Id.* at 68–81. The testimony also showed funds going from Spain to a joint account in which Artemio Tardon, the defendant, and their sister, Nieves, were owners, followed by use of those funds to purchase Murano 908. *Id.* at 78."[14]

*Id.* at pp. 8-9.

### c.   The United States' Position Re: The Real Properties

The United States' contentions (included in their proposed Report) will be outlined in two sections. The first section concerns the three Mark units and the second section involves Murano Unit 908.

---

[14]   Petitioners further explain in a footnote:

Agent Gaitan also testified about his examination of real estate taxes paid during the year prior to the defendant's 2011 arrest. *Id.* at 93. The account from which 2010 taxes were paid was jointly owned by Artemio Tardon, the defendant, and their sister, Nieves, and approximately $2.5 million had been transferred to that account after it was wired from Spain. *Id.* at 94, 96–103. Agent Gaitan explained that the monies were sent by Artemio Tardon and others from Spain. *Id.* at 129. On cross-examination, Agent Gaitan explained: that he was "'able to trace who sent that money,'" and that the sources were "'**Artemio** and other sources of income.'" ECF # 877-1:129.

[ECF No. 905, p. 8, n. 9 (emphasis added)].

i.   <u>The Mark Units</u>

At the evidentiary hearing, Miamark offered only public company records, an operating agreement, and quitclaim deeds to substantiate its standing and interest in the Mark Units. *See* ECF Nos. 874-1 to 874-5.

The United States relies on the following to support its view that Miamark did not meet its burden of showing that it has a separate identity from the Defendant or that it followed corporate formalities:

1.      The quitclaim deeds for the Mark Units dispute Miamark's assertion in the Condominium Petition that it acquired title "via *purchases* on May 17, 2006 (Units 502 and 2703) and November 18, 2006 (Unit 202)." *Compare* ECF Nos. 874-3; 874-4; 874-5 *with* ECF No. 734 (Condominium Petition 2). The quitclaim deeds, however, have dates of November 2, 2006, and April 5, 2006 (twice). Petitioners have not explained this inconsistency.

2.      Alvaro executed purchase agreements to acquire Mark Unit 2703 and Mark Unit 202, and eventually, in or around 2001, he directed Fabiani Krentz, a convicted co-conspirator, to acquire title to the Forfeited Mark Units. *See* ECF Nos. 880-67; 880-65. Fabiani Krentz held title to the Forfeited Mark Units for approximately five years, before transferring the properties, via quitclaim deeds, to Miamark. *See* ECF Nos. 880-34; 880-99; 825; 880-74; 734 (Appendices B, C, & D). But in his deposition, Alvaro, as managing

member of Miamark, admitted that such transfers "are quitclaims. They **weren't sales**

. . . They **changed names** to Miamark." *See* ECF No. 880-50 (emphasis added).

3.      Although he managed and served as Miamark's registered agent, the

Defendant (i.e., Alvaro) did not observe corporate formalities and treated the company's

assets as his own. For example, although required by the company's operating agreement

to maintain records at the principal place of business, he did not do so. *See* ECF Nos. 880-

95; 880-42.

4.      Alvaro also used the Forfeited Mark Units to house his friends, including

David Pollack, a convicted co-defendant who resided in Mark Unit 202 for two years

without paying rent. Alvaro is the one who allowed Pollack to stay in the apartment

without paying rent. [ECF Nos. 520 (5/6/2014 Pollack Trial Tr. 21:1-21:17; 144:9-144:13);

880-44].

5.      Alvaro failed to segregate Miamark's funds in accordance with its

operating agreement. It took more than two years after Miamark's formation for the

Defendant to open a company bank account (at Colonial Bank). *See* ECF Nos. 880-41, p.

10; 825.

6.      Before and after opening the account, Alvaro used personal and other

accounts to receive rental income and satisfy the company's expenses instead of a

designated business account as required by the operating agreement. *See* ECF Nos. 880-

47 (Miamark Tardon Dep'n 117:19-118:16); 884-1.

7.     Defendant also used Miamark's bank account to pay for expenses related to his other real properties. *See id.*; ECF No. 880-41.

8.     Despite provisions in its operating agreement (Section 8.4) on timely preparation and filing of tax returns, Miamark failed to file any federal income tax returns. *See* ECF Nos. 880-95; 825 (Exhibit G, pp. 53-118); 880-61; 880-43 (Tardon Dep'n 134:13-136:5).

9.     The Defendant and his then-wife, Sharon Cohen, instead personally claimed the Forfeited Mark Units on *their* jointly filed federal tax return in 2008. *See id.*

10.     At trial, Sharon Cohen confirmed that the Defendant owned the Forfeited Mark Units, and that the Defendant created limited liability companies to hold real properties that really belonged to him. *See* ECF No. 523 (5/13/2014 Cohen Trial Tr. 77:13-80:19).

11.     In fact, before his conviction, the Defendant often represented that he was the owner of Miamark and the Forfeited Mark Units. Miamark's articles of organization identify the Defendant, Alvaro, as the company's managing member. *See* ECF Nos. 880-96; ECF No. 880-95.

12.     A member of a Florida limited liability company is an owner, and by default, a Florida limited liability company is member-managed. *See* Florida Statutes §§ 608.402(20), (21), 608.422(1) (2006); Florida Statutes § 605.0407 (2013 & 2019).  To the extent an *internal* operating agreement conflicts with *publicly filed* articles of organization and

reports, outsiders may "reasonably rely" on the external record. *See* Florida Statutes § 605.0107(4)(b) (2013 & 2018) ("The record prevails as to other persons to the extent the other persons reasonably rely on the record.").

13.     The Defendant, regardless of his intended status within the company, held himself out to be an owner of Miamark and the Forfeited Mark Units on several occasions. In correspondence with The Mark's condominium association, **he** was identified as the "owner" of the Forfeited Mark Units "through various entities." *See* ECF No. 884-1 (emphasis added).[15] In addition, in public documents filed at the time of Miamark's formation through his indictment in 2011, the Defendant consistently identified himself as a managing member, and therefore, an owner of Miamark. *See* ECF No. 880-96.

14.     After Alvaro was criminally charged in 2011, Miamark submitted a 2013 restatement and 2014 annual report indicating that he was its managing member. *See* ECF No. 880-96. Furthermore, in support of the interlocutory sale of Mark Unit 202, Richard Klugh, criminal defense counsel for the Defendant, submitted a sworn declaration to the Court that verified Defendant's status as Miamark's "managing member." *See* ECF Nos. 406; 406-3.[16]

---

[15]     This exhibit is a letter, sent on an attorney's letterhead and signed by the Miami attorney, advising that his client, Alvaro, is the owner of units 202, 502 and 2703 "through **his** various entities." (emphasis added).

[16]     In particular, Mr. Klugh's sworn declaration said:

15.     In other pre-trial litigation, the Defendant argued (in a motion filed by Mr. Klugh, as counsel for Alvaro) that he "concealed nothing" because the company records for Miamark "list the **defendant** as the *owner* and give his **address** and **identifying information**." [ECF No. 75 (emphasis in original)]. Similarly, the motion represented that "every single property as to which an LLC was the purchaser was "identified by name with the defendant" and that "**all** of the LLCs and corporations go directly back to the defendant on the official Florida records sites. . . ." *Id.* (emphasis in original).

16.     In spite of these prior admissions, the Defendant, after his conviction and the forfeiture of the Forfeited Mark Units, has claimed to be only a manager of Miamark; the company, he has asserted, really belongs to his family members.

For instance, shortly *before* the Defendant's conviction, on or about April 27, 2014, Miamark's annual report indicated that the Defendant was its "MGRM" and "MANAGING MEMBER." *See* ECF No. 880-96. However, *after* his conviction in or around December 2014, the Defendant verified Miamark's initial petitions claiming the

---

The undersigned, attorney for Alvaro Lopez Tardon, has verified the authenticity of the documentation of the **defendant's stipulation to sell property** in this case [D.E. 403-1], of the power of attorney from the defendant to the undersigned granting the undersigned authority to conduct transactions including the present property sale (attached as Ex. A to the joint supplement to joint motion to approve stipulated sale), and of the **defendant's status as managing member of MiaMark LLC** (Ex. B to the joint supplement to joint motion to approve stipulated sale).

[ECF No. 406-3 (emphasis added)].

Forfeited Mark Units as the company's "authorized manager." *See* ECF Nos. 623; 637. Then, in Miamark's 2015 annual report, publicly filed on or about April 18, 2015, the Defendant was listed only as the company's manager. *See* ECF No. 880-96. Also, on or about May 15, 2015, the Defendant verified Miamark's interrogatory answers as its manager, and indicated that any reference to him as a managing member in corporate documents was a "misnomer" in "corporate documents prepared by counsel." *See* ECF No. 880-51, p. 13.[17]

17.     Alvaro and his personal attorney, Mr. Klugh, are the only representatives who Miamark has produced in this litigation, and they, and not Miamark, would benefit from the release of Forfeited Mark Units. Mr. Klugh represented at Alvaro's deposition that he, in effect, helped to manage the Forfeited Mark Units after Defendant's detention, by, for example, paying maintenance fees.[18] *See* ECF No. 880-4.

***

**[A Note About Deposition Behavior]**

Federal Rule of Criminal Procedure 32.2(c)(1)(B) provides that the "the court may permit the parties to conduct discovery in accordance with the Federal Rules of *Civil*

---

[17]     Alvaro signed the interrogatory answers and Mr. Klugh served as the notary for his under-oath signature.

[18]     Mr. Klugh blurted out this information as substantive factual information in response to a deposition question <u>asked of his client, Alvaro</u>, who was appearing as Miamark's corporate representative.

Procedure." (emphasis added). The Rules of Civil Procedure do not permit attorneys representing deponents to (1) coach the client by raising rhetoric-filled objections designed to feed the deponent information or advice; (2) answer the substantive questions themselves, before the deponent has provided an under-oath substantive response; and (3) instruct the deponent to not answer questions in the absence of a legitimate privilege objection or a Court-ordered limitation on the subject matter. *See generally Amodeo*, 916 F.3d at 972 (ancillary proceeding is civil in nature).

In fact, courts regularly condemn attorneys who engage in that type of conduct at depositions. *Quantachrome Corp. v. Micromeritics Instrument Corp.*, 189 F.R.D. 697, 700 (S.D. Fla. 1999) (requiring offending party, who made speaking objections which amounted to providing the witness with counsel's preferred answer, to bear the costs of bringing the motion to compel and the cost of retaking a deposition); *see also Regions Bank v. Legal Outsource PA*, No. 14-CV-476FTM29MRM, 2016 WL 7228738, at *5 (M.D. Fla. Mar. 10, 2016) (finding counsel's conduct of delaying the deposition through "patently improper" speaking objections warranted a continuation of deposition); *Perrymond v. Lockheed Martin Corp.*, No. 109CV01936TWTAJB, 2011 WL 13269787, at *2 (N.D. Ga. Feb. 18, 2011) (internal citation omitted) ("[T]here is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers.").

There is no doubt that the conduct Mr. Klugh exhibited at Alvaro's deposition is, to be diplomatic, frowned upon. *See Collins v. Int'l Dairy Queen, Inc.*, No. CIV.A. 94-95-4MACWDO, 1998 WL 293314, at *2 (M.D. Ga. June 4, 1998) ("A lawyer should not object to a question . . . unless the lawyer reasonably believes that the witness may be misled or the witness indicates confusion by the question" and even then, a lawyer "should simply ask examining counsel to rephrase and clarify the question"); *see also Odone v. Croda Int'l PLC.*, 170 F.R.D. 66, 68 (D.D.C. 1997) ("It is well settled that in the course of a deposition [an] [a]ttorney . . . may not object to questions in such a way as to 'coach' the witness or suggest an answer.").

Mr. Klugh did not merely interpose objections. He sometimes assumed the role of witness and volunteered a substantive answer, as if he were the deponent. This is impermissible. *See Frazier v. Se. Pa. Transp. Auth.*, 161 F.R.D. 309, 317 (E.D. Pa. 1995) (granting motion for a re-deposition where plaintiff's counsel provided answers to deposition questions on behalf of his client); *see also State Farm Mut. Auto. Ins. Co. v. Dowdy ex rel. Dowdy*, 445 F. Supp. 2d 1289, 1293 (N.D. Okla. 2006) ("The Court . . . finds 33 instances in which counsel . . . answered questions for the deponent Holtmann, suggested answers for Holtmann or improperly commented on answers given, all in violation of the letter and spirit of Fed. R. Civ. P. 30."); *Damaj v. Farmers Ins. Co.*, 164 F.R.D. 559, 560 (N.D. Okla. 1995) ("Thus, it would be fair to characterize Mr. Banks's deposition as primarily conversation and argument between counsel as opposed to a question and answer

session between the deposing attorney and the witness."); *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 621 (D. Nev. 1998) (emphasis added) ("[A] questioning attorney is entitled to have the **witness,** and the witness alone, **answer questions**.").

Despite these clear rules, the Undersigned's review of Alvaro's deposition transcript reveals that Mr. Klugh interrupted, gave answers himself (even though he was not under oath and was not the deponent), interposed inappropriate objections, and made comments designed to coach his client.

Whether part of an intentional strategy or perhaps an ill-advised, overly-zealous commitment to his client, Mr. Klugh's deposition behavior disrupted an orderly question-and-answer flow. The AUSA sometimes responded to Mr. Klugh's answers and coaching (e.g., "he's [referring to Alvaro] got to answer these questions" [ECF No. 825-3, p. 163]), but he did not adjourn the deposition or contact Chambers. The following four examples illustrate Mr. Klugh's deposition behavior:

> Q. So you did not have any experience prior to that in managing a limited liability company?
>
> MR. KLUGH: *You know, it's of record. He's not a professional manager. These are family companies. These are the only LLCs he formed.*
>
> MR. GROVE: He needs to answer the question.
>
> MR. KLUGH: But the questions can be interpreted all kinds of ways. That's why I'm objecting[19] for the record, to make sure we understand what the question is. These are the only LLCs he's ever been involved with.

---

[19]    Mr. Klugh's interruption was not an *objection*. It was a substantive *answer*.

[ECF No. 825-3, pp. 77-78 (emphasis added)].

> Q. So the members or the owners never received a penny for the business activities of Miamark?
>
> MR. KLUGH: *They received no compensation for their services and no distributions.*
>
> (In English.) THE WITNESS: For the benefits.
>
> MR. KLUGH: *For him to know that, he would have to go through the bank records, and I think family members had signing authority on the banks.*
>
> MR. GROVE: No, that's not -- well, what was said during this deposition was, there was one account for Miamark.
>
> MR. KLUGH: *Right. I don't know whether he said they would pay taxes for it. So there might have been an exchange of money . . .*

*Id.* at p. 97 (emphasis added).

> Q. According to the operating agreement, you are the only person who could authorize a member being compensated.
>
> MR. KLUGH: *I object to that. This just gives an authority. I don't know if it says he's the only one.*
>
> MR. GROVE: Where else in the operating agreement does it give authority to anyone else to allow a member to be compensated for services?
>
> MR. KLUGH: *I'm not sure. I'm just saying that this agreement does not say that it's the only way. It's a way to provide money to the managing members without changing the contribution –*
>
> MR. GROVE: Well, the section speaks for itself, compensation for services, and it says that upon agreement of the managing member, if there is more than one, a member may be compensated for the performance of services. But it's got to be by the managing member. A managing member has to decide that.

MR. KLUGH: *Compensation for services.*

MR. GROVE: For services. Like, for instance, the services they were providing that we discussed.

MR. KLUGH: *I still disagree that it has to be.*

MR. GROVE: Okay.

MR. KLUGH: *It's possible that it is.*

BY MR. GROVE:
Q. But you don't believe you had the authority?

A. Based on my understanding, since I was a person that can be fired and I was not part of a corporation –

MR. KLUGH**:** *It's sort of like Archibald Cox's authority to subpoena Nixon for the tapes. It didn't last very long.*

*Id.* at pp. 130-131 (emphasis added).

Q. Okay. Now, previously, we, the government, served interrogatories and a request for production. In that, both sets, there is an authorization for us to receive income tax returns, and there is another form too that would come with the return – I forget. But basically they are release forms.

MR. KLUGH: *I've gotten them signed, but I mean, we are willing to stipulate there were no returns filed. That may have been an error, but I mean, I just don't know that –*

MR. GROVE: I'm just trying to get out whether or not income tax returns were filed or not.

MR. KLUGH: *As far as he knows, he doesn't remember signing one or filing one. I'm not aware how it could be filed.*

BY MR. GROVE:
Q. And you are aware, according to the agreement, that you are the tax matters partner?

MR. KLUGH: *I'm not sure that he is aware, even if that term exists.*

BY MR. GROVE:
Q. Well, let's ask the question. Are you aware that under the terms of the operating agreement, you as the manager are the tax matters partner? That's Section 8.5.

MR. KLUGH: *Just for the record, it says that he is, but if he is unwilling to do it, the members, you know, have a responsibility to find somebody else. So it's up to his willingness.*

*Id.* at pp. 135-136 (emphasis added).

Had the AUSA adjourned the deposition to contact the Undersigned's chambers, I would have (if available) immediately entertained objections to Mr. Klugh's deposition behavior in order to determine whether I should direct Mr. Klugh to immediately stop raising incorrect objections, giving improper directions to not answer questions and volunteering answers. At times, it appeared as though Mr. KIugh was the *deponent*, as opposed to an attorney *representing* the deponent.

When the Undersigned is confronted with this type of attorney conduct in civil depositions, I sometimes enter a fee-shifting award against the misbehaving attorney. Had I held a hearing about the comments and objections made at Alvaro's deposition, Mr. Klugh would have had the opportunity to explain his conduct, of course. But the transcript I have reviewed presumably sets out exactly what happened -- what Mr. Klugh said and the circumstances under which he said them. That transcript does not reflect adequate legal support for all the instructions, comments, coaching and volunteered information. Perhaps Mr. Klugh would have been able to offer some type of outside-the-

50

transcript/off-the-record explanation to try to justify his conduct, but the transcript itself does not suggest the existence of such a rationale.

**[end of note about deposition conduct]**

**\*\*\***

Finally, it is the United States' contention, that like other real properties that were finally forfeited by the Court, the Defendant acquired the Forfeited Mark Units through a nominee, and then transferred the assets to a company he created and controlled. *See* ECF Nos. 884-4[20]; 523.

### ii.   The Murano 908 Unit

The United States relies on the following factors to support its view that Murano is not a person "other than" Alvaro:

1.      Murano did not purchase Murano Unit 908.  Instead, on January 25, 2006, title was conveyed to Murano, subject to a first mortgage held by Washington Mutual Bank ("WAMU") and after two installment payments were made from Alvaro's personal account and another shell company account. *See generally* ECF No. 877-1 (2/19/2019 Evidentiary Hr'g Tr. 60:23-81:22); *see also* ECF Nos. 713 (6/11/14 Trial Tr. 70:20-72:19); 880-36 (G075-00004-G075-00006); 880-62; 826-6, p. 5.

---

[20]      Ms. Cohen testified that the LLCs were created in order for Alvaro to acquire property.

More specifically, the first payment for $50,000 came from Alvaro's personal checking account, which he jointly held with Fabiani Krentz, a convicted co-conspirator. The second payment for $460,000 came from loan proceeds[21] that Fabiani Krentz obtained by refinancing a loan on a luxury condominium, Unit 3801 at the Continuum on South Beach (hereinafter, "Unit 3801"),[22] which was then-titled to Contion, LLC, for which Alvaro was managing member. *Id.; see also* ECF Nos. 713 (6/11/14 Trial Tr. 70:20-73:10); 880-36; 880-2; 884-60; 880-62. Unit 3801 was forfeited in the criminal case, after a trial and the jury's finding that it was involved in the money laundering conspiracy. *See* ECF Nos. 484; 487; 496.

2.     In addition, Alvaro, and not Murano, paid down the WAMU mortgage on Murano Unit 908. Between November and December 2008, the mortgage was satisfied with funds from personal checking accounts held solely by Alvaro, or jointly with his brother, Artemio Tardon, and his sister, Maria Tardon. *See* ECF Nos. 877-1 (Hr'g Tr. 75:22-81:22); 713 (Trial Tr. 70:20-73:10); 880-2; 880-6.

3.     These payments from personal accounts contravened Murano's operating agreement, which mandated that company expenses be paid from a *company* bank account. *See id.; see also* ECF Nos. 713 (Trial Tr. 73:24-75:11); 880-2; 880-5; 880-90. However,

---

[21]     More than half a million dollars in loan proceeds remained after this payment, which went to Alvaro's personal checking account held jointly with Fabiani Krentz. *See id.; see also* ECF Nos. 880-6 (G071-00009); 880-2 (G018-00350).

[22]     Unit 3801 is located at 100 S. Point Drive, Miami, Florida 33139.

a company bank account was not opened until June 1, 2009, well after Murano was established, despite the operating agreement's requirement to do so.  *See* Ancillary Ex. 279, ECF No. 880-40 (G017-01222). Indeed, before and after opening Murano's corporate account, Alvaro used personal and other accounts to receive rental income and pay company expenses. For example, he used a personal account jointly held with Fabiani Krentz to pay Murano Unit 908's condominium association fees between January 2009 and March 2009. *See* Tr. Ex. 1, ECF No. 880-2 (G001-00621, G001-00624, and G001-00629).

4.      Moreover, the Defendant admitted that once he opened an account for Murano, he often left blank company checks with his then-spouse, Sharon Cohen, for her to use while he was away. *See* ECF No. 880-58 (Dep'n Tr. Murano Tardon 57:8-65:6). According to Alvaro, Sharon Cohen had authority to use company checks based on her status as "wife of the manager [Alvaro]," despite the fact that he was the sole account signatory.  *See* ECF Nos. 880-57 (Dep'n Tr. Murano Tardon 57:19-58:2); 880-40 (G017-01222); 880-60 (Dep'n Tr. Murano Tardon 55:22-56:23, 64:4-9).

5.      Approximately $15,000 from Murano's account was used for non-business-related expenses, including plastic (or cosmetic) surgery, personal dining, massage and spa services, payment of credit card debts, payments to "cash," and payment of Unit 3801's condominium association fees. *See generally* ECF No. 880-40.

6.      Murano failed to follow corporate formalities in other respects. Murano's operating agreement was not maintained at its principal place of business, as required

under the terms of the operating agreement and under Florida law. *See* ECF Nos. 880-61; 880-90; *see also* Fla. Stat. § 608.401(1)(d) (2006); Fla. Stat. § 608.423 (2006).[23]

7.     Murano failed to file federal income tax returns despite receiving substantial rental income from Murano Unit 908. *See* ECF Nos. 880-86; 880-97; 880-90; 528 (Trial Tr. 100:2-102:9); 880-27. Instead, Alvaro and Sharon Cohen claimed ownership of and listed rental income from Murano Unit 908 in a joint individual federal tax return for 2008. *See* ECF Nos. 880-23; 880-53. The 2008 return represents that Alvaro and his wife received $60,000 in revenue from Murano Unit 908.

8.     Before his conviction in the underlying criminal case, Alvaro represented that **he** was the owner of Murano. Murano's articles of organization list him as its managing member. [ECF Nos. 880-90; 880-91]. In addition, all of Murano's annual reports up to 2011, which was the last report filed by the company, list the Defendant as its managing member. *See* ECF No. 880-91. A member of a Florida limited liability company is an owner, and by default, a Florida limited liability company is member-managed. *See* Fla. Stat. §§ 608.402(20), (21), 608.422(1) (2006); Fla. Stat. § 605.0407 (2013 & 2018).

9.     In pre-trial litigation in the underlying criminal case, Alvaro argued that he "concealed nothing" because the company records for Murano "list the ***defendant*** as the

---

[23]     The Florida Limited Liability Act, Fla. Stat. § 608.401, *et seq.* was in effect when Murano was formed. *See* Fla. Stat. § 608.401, *et seq.* (2006). Since 2013, the Florida Revised Limited Liability Act has been in effect, with minor changes in 2015. However, the Revised Limited Liability Act governs only limited liability companies *formed* after January 1, 2015. *See* Fla. Stat. § 605.1108(1).

*owner* and give his *address* and *identifying information*." [ECF No. 75 (emphasis in original)].

10.     Similar to his involvement with Miamark, despite his detention and confinement, Alvaro continues to dominate and control Murano, remaining its only managing member. In these proceedings, Alvaro, who has been sentenced to 150 years of imprisonment, signed and attested to the Condominium Petition and was **designated for deposition as the company's corporate representative**. *See* ECF Nos. 734; 880-59.

11.     Since the Defendant's detention in July 2011, Murano has not filed an annual report with the Florida Department of State, resulting in the administrative dissolution of Murano. *See* ECF No. 880-91. No property taxes have been paid for Murano Unit 908 since the Defendant's detention. *See* ECF No. 880-54.

12.     However, the property has generated income, as tenants have leased Murano Unit 908 from Mr. Klugh, who used his power-of-attorney to act on behalf of Murano and to also receive rental payments. *See* ECF Nos. 880-86; 880-85; 880-97; 880-70. For instance, The Lakes LDT Partnership leased Murano Unit 908 from November 2013, through January 2015, and paid approximately $70,000 in rent directly to Mr. Klugh, and not to Murano's company account. *See* ECF Nos. 880-97; 880-85. Mr. Klugh, in turn, has paid both Murano's and the tenant agent fees from his law firm's account. *See* ECF No. 880-86.

### d.   Assessment of Competing Contentions Re: Real Estate Parcels

The Undersigned finds that Petitioners are not entities "other than the defendant" and therefore lack statutory standing to challenge the preliminary forfeitures of these real properties.

Petitioners did not put on any live witnesses at the evidentiary hearing. They submitted only limited documentary evidence. They designated Alvaro as the corporate representative to provide deposition testimony to bind Murano. Their attorney, Mr. Klugh, provided substantive answers and made comments which appear to be efforts at improperly coaching Alvaro on the various answers. Petitioners did not meet their burden of establishing that they are entities other than Alvaro.

To the contrary, Alvaro often represented himself to be the owner of Miamark and the Mark Units, and he dominated and controlled the entities who submitted the petitions (i.e., Miamark, LLC and Murano 908, LLC). The mere fact that these properties were titled in the names of entities does not mean that Alvaro was not the actual owner who primarily dominated the entities.

To be sure, there are conflicting contentions. But the United States' submission of specific *evidence* is substantial. Petitioners rely mostly on contentions and theories, as opposed to actual evidence. Because the Undersigned is not relying solely on record title and is evaluating the evidentiary realities of control and management, record title is insufficient. *See Parenteau*, 647 F. App'x at 596-98 (finding claimant was not a person

"other than the defendant" even though the claimant had record title ownership where claimant failed to introduce evidence at hearing that that it had an identity separate from the defendant or that it had followed any corporate formalities, including recordkeeping).

The evidence establishes that Petitioners have, at best, nominal ownership to the real properties at issue. The mere fact that some family members may have at times stayed at the apartments is woefully inadequate to establish that the corporate entities (and not Alvaro) are the actual, real owners of the properties.

The myriad factors listed above convincingly demonstrate that Petitioners lack statutory standing. Although it is not the United States' burden to establish that Petitioners lack standing, it submitted a large amount of compelling and persuasive evidence on the statutory standing point. Petitioners, on the other hand, submitted precious little evidence, even though they have the burden to establish standing.

The Undersigned will not here repeat all the factors listed above in the more-comprehensive discussion of the United States' evidentiary factors. But the Undersigned is highlighting the more-significant ones, all of which demonstrate that Petitioners have not met their burden of establishing standing to challenge the forfeiture of the four real properties.

First, at trial, Alvaro's then-spouse, Sharon Cohen, testified that Alvaro owned the Mark Units and created LLCs to hold properties that actually belonged to him. Second, the LLCs' articles of organization list Alvaro as the managing member. Third, Alvaro's

attorney, Mr. Klugh, represented in the underlying criminal case that Alvaro "**concealed nothing**" because the records of Miamark and Murano 908 **"list the defendant as the owner** and give his address and identifying information." [ECF No. 75 (emphasis added)]. Fourth, Alvaro admitted that the transfer of title to The Mark Units "weren't sales" because they merely "changed names to Miamark." [ECF No. 880-50]. Fifth, both Miamark and Murano **selected** Alvaro to be its corporate representative for a deposition which the United States took of the corporate Petitioners. [ECF Nos. 825-3; 826, p. 3]. Miamark and Murano both designated the Defendant even though he was a convicted felon. Sixth, Alvaro often represented that he was the owner of Miamark and The Mark Units before his conviction. For example, in correspondence with The Mark's condominium association, he was identified as the "owner" of The Mark Units "through various entities." [ECF No. 825-8, p. 87].

Focusing on the specifics of the financial circumstances, Miamark did not pay any consideration to obtain title to The Mark Units. Instead, Defendant Alvaro executed purchase agreements to acquire Unit 2703 and Unit 202, and eventually, in or around 2001, Defendant Krentz, a convicted co-conspirator, acquired title to The Mark Units. *See* ECF No. 825. Defendant Krentz held title to The Mark Units for approximately five years, before transferring the properties, via quitclaim deeds, to Miamark. *See id.* at ¶ 6. As noted above, Defendant Alvaro admitted in Miamark's deposition, "They weren't sales . . . They changed names to Miamark." *See id.* at ¶ 7.

For the Murano unit, Ideal Properties, Inc. ("Ideal") conveyed title for Unit 908 to Murano, subject to a first mortgage, on January 25, 2006, after receiving two-installment payments. [ECF No. 826]. However, *Murano* did not make either of these payments. Rather, the first payment for $50,000 came from ***Alvaro's*** personal checking account that he held jointly with his convicted co-conspirator, Defendant Krentz, and the second payment for $460,000 came from loan proceeds Defendant Krentz obtained by refinancing a loan on a luxury condominium owned by Contion, LLC, for which Alvaro was Managing Member. *See* ECF No. 826-1.

Furthermore, *Murano* (the record title owner) did not make the payments to satisfy and release WAMU's first mortgage on Unit 908 either. Rather, Alvaro paid off WAMU's first mortgage between November and December 2008 using funds from personal checking accounts that he held either solely or jointly with his brother, Artemio Lopez Tardon, and his sister, Maria Tardon Lopez, despite requirements in Murano's Operating Agreement mandating payment of Murano expenses from a company account. *See* ECF No. 826-1, ¶¶ 12-13, 22. In fact, Murano was not able to pay off WAMU's first mortgage using company funds because Alvaro, as sole Managing Member, did not open a company account for Murano until June 1, 2009. *Id.* at ¶¶ 19, 20. As Murano's sole Managing Member, Alvaro opened Murano's only bank account -- over which he had sole signature authority. *Id.* at ¶¶ 19, 22.

In addition, attorney Peter Lopez testified that realtor Daisy Martins first introduced him to Alvaro in order to create Murano so that Alvaro could acquire the Murano unit. [ECF No. 826-14, p. 6]. According to Lopez's deposition testimony, Alvaro showed up in person in his office and asked him "to create the company, so that *he* could purchase that property." *Id.* at p. 7 (emphasis added).

Because Petitioners are not "other than the Defendant," they cannot seek to demonstrate that they have a superior interest in the real properties. Thus, they are not entitled to an order amending the order of forfeiture in order to protect their alleged interest in the property. Given that Petitioners lack statutory standing to challenge the forfeiture, the Court need not address the substantive merits of their claims. *Masilotti*, 510 F. App'x at 810 n.2[24]; *cf. Henry*, 621 F. App'x at 972 ("[A] person found to be acting as a nominee for others whose property is subject to forfeiture cannot have a vested interest in the property.").

### e. *Forfeited Vehicles*

#### i. Petitioners' Position Re: The Two Luxury Vehicles

In the Vehicle Petitions, Maria Tardon and Artemio Tardon have claimed ownership of the Rolls Royce, and Maria Tardon and Kyte Schooll have claimed

---

[24]    Attorney Richard Klugh was counsel for appellants in *Masilotti*.

ownership of the Mercedes Benz.[25]  *See* ECF No. 735.  They have record title to the two vehicles.

The United States, however, contends that the title interests are inadequate by themselves to establish statutory standing and constitutional standing, as Petitioners are not "other than the defendant" and also lack Article III standing. The United States also asserts that Alvaro made some level of personal use of the cars and that the decision to transfer the cars to Spain in July 2011 was precipitated by divorce proceedings that Alvaro initiated against his wife. *See* ECF No. 776-11.

The United States contends that Petitioners' mere "involvement" in helping to obtain title does not mean that they exerted primary dominion and control over the vehicles. In other words, the United States argues that helping to arrange title in the names of the corporate entities is inadequate to disguise the reality that Alvaro is the true owner.

Petitioners disagree and rely on the following factors:

1.      They say the United States does not dispute that Alvaro and his family members were involved in car sales as part of Spanish and U.S. corporate entities about which there was substantial testimony at trial (including The Collection Motor Sports of

---

[25]      Artemio Tardon, an indicted co-defendant, initially claimed an interest in the Mercedes Benz, as well as the Rolls Royce; however, his claim to the Mercedes Benz was dismissed. *See* ECF No. 762.

Madrid, Kyte Schooll, and The Collection Motor Sport of Miami, LLC). Similarly, they represent that the United States has acknowledged that the car business entities provided the funds to purchase the Mercedes (Kyte Schooll wire transfers, *see* ECF No. 550-6, p. 3) and the Rolls Royce (Spanish car companies provided the funding by wire transfer, *see id.*).

2.      Concerning the Mercedes, the United States introduced evidence showing that all of the purchase money for the car was provided by Petitioner Kyte Schooll in four wire transfers amounting to $343,700. [ECF No. 713, p. 60]. In fact, Petitioners note that the United States' motion for forfeiture attached a chart showing each of the payments by Kyte Schooll to purchase the Mercedes. [ECF No. 550-6, p. 3 (showing wire transfer payments from Kyte Schooll to Rick Case Honda on Feb. 21-23, 2007, for full price of Mercedes)].

3.      Kyte Schooll has always been listed at least as a co-owner in the titling of the Mercedes.

4.      Concerning the Rolls Royce purchase, at the forfeiture jury trial, the United States sought to show improper sources for the funding of the purchase, explaining that two Spanish car companies with ties to the Tardon family had provided the funds. *See* ECF No. 713, pp. 47-48 (Agent Gaitan explains that car dealer Cars Boats Madrid SL wired $315,960 to Braman Motors to purchase the Rolls Royce); ECF No. 550-6 (noting additional $49,000 from The Collection Exotic Cars went to the purchase of the Rolls

Royce); ECF No. 550-6, p. 3 (showing purchase funded by Cars Boats Madrid SL); ECF No. 536, p. 69 (counsel for the United States stating: "[W]e have two separate wires going to purchase an automobile [the Rolls Royce] -- a luxury automobile *that was then titled in the name of a company*.") (emphasis added).

5. The trial testimony showed that while Alvaro was going through a divorce proceeding, he sought to ship various vehicles to Spain, and that Alvaro communicated with the general manager for The Collection Motor Sports regarding those proposed shipments. When it was ready to be shipped to Spain (where Maria and Artemio lived and whether The Collection Motor Sports dealership did business), the Mercedes title included Maria, along with Kyte Schooll and Alvaro in the titles.

6. The title for the Rolls Royce was originally in Alvaro's name, when the car was purchased in July 2010, less than a year before Alvaro's arrest. Title was transferred to Claimants Artemio Tardon and Maria Tardon when the car was to be shipped to Spain in 2011.

7. Sharon Cohen's testimony, and the testimony of David Pollack [ECF No. 776-9, p. 18] showed that the reason for shipping cars to Spain was to advance the interest of the Tardon family's car business. That business was shown to have millions of dollars in sales and two showrooms, with a record that included highly profitable transactions. *See* ECF Nos. 531, pp. 6-62; 532, pp. 95-130.

8.      Alvaro, a co-owner of The Collection who worked without a salary, according to the financial evidence introduced at trial by the United States, purchased many used cars for shipment to the Spanish dealership he and his family owned. David Pollack testified that: "He would keep them for a few months, up to a year . . . And then he would ship them over to Spain to be sold in his dealership."  [ECF No. 776-9, p. 18]. There was no evidence offered that any use or other action by Alvaro (including any delay in sending the cars to Spain) caused any diminution of the value of the collectible cars that he worked to select for resale. To the contrary, when other collectible cars were auctioned for sale in this case by the United States, they were offered as being in excellent condition and they produced millions of dollars at auction.

9.      Even if the *timing* of the shipment of cars to Spain was affected by ongoing divorce proceedings, testimony by the United States' witness Pollack shows that the purpose of the shipment of the cars was so that they could "be sold in a dealership."  [ECF No. 776-9, p. 18]. According to Petitioners, the United States failed to contest their interrogatory answers pertaining to the vehicles [ECF Nos. 776-3; 776-4; 776-5] that made that very point, that the transactions were conducted in the ordinary course of the family's car dealer operations that included permitting individual members of the family to personally own or co-own vehicles, including to facilitate handling and shipment.

10.     The United States' effort to treat Artemio Tardon's interest in the cars as stemming just from the retitling of a vehicle ignores his other interrogatory answers [ECF

No. 776-4] revealing his ownership of the car businesses and the assets of the dealer-use cars. Interrogatory answers by Artemio and Maria Tardon clearly state that "the cars were purchased for Kyte Schooll (the McLaren) and The Collection Motor Sports (Rolls Royce), were held in Miami for dealer use and then were to be transported to Europe for sale." [ECF Nos. 776-3; 776-4]. An interrogatory answer by Kyte Schooll explains that the cars were "under the control of agents of the company." [ECF No. 776-5].

Thus, the answers maintain that the cars were at all times destined for use in the family car businesses, Kyte Schooll and The Collection, or were to be used by dealer agents pending or prior to sale, and were titled accurately and validly. Kyte Schooll, which was initially owned by Artemio Tardon, Maria de las Nieves Tardon, Julio Cesar Fraile Garcia, and Maria Tardon Torrego, was a coordinating entity for assets of the Tardon car sales company, The Collection Motor Sports of Madrid. [ECF No. 525, pp. 91-92]. And Kyte Schooll paid in full for the Mercedes and was invoiced accordingly. [ECF No. 877-1, p. 110].

ii.   <u>The United States' Position Regarding the Luxury Vehicles</u>[26]

1.     After several years of litigation, Petitioners' exclusive reliance on title documentation to support their claims to the Forfeited Vehicles demonstrates that Maria Tardon, Artemio Tardon, and Kyte Schooll hold only nominal title to the Mercedes Benz or the Rolls Royce.

2.     There is overwhelming evidence in the record that shows Alvaro's dominion and control over the Forfeited Vehicles *before* their seizure. Alvaro purchased, possessed, and insured the Forfeited Vehicles, while Petitioners gave nothing of extrinsic value in obtaining title and did not exercise any other form of dominion or control over either of them.

3.     In July 2010, Alvaro purchased the Rolls Royce for more than $330,000, and certified that he **personally** had automobile insurance then-in effect for the vehicle. *See* ECF Nos. 877-1 (Evidentiary Hr'g Tr. 119:4-120:5; 121:21-122:3); 880-80 (ADM135-00007 to ADM135-00008); 776-6, p. 104.

---

[26]     In addition to challenging statutory and constitutional standing, the United States has asserted a technical argument about the Mercedes. It points out that the title is registered to Alvaro **or** Kyte Schooll **or** Maria Tardon. Therefore, the United States argues, the three owners (including Alvaro) are joint tenants, and Maria Tardon and Kyte Schooll therefore cannot have *superior* interest to Alvaro (because, as joint tenants, they all have the *same* interest). The Undersigned need not address this argument because I have determined that Petitioners lack standing. Therefore, there is no reason to discuss the merits (i.e., whether Petitioners met their burden of establishing a superior interest to Alvaro in the Mercedes) when Petitioners have not cleared the standing hurdle.

4.      In February 2007, the Mercedes Benz was purchased for approximately $343,201, initially shipped to Spain, and then returned to Alvaro.  *See* ECF Nos. 877-1 (Evidentiary Hr'g Tr. 110:10-111:10); 880-83 (ANC001-00340); 776-6, p. 6, 12. In a letter to the tag agency upon the vehicle's return, Alvaro stated that the Mercedes Benz "was unregistered in Spain to its **owner,** Alvaro Lopez [the Defendant], who *is also* the owner of Kyte Schooll SL." [ECF No. 880-83, p. 13].

5.      The Defendant also personally insured the Mercedes under a policy held by him and his then-spouse, Sharon Cohen.  *See* ECF No. 880-82.

6.      After their purchase, Alvaro registered and titled the Forfeited Vehicles in his name at *his* address at 2475 S. Bayshore Drive, Villa 3, Coconut Grove, Florida ("Bayshore residence").[27] *See* ECF No. 880-83.

7.      The Defendant drove the Mercedes Benz and the Rolls Royce and would "show [them] off" at restaurants or clubs, and he stored them at his various residences. *See* ECF Nos. 523 (Cohen Trial Tr. 83:11-14); 776; 519.

8.      In further demonstration of Alvaro's dominion and control, it was *Alvaro* who decided to transfer nominal title to the Forfeited Vehicles to his mother, Maria Tardon, and his brother, Artemio Tardon, because he feared that his then-spouse, Sharon Cohen, might try to obtain them in pending divorce proceedings. *See* ECF Nos. 884-2;

---

[27]      The Bayshore residence was forfeited as property involved in Alvaro's offenses. [ECF Nos. 496; 682].

880-32. In fact, after a domestic dispute with Sharon Cohen, Alvaro told David Pollack, a convicted co-conspirator, that he was going to ship approximately seven cars to Spain because he feared that Sharon Cohen would get the vehicles in divorce proceedings. *See* ECF No. 520 (Pollack Trial Tr. 38:12-39:12). Indeed, the Defendant titled other vehicles and property he owned in the names of other persons, including Sharon Cohen and David Pollack, who did not exchange funds or sign paperwork to obtain the property. *See* ECF Nos. 523 (Cohen Trial Tr. 80:23-82:25, 87:24-88:10); 776-7; 519 (Pollack Trial Tr. 182:19-190:1).

9.      Petitioners Maria Tardon and Artemio Tardon, who were not present at the evidentiary hearing, admitted in their interrogatory answers that they did not acquire title through a financial transaction, and no funds were exchanged when title to the Forfeited Vehicles was transferred to their names. *See* ECF Nos. 880-77; 880-78; 776-2; 776-3.

10.      Significantly, Maria Tardon and Artemio Tardon have both asserted that their respective interests in the Forfeited Vehicles "arose from [their] expenditure of effort and money *in arranging to help* effectuate the resale of the vehicles." *See* ECF Nos. 776; 880-77; 880-78.

11.      When asked in interrogatories about specific instances of their dominion and control over the Forfeited Vehicles, Maria Tardon and Artemio Tardon in nearly

identical fashion referenced *only* their **assistance with the transfer of title**, and nothing more. *See id*.

12.     Petitioners also admitted that the Forfeited Vehicles were located in Miami, out of their possession. *See* ECF Nos. 776-2; 880-77; 880-78.

13.     In interrogatory answers, both Maria Tardon and Artemio Tardon have acknowledged that they obtained their claimed interests in the Forfeited Vehicles "following the separation of [the Defendant] from his wife." *See* ECF Nos. 776; 880-77; 880-78. Accordingly, Maria Tardon and Artemio Tardon's only proffered instance of dominion and control over the Forfeited Vehicles was their limited interaction in transferring title to the Forfeited Vehicles for the benefit of Alvaro.

### f.   Assessment of Competing Interests Re: The Luxury Vehicles

Before outlining the evaluation of the Petitioners' standing, it is appropriate to note that the Undersigned views Petitioners' interrogatory answers to be largely detail-free, vague responses which appear designed to provide as little information as possible. In addition, the answers, nebulous as they are, are somewhat equivocal, and reveal unfamiliarity with the specific facts surrounding the very vehicles at issue in their Petitions.

For example, in response to an interrogatory asking for the date the vehicle was purchased and the contact information of the seller and buyer, Maria Tardon gave the following under-oath answer: "My ***understanding*** is that the cars were purchased for

Kyte Schooll (the McLaren) and The Collection Motor Sports (Rolls), were held in Miami for dealer use and then were to be transported to Europe for sale. These ***addresses are of record*** in the case. The principals in the sales companies are Artemio and Alvaro Lopez Tardon." [ECF No. 880-78, p. 9 (emphasis added)].

Similarly, in response to an interrogatory asking if the vehicle was a gift, Maria Tardon gave the following under-oath answer: "It was my ***understanding*** that my interest in the property arose from my expenditure of effort and money in arranging to ***help effectuate the resale*** of the vehicles." *Id.* at p. 14 (emphasis added).

Although courts have found that nominal ownership precludes relief on the *merits* under 21 U.S.C. § 853(n)(6)(A), the Eleventh Circuit, citing a United States Supreme Court opinion,[28] held in *Weiss* that "[o]ne who has no interest of his own at stake always lacks ***standing***." *Weiss*, 467 F.3d at 1311 (emphasis added); *cf. Morgan,* 224 F.3d at 343 ("[C]ourts must evaluate whether the petitioner is a nominee when reviewing the substance of a § 853(n) claim.").

In other words, although the Petitioners would also lack a superior interest under 21 U.S.C. § 853(n)(6)(A) on the merits of their purported claims to the vehicles, the Undersigned concludes that their claims should be rejected first for lack of standing, which is a **threshold** issue.

As outlined above, Petitioners rely on their status as legal title owners to the two

---

[28]    *Linda R.S. v. Richard D*, 410 U.S. 614, 617 (1973).

vehicles, but this is insufficient here to establish standing. The Undersigned concludes that they lack both statutory standing (because they are not "other than" Alvaro) and constitutional standing (because they are mere naked title owners who are nominees for Alvaro). *See Weiss*, 467 F.3d at 1308-09.

There is ample legal authority to support the conclusion that Petitioners cannot challenge the forfeiture of the two luxury vehicles because they lack standing and because helping to make arrangements to transfer title is insufficient to confer the requisite standing under the facts here. *See United States v. Bond*, No. 6:13-CR-03103-MDH-2, 2015 WL 403102, at *3 (W.D. Mo.  Jan. 28, 2015) (holding that petitioner lacked standing because he held only bare legal title to the boat and did not exercise dominion and control over it where the defendant, and not petitioner, paid insurance and marina fees for forfeited boat); *see also Rogers*, 1996 WL 252659, at *3 (finding no standing where defendant registered forfeited Mercedes and paid sales tax and claimant did not use the car); *Gamory*, 2010 WL 3880880, at *5 (concluding titled petitioner, who admitted that he did not pay for forfeited Mercedes, was the nominee of his son, the defendant); *United States v. Washington*, No. CR 3:11-2064-10-JFA, 2013 WL 3762906, at *3 (D.S.C. July 16, 2013) (granting summary judgment against petitioner who denied ownership of Cadillac, gave nothing of value to receive title, and never drove it); *United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1277 n.3 (11th Cir. 2010) (finding title owner of aircraft lacked standing); *United States v. One 1981 Datsun*, 563 F. Supp. 470, 476 (E.D. Pa. 1983) (finding

titled claimant lacked standing because he neither paid for nor used vehicle).

Petitioners have not claimed that they paid for the vehicles, ever used the luxury vehicles, or ever drove the vehicles. Indeed, they have not even said that they have ever been in the vehicles. Rather, their theory is that they traveled to Miami to help make arrangements for transfer of title. This is inadequate to offset Alvaro's substantial involvement in the purchase and use of the vehicles. *See, e.g., Gamory*, 2010 WL 3880880, at *5 (finding no standing where petitioner never drove forfeited Mercedes, could not identify vehicle's color, and admitted that car was parked at defendant's property); *Washington*, 2013 WL 3762906, at *3 (noting petitioner did not drive Cadillac); *Rogers*, 1996 WL 252659, at *3 (finding titled petitioner to be nominee when she did not use forfeited Mercedes and was not involved in the defendant's significant modifications to the vehicle); *United States v. Pavlock*, No. 1:10CR7, 2014 WL 11380927, at *2 (N.D.W. Va. Mar. 4, 2014) (finding petitioner, the purported owner of company that held title to forfeited vehicles that defendant drove, was defendant's nominee because he did not exercise dominion or control over relevant business or forfeited assets); *cf. United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 452 (E.D.N.Y. 1990) (in civil forfeiture case, finding titled claimants, having never driven the subject vehicle, lacked dominion and control).

Framed by the evidence demonstrating Alvaro's dominion and control over the two luxury vehicles, comparing Petitioners' purported interests with a claimant who received a mere gift is analytically helpful (but unhelpful to their position). *See, e.g.,*

*United States v. McCorkle*, 143 F. Supp. 2d 1311, 1321 (M.D. Fla. 2001) (finding petitioner, an animal foundation, to be nominee when it received vehicle as a "gift").

Thus, by way of summary, because they hold bare legal title to property for the benefit of another (i.e., Alvaro) and did not exercise significant dominion or control over the vehicles, Maria Tardon, Artemio Tardon, and Kyte Schooll are not "other than" Alvaro. To the contrary, they are his nominees and lack both statutory and Article III standing to challenge the forfeiture of either the Mercedes Benz or Rolls Royce.

## V.    Conclusion

For the foregoing reasons, the Undersigned finds that Miamark, Murano, Maria Tardon, Artemio Tardon, and Kyte Schooll are *not* persons "other than the defendant" under 21 U.S.C. § 853(n)(2).  I likewise find that they are mere nominee owners and lack Article III standing. Even if the United States had elected to not present evidence at the evidentiary hearing, the Undersigned would have reached the same conclusion, as Petitioners bear the burden of establishing their standing to the fullest degree at the evidentiary hearing. Here, they have spent years in litigation and had more than six months' notice of the hearing, yet only mustered nine exhibits that show nominal rather than actual ownership of the Forfeited Vehicles, Forfeited Mark Units, and Murano Unit 908. Accordingly, the Undersigned **respectfully recommends** that the Vehicle Petition [ECF No. 735] and Condominium Petition [ECF No. 734] be **denied** and/or rejected for lack of standing.

Finally, the Undersigned **respectfully recommends** that Judge Lenard also **deny** the following additional motions: the United States' summary judgment motion concerning the vehicles [ECF No. 776]; the United States' summary judgment motions concerning the real properties [ECF Nos. 825; 826]; the United States' motion for a show cause order concerning Petitioners' standing [ECF No. 760]; the United States' motion to dismiss regarding the petition for the Mercedes [ECF No. 737]; the Petitioners' amended motions to assert third party interests in property [ECF Nos. 734; 735]; and the United States' motion for a hearing to inquire about a potential conflict [ECF No. 714].

## VI.   Objections

The parties shall have fourteen (14) calendar days from the date of this report to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) calendar days from the date of the objection. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report, and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in

this report, except upon grounds of plain error and if necessary in the interest of justice.

*See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885

F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, on February

4, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All counsel of record