## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20470-CR-LENARD/GOODMAN

**UNITED STATES OF AMERICA,**

**v.**

**ALVARO LOPEZ TARDON,**

Defendant.
_____/

**re:**

**MIAMARK LLC and MURANO 908 LLC,**

Petitioners,

and

**KYTE SCHOOLL (a Spanish corporation),**
**MARIA TARDON TORREGO, and**
**ARTEMIO LOPEZ TARDON,**

Petitioners.

_____/

**OMNIBUS ORDER ADOPTING AND SUPPLEMENTING REPORT AND
RECOMMENDATIONS ON PETITIONS TO SET ASIDE FORFEITURE OF
SUBSTITUTE ASSETS (D.E. 906), DISMISSING AMENDED PETITIONS FOR
THIRD-PARTY INTEREST IN FORFEITED PROPERTY (D.E. 734, 735), AND
DENYING AS MOOT THE MOTIONS ASSOCIATED WITH DOCKET
ENTRIES 620, 714, 760, 776, 825, AND 826**

**THIS CAUSE** is before the Court on the Report and Recommendations on Petitions

to Set Aside Forfeiture of Substitute Assets issued by Magistrate Judge Jonathan Goodman

on February 4, 2020.  ("Report," D.E. 906.)  Third-party Petitioners Miamark LLC,

Murano 908 LLC, Kyte Schooll (a Spanish corporation), Maria Tardon Torrego, and Artemio Lopez Tardon (collectively, "Petitioners") filed Objections on March 19, 2020, ("Objections," D.E. 909), to which the Government filed a Response on June 1, 2020, ("Response," D.E. 914).  Upon review of the Report, Objections, Response, and the record, the Court finds as follows.

## I.      Background

### a.      Procedural background

On May 29, 2012, a Grand Jury returned a Second Superseding Indictment ("SSI") charging Defendant Alvaro Lopez Tardon with one count of conspiring to launder money in violation of 18 U.S.C. § 1956(h) (Count 1) and thirteen counts of substantive money laundering in violation of 18 U.S.C. § 1957 (Counts 2 through 14).  (See D.E. 203.)  The SSI also contained forfeiture allegations seeking a money judgment of $26,443,771.00, twelve luxury automobiles, sixteen pieces of real property, twenty-six bank accounts, and several other items.  (Id. at 5-11.)

On June 11, 2014, a jury found Defendant guilty of all charges.  (See Jury Verdict, D.E. 484.)  The jury was retained for forfeiture proceedings which occurred on June 11 and 12, 2014.  (See D.E. 488.)  The jury returned a Special Verdict finding that some, but not all, of the property listed in the SSI's forfeiture allegations was involved in or traceable to the offenses of conviction, and therefore subject to criminal forfeiture ("forfeitable property").[1]

---

[1]      The forfeitable property includes:

The property that the jury did <u>not</u> find was subject to forfeiture ("non-traceable property") includes:

1) One 2010 Rolls-Royce Ghost (VIN: SCA664S50AUX48905);

2) One 2006 Mercedes-Benz SLR McLaren (VIN: WDDAJ76F06M000724);

3) Real property known and numbered as 1155 Brickell Bay Drive, #202, Miami, FL 33131, with all appurtenances, improvements and attachments thereon;

4) Real property known and numbered as 1155 Brickell Bay Drive, #502, Miami, FL 33131, with all appurtenances, improvements and attachments thereon;

5) Real property known and numbered as 1155 Brickell Bay Drive, #2703, Miami, FL 33131, with all appurtenances, improvements and attachments thereon; and

---

1) One 2008 Bugatti Veyron (VIN: VF9SA25C08795118);
2) One Ferrari Enzo (VIN: ZFFCW56A830133927);
3) One 2009 Mercedes-Benz Maybach 57S (VIN: WDBVF79J89A002576);
4) One 2011 Mercedes-Benz G55K (VIN: WDCYC7BF8BX190896);
5) One 2010 Mercedes-Benz G55 AMG (VIN: WDCYC7BF8AX183252);
6) One 2010 Land Rover Range Rover (VIN: SALMF1E48AA327736);
7) Real property known and numbered as 2475 S. Bayshore Drive, Villa 3, Coconut Grove, FL 33133, together with all appurtenances, improvements and attachments thereon;
8) Real property known and numbered as 100 S Pointe Drive, Unit #3801, Miami Beach, FL 33139, together with all appurtenances, improvements and attachments thereon;
9) All principal, deposits, interest, dividends and other amounts credited to account number 229016239866 at Bank of America, N.A., in the name of Sharon Cohen, Maria De Las Nieves Tardon Lopez;
10) All principal, deposits, interest, dividends and other amounts credited to account number 229037949711 at Bank of America, N.A. in the name of Alvaro Lopez Tardon; and
11) All principal, deposits, interest, dividends and other amounts credited to account number 1100002143680 at Branch Banking and Trust (BB&T), f/k/a Colonial Bank in the name of Alvaro Lopez Tardon and MIAMARK LLC.

(Special Verdict, D.E. 487 at 1-3, 9-10, 12-19.)

6)  Real property known and numbered as 1000 S. Pointe Dr., Unit #908, Miami Beach,

    Florida 33139, with all appurtenances, improvements and attachments thereon.

(See Special Verdict, D.E. 487.)[2]

On August 15, 2014, the Government filed a Motion for Forfeiture Money Judgment

and for Order of Forfeiture of Substitute Assets, seeking a forfeiture money judgment

pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(B) in the amount of

$14,358,639.64, and the forfeiture of the non-traceable property listed above as substitute

assets pursuant to 21 U.S.C. § 853(p) in partial satisfaction of the prospective forfeiture

money judgment.  (D.E. 550.)  On October 22, 2014, the Court entered an Order Granting

---

[2]        Other property that the jury did not find was subject to forfeiture includes:

1)  One (1) diamond holder, with eight (8) diamonds;
2)  Eight (8) watches:
    a.  one (1) Audemars Peguet - black/silver with blue face;
    b.  one (1) Audemars Peguet - black/silver with white face;
    c.  one (1) Audemars Peguet - black/blue face;
    d.  one (1) Audemars Peguet - white/red face;
    e.  one (1) Audemars Peguet Ltd Edition 93/150-blue/white & red face;
    f.  one (1) Royal Offshore - red/black/yellow face, Ltd Ed 724/150;
    g.  one (1) Royal Oak Offshore Grand Prix - copper/black; and
    h.  one (1) Royal Oak Offshore Ltd Edition Juan P. Montoya –black/blue/white; and
3)  Seven (7) miscellaneous items of jewelry:
    a.  one (1) silver bracelet chain;
    b.  one (1) chain with ivory tusk;
    c.  one (1) gold/silver color bracelet;
    d.  gold/silver color necklace;
    e.  cheetah print tusk;
    f.  gold/black watch with diamond Cartier; and
    g.  extra link.

(See Special Verdict, D.E. 487.)  On April 26, 2016, the Court entered a Final Order of Forfeiture
of Substitute Property as to the eight watches listed above.  (D.E. 764.)  On February 20, 2019, the
Court entered an Order Granting the Government's Motion for Final Order of Forfeiture of
Substitute Assets as to the diamond holder with eight diamonds and seven miscellaneous items of
jewelry listed above.  (D.E. 867.)

in Part the Government's Motion for Forfeiture Money Judgment and for Order of Forfeiture of Substitute Assets. ("Forfeiture Order," D.E. 601.) Relevant here, the Court concluded that: (1) The Government was entitled to a forfeiture money judgment against Defendant for $14,358,369.64; and (2) the Government was entitled to an Order of Forfeiture of Substitute Assets with respect to the non-traceable property to satisfy any deficiency in the money judgment.[3] (See id. at 27.) Thereafter, the Parties submitted an agreed-upon proposed Amended Order of Forfeiture of Substitute Property, which this Court entered on October 30, 2014. (D.E. 613.) On August 25, 2015, the Court entered a Second Amended Order of Forfeiture of Substitute Property, which clarified the descriptions of certain forfeited substitute assets. (D.E. 703.) Pursuant to the Second Amended Order, the non-traceable property was forfeited to the Government as substitute assets in partial satisfaction of the forfeiture money judgment.[4] (Id. ¶ 2.)

In December 2014, several third parties asserted an interest in the non-traceable property and petitioned the Court pursuant to 21 U.S.C. § 853(n) for an adjudication of their rights regarding their claimed interest in the property, including the Third-Party Petitioners herein.[5] (See D.E. 620, 623, 631, 637, and 638.)

---

[3] The Court also granted in part Defendant's Motion for Return of Property and to Release Lis Pendens, (D.E. 517), ordering the Government to release certain non-traceable property to Defendant to satisfy his outstanding legal fees. (D.E. 601 at 28.)

[4] Pursuant to the Second Amended Order of Forfeiture, the Government returned to defense counsel's law firm $104,308.73 that was derived from the interlocutory sale of 1155 Brickell Bay Drive, #202, Miami, Florida 33131, to satisfy Defendant's outstanding legal fees. (D.E. 613 ¶ 4; see also D.E. 703 at 28.)

[5] In addition to the petitions regarding non-traceable property, Longview Villas Owners Association, Inc. filed a Petition to Protect Third Party Interest from Forfeiture regarding

5

On December 11, 2015, the Court dismissed without prejudice the Third-Party Petitions associated with Docket Entries 623, 631, 637, and 638, which were filed by the Third-Party Petitioners herein.[6, 7]   (See D.E. 732; see also D.E. 745 at 49, 51.)

---

the forfeited real property located at 2475 South Bayshore Drive, Villa 3, Coconut Grove, Florida 33133.  (D.E. 632.)  The Court referred this petition to Judge Goodman (D.E. 634) who issued a Report recommending that the Final Order of Forfeiture acknowledge the Government's obligation to pay monies owed to Longview based upon Defendant's failure to pay Longview.  (D.E. 659.)  On February 4, 2015, the Court adopted Judge Goodman's Report and ordered that "[t]he Final Order of Forfeiture shall include the Government's obligation to pay Longview any fees, interest, penalties, etc. lawfully owed to Longview based upon Defendant's failure to pay Longview."  (D.E. 669.)

[6]      On November 10, 2015, the Government filed a Motion for Inquiry as to whether Defendant's trial attorney Richard Klugh—who at the time also represented all of the third-party petitioners (except the Rubins), including The Collection Motor Sports of Madrid, Kyte Schooll, Maria Tardon, Artemio Lopez Tardon, Murano 908, LLC and Miamark, LLC—had a potential advocate/witness conflict with respect to his representation of the petitioners.  (D.E. 714.)  A status hearing was scheduled for November 23, 2015.  (D.E. 712.)

At the November 23, 2015 hearing, Mr. Klugh stated that he did not anticipate a conflict, but that a deposition of the Government's witness would determine whether he would be required to serve as a witness for his client(s).  (See Tr. of Nov. 23, 2015 Hr'g (D.E. 720) at 5; Response (D.E. 721) at 3.)  The Court set the matter for a further status hearing on December 8, 2015.  (D.E. 718.)

At the December 8, 2015 status hearing, the Court scheduled a bench trial for December 10, 2015.  (See Minute Entry, D.E. 722; Notice of Hr'g, D.E. 723.)

On December 10, 2015, Mr. Klugh filed a Motion to Withdraw as counsel for all petitioners.  (D.E. 728.)  Therein, he informed the Court that he had "come to the conclusion that multiple conflicts of interest arise from the present status of this case," (id. at 2), and requested that the Court grant the petitioners at least thirty days to retain new counsel, (id. at 5).  On December 10, 2015, after a hearing on the matter, the Court granted Mr. Klugh's request to withdraw as counsel for Petitioner Murano 908, LLC.  (Tr. of Bench Trial (12/10/15), D.E. 740 at 19, 74.)  The trial went forward as to the other Petitioners.  (See id. at 19.)

On December 11, 2015, Mr. Klugh renewed his Motion to Withdraw as counsel for all remaining petitioners.  (See Tr. of Bench Trial (12/11/16), D.E. 745 at 6.)  Based on Mr. Klugh's conflict, the Court dismissed without prejudice all of the petitions and indicated that the claims may be refiled pursuant to statute.  (Id. at 48-51.)

[7]      The Court referred the Petition associated with Docket Entry 620, filed by James and Olga Rubin claiming an interest in the real property located at 1000 S. Pointe Drive, Unit 908, Miami Beach, Florida 33139, to Judge Goodman.  (D.E. 627.)  On December 18, 2014, the Government filed a Response acknowledging the Rubin's property lien interest in the Murano Unit 908, stating that a court hearing on this matter was not necessary to resolving the petition, and

On January 14, 2016, Third-Party Petitioners Miamark LLC and Murano 908 LLC filed an Amended Petition for Third-Party Interest in Forfeited Property.  (D.E. 734.) Therein, Murano 908 LLC ("Murano")—which is owned by Artemio Lopez (Defendant's brother and indicted co-defendant), Maria Tardon Torrego (Defendant's mother), and Nieves Tardon Torrego (Defendant's sister)—claims ownership of the real property located at 1000 S. Pointe Drive, Unit 908, Miami Beach Florida 33139, (the "Murano Unit 908") "by virtue of purchase and satisfaction of all mortgages on the property[.]"  (Id. at 1.)  Murano claims that it "acquired the property via purchase from the existing mortgage holder and owner on January 26, 2006."  (Id. at 2 (citing D.E. 734 at 6).)  Miamark LLC ("Miamark")—which is also owned by Artemio Lopez, Maria Tardon Torrego, and Nieves Tardon Torrego—claims that it is "the record title owner via purchase" of 1155 Brickell Bay Drive, Units 202, 502 and 2703, Miami, Florida 33131 (the "Marks Units").  (Id. at 1-2.)  Miamark argues that it "acquired title to the properties via purchases on May 17, 2006 (Units 502 and 2703) and November 18, 2006 (Unit 202)."[8]  (Id. at 2.)

Also on January 14, 2016, Third-Party Petitioners Kyte Schooll (a Spanish corporation), Maria Tardon Torrego, and Artemio Lopez Tardon filed an Amended Petition

---

stating that the Government will, "upon vesting of clear title to the subject real property in its favor, and sale of the subject real property thereafter, satisfy the Petitioners' property lien interest claimed against the subject real property based on the terms of the Default Judgment."  (D.E. 643.) Accordingly, the Court denies the Rubin's Motion as moot.

[8]     At a May 25, 2018 status conference before Judge Goodman, counsel for Miamark clarified that Miamark is claiming only the Mark Unit 202 Forfeited Proceeds, and not all of the net seller proceeds from the interlocutory sale of Mark Unit 202, which included funds released to satisfy Defendant's outstanding trial attorney fees in the underlying criminal case.  (See Report at 10.)

for Third-Party Interest in Forfeited Property.  (D.E. 735.)  The Petition claims that "Florida car title records and other transactional records show that" (1) Maria Tardon Torrego and Artemio Lopez Tardon own the 2010 Rolls-Royce Ghost (VIN: SCA664S50AUX48905), and (2) Maria Tardon Torrego, Artemio Lopez Tardon, and Kyte Schooll (a Spanish corporation) own the 2006 Mercedes-Benz SLR McLaren (VIN: WDDAJ76F06M000724).[9]  (Id. at 1-2.)  The Petitioners argue that their "interest is superior to any interest claimed by the defendant[.]"  (Id. at 2.)

On February 1, 2016, the Government filed a Motion to Dismiss the Artemio Lopez Tardon Petition Claiming an Interest in the 2006 Mercedes-Benz SLR McLaren, or in the Alternative, to Show Cause Why His Petition Should Not be Dismissed.  (D.E. 737.) Artemio filed a Response, (D.E. 746), to which the Government filed a Reply, (D.E. 748). The Court subsequently granted the Motion to Dismiss, finding that Artemio had failed to establish standing to proceed in his claim for the Mercedes.[10]  (D.E. 762 at 9-11.)

On April 13, 2016, the Government filed a Motion for Order Compelling the Remaining Petitioners to Show Cause Why They Have Standing to Proceed, or in the

---

[9]     In the same Petition, The Collection Motor Sports of Madrid (a Spanish Corporation) claimed ownership of the eight (8) Audemars Piguet watches that the Court ordered to be forfeited to the Government as substitute assets in partial satisfaction of the forfeiture money judgment.  (See D.E. 735 at 1-2.)  On January 25, 2016, the Government filed a Motion to Dismiss The Collection's Petition.  (D.E. 736.)  On February 24, 2016, the Court granted the Government's Motion to Dismiss the Collection's Petition and dismissed the Petition with prejudice.  (D.E. 747.) The Court subsequently issued a Final Order of Forfeiture of Substitute Property of the Eight (8) Seized Watches.  (D.E. 764.)

[10]     The Court's Order did not resolve Kyte Schooll and Maria Tardon's ownership claim of the 2006 Mercedes-Benz SLR McClaren, or Kyte Schooll, Maria Tardon, and Artemio Lopez Tardon's ownership claim of the 2010 Rolls-Royce Ghost.

Alternative, to Clarify Pending Petitions.  (D.E. 760.)  Miamark, Murano, Kyte Schooll, Artemio Lopez Tardon, and Maria Tardon Torrego filed a Response, (D.E. 765), to which the Government filed a Reply, (D.E. 767).

On October 6, 2016, the Government filed a Motion for Summary Judgment against the Petitioners Claiming the Forfeited Mercedes Benz and Rolls Royce (the "Forfeited Vehicles").  (D.E. 776.)  Artemio Lopez Tardon, Maria Tardon Torrego, and Kyte Schooll filed a Response, (D.E. 777), to which the Government filed a Reply, (D.E. 778).

On May 14, 2018, the Court entered a Paperless Order referring all pending motions to Judge Goodman.  ("Paperless Order of Referral," D.E. 813.)

On June 22, 2018, the Government filed a Motion for Summary Judgment Against Petitioner Miamark LLC Claiming Three Forfeited Condominium Units (i.e., "the Marks Units").  (D.E. 825.)  Miamark filed a Response, (D.E. 827), to which the Government filed a Reply, (D.E. 834).

On June 25, 2018, the Government filed a Motion for Summary Judgment Regarding Murano 908, LLC's Petition Claiming Ownership to Forfeited Real Property (i.e., "the Murano Unit 908").  (D.E. 826.)  Murano filed a Corrected Response, (D.E. 832), to which the Government filed a Reply, (D.E. 835).

Judge Goodman held an evidentiary hearing on February 19, 2019.  (See Minute Entry, D.E. 863; Tr. of Evid. Hr'g, D.E. 876.)  "During the evidentiary hearing, Petitioners presented no witnesses, and they submitted nine exhibits, which included title documentation and a selection of company records."  (Report at 11 (citing Tr. of Evid. Hr'g at 41:24 – 46:18, 47:12-21, 135:3-19).)  "[T]he United States presented FBI Special Agent

Daniel Gaitan" and "submitted more than 100 exhibits in support of its defense."  (Id. (citing Tr. of Evid. Hr'g at 50:25 – 134:11).)

On April 17, 2019, Judge Goodman issued an Order directing the Parties to mediate the forfeiture issues before United States Magistrate Judge Chris M. McAliley.  (D.E. 889.) The mediation began on July 11, 2019, (D.E. 898), and continued to a second day on July 22, 2019, after which Judge McAliley declared an impasse, (D.E. 900).

**b.      Report and recommendations**

On February 4, 2020, Judge Goodman issued the instant Report.  (D.E. 906.)  Judge Goodman found that Petitioners lack statutory standing to assert a legal interest in the property which has been ordered forfeited to the United States because Petitioners are not persons "other than the defendant," 21 U.S.C. § 853(n)(2).  (Report at 73.)  Judge Goodman further found that Petitioners are mere nominee owners who lack standing under Article III of the United States Constitution.  (Id.)

First, Judge Goodman rejected the position (advocated by Petitioners) taken by United States Magistrate Judge Alicia M. Otazo-Reyes's Report and Recommendation, and subsequently adopted by United States District Judge Darrin P. Gayles, in United States v. Silva, 15-20727-Cr-Gayles, D.E. 120 (S.D. Fla. Sept. 6, 2018).  (See Report at 19-24.) Briefly, in Silva, Judge Otazo-Reyes found that Maisons Floride LLC was a person "other than the defendant" for purposes of 21 U.S.C. § 853(n)(2) based only on the fact that it held record title to the at-issue properties, even though the Government had submitted significant evidence that the defendant "was in total control of the entity, that no one else played a role in its activities and that no corporate formalities were followed."  (Report at

10

20.)  Judge Goodman found that: (1) he was not bound by <u>Silva</u>, (<u>id.</u> at 23); (2) neither the Report and Recommendations nor the Order adopting it cite to any law to support the notion that a corporate filing is always sufficient to, by itself, establish statutory or Article III standing at an evidentiary hearing in an ancillary forfeiture proceeding, (<u>id.</u> at 24); (3) "if the <u>Silva</u> ruling were to be followed by this Court (or other Courts), the United States would be foreclosed from challenging the standing of all corporate petitioners and claimants who took the strategic step of filing incorporation records with the State[,]" (<u>id.</u>); and (4)

> <u>Silva</u> would permit criminals to act with impunity and protect their assets and substitute assets by simply taking the administrative step of incorporating (while still maintaining dominion and control of the assets technically listed in the name of another). That one strategic step would be sufficient to establish standing and prevent further inquiry -- because corporate records would show the entity as technically separate from the convicted criminal defendant. <u>See generally</u> <u>United States v. Morgan</u>, 224 F.3d 339, 343 (4th Cir. 2000) ("Failing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity.").

(<u>Id.</u> at 24.)  To Judge Goodman, this "makes no sense" and "would render superfluous the statutory requirement that a petitioner be someone "other than the defendant."  (<u>Id.</u>)  Thus, Judge Goodman rejected the approach taken in <u>Silva</u>.

Instead, recognizing that the Eleventh Circuit had not considered how to interpret "other than the defendant" under 21 U.S.C. § 853(n)(2), Judge Goodman adopted the approach taken by the Sixth Circuit in <u>United States v. Parenteau</u>, 647 F. App'x 593 (6th Cir. 2016).  (<u>Id.</u>)  As summarized by Judge Goodman:

> In <u>Parenteau</u>, a case similar to the one presented here, the Sixth Circuit found that interpreting 21 U.S.C. § 853(n)(2)'s requirement that petitioner be a

11

person "other than the defendant" is one of "ordinary statutory construction," and not governed by federal common law or state law.  See id. at 598-99 (quoting Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989)) ("[T]he presumption is that 'in the absence of a plain indication to the contrary,' a federal statute's application 'is not . . . dependent on state law.'"). The issue "is not whether [petitioner] has a property right in the first place but rather who is eligible to petition for relief . . ." Id. at 598 (emphasis in original).

The Parenteau Court rejected the notion that record title ownership is sufficient to confer statutory standing: "the fact that an ancillary petition is not in the name of the criminal defendant is **not**, by itself, enough to conclude that the petitioner is a **person other than the defendant.**"  Id. at 596. (emphasis added).

In interpreting 21 U.S.C. § 853(n)(2), the Sixth Circuit focused on defendant's ownership and control of the third-party petitioner, a limited liability company, as well as the facts of the underlying criminal case, which established that the company's assets were "involved in [the defendant's] schemes."  See id. at 596-98. The Sixth Circuit cited petitioner's failure, aside from incorporation documents, to introduce evidence at the ancillary hearing that it had an identity separate from the defendant or that it had followed any corporate formalities, including recordkeeping.  See id. at 596.

Moreover, the Sixth Circuit noted that it was undisputed the petitioner was "completely dominated" by the defendant, was a "mere façade" for the defendant, and that defendant "diverted funds" from the company for personal use.  Id.  The Court observed that "[n]othing suggests that [the company's] legal existence ever stood in the way of [the defendant's] manipulation of [the company's] assets." Id. at 598.

The Parenteau Court also reasoned that affording standing to "a corporate entity solely because that entity is legally distinct from a natural person" would undermine two policies that underpin the federal forfeiture scheme, that of defendant's punishment and of the United States' interest in finality in the defendant's sentence.  See id. at 596. "Section 853(n)(2) is best read to preclude such a result."  Id.

(Id. at 25-26.)  Judge Goodman found that the Sixth Circuit's approach "is supported by the language of 21 U.S.C. § 853(o), which specifically provides that the statute's provisions 'shall be liberally construed to effectuate its remedial purposes.'"  (Id. at 26 (citing 21

U.S.C. § 853(o)); see also id. at 26-27 ("In other words, it would be inconsistent with the forfeiture statute's remedial purposes to enable a defendant to avoid forfeiture by simply establishing a shell company.").)   Judge Goodman also found that this approach was consistent with the Undersigned's Order dismissing Artemio's Petition claiming an interest in the 2006 Mercedes-Benz SLR McClaren.   (Id. at 29-30 (citing D.E. 762 at 8-10).) Accordingly, Judge Goodman did not "rely solely on the mere record title ownership of Petitioners" and instead "look[ed] behind title (which is, to be sure, a factor to consider) to see whether Petitioners have met their burden of establishing statutory standing by demonstrating that they are parties 'other than the defendant.'"   (Id. at 28 (citations omitted)).)

Next, Judge Goodman rejected Petitioners' suggestion that there is a distinction between the applicable rules and procedure for forfeited assets that are substitute property—what Petitioners refer to as "untainted" property—and assets that are directly forfeited as "tainted" property.  (Id. at 30.)  Judge Goodman found that: (1) The Eleventh Circuit has made clear that the purpose of the ancillary proceeding is to determine the ownership of the forfeited property, which makes it akin to a quiet title proceeding, (id. at 31 (citing United States v. Gilbert, 244 F.3d 888, 911 (11th Cir. 2001) (stating that the ancillary proceeding is "essentially a quiet title proceeding"); Amodeo, 916 F.3d at 972 ("Although it occurs in the context of criminal forfeiture, the ancillary proceeding is civil in nature.")); (2) the nature of the proceeding remains a quiet title proceeding regardless of whether the forfeited assets are substitute or directly forfeited property, (id. (citing United States v. Fleet, 498 F.3d 1225, 1228 (11th Cir. 2007) (holding provisions in the subsection

13

pertaining to forfeiture of facilitating and derived property, 21 U.S.C. § 853(a), apply in

the same way to the subsection pertaining to forfeiture of substitute property, § 853(p)));

and (3)

> regardless of whether forfeited assets are so-called "untainted" property or facilitating or derived "tainted" property, a petitioner in an ancillary proceeding has the same threshold burden of establishing that a petitioner has standing to contest the forfeiture.  Once standing is established, a petitioner has the burden of meeting one of the criteria listed in 21 U.S.C. § 853(n)(6) by a preponderance of the evidence.  Neither the burden to establish standing nor the requirement to establish the statutory criteria is affected by the nature of the assets (i.e., substitute proceeds or tainted property).

(Id. at 31-32.)

Judge Goodman noted that although state law determines the nature of a claimant's

interest in the forfeited property, straw owners "**do not** necessarily suffer an injury that is

sufficient to demonstrate standing[;]" similarly, "[**n]ominee** connotes the delegation of

authority to the nominee in a representative or nominal capacity only, and does **not** connote

the transfer or assignment to the nominee of any property in, or ownership of, the rights of

the person nominating him."  (Id. at 34 (quoting Henry, 621 F. App'x at 972).)  Thus,

although it is undisputed that Petitioners are listed as the record title owners of the at-issue

properties, Judge Goodman examined the evidence to determine whether "Petitioners have

established statutory standing by demonstrating primary dominion or control over the

properties (i.e., whether they are 'other than' Alvaro)."  (Id. at 34.)

Next, Judge Goodman examined all of the evidence and arguments Petitioners relied

on to establish their ownership in the real estate properties, (id. at 34-38), and the

Government's rebuttal evidence and arguments, (id. at 39-44 (the Marks Units), 51-55

(Murano Unit 908)).  The Court highlights the following evidence regarding ownership of

the Murano Unit 908 because it is relevant to one of Petitioners' Objections:

> 12.    [T]he [Murano Unit 908] has generated income, as tenants
> have leased Murano Unit 908 from [defense counsel Richard] Klugh, who
> used his power-of-attorney to act on behalf of Murano and to also receive
> rental payments.  See ECF Nos. 880-86; 880-85; 880-97; 880-70.  For
> instance, The Lakes LDT Partnership leased Murano Unit 908 from
> November 2013, through January 2015, and paid approximately $70,000 in
> rent directly to Mr. Klugh, and not to Murano's company account.  See ECF
> Nos. 880-97; 880-85. Mr. Klugh, in turn, has paid both Murano's and the
> tenant agent fees from his law firm's account.  See ECF No. 880-86.

(Report at 55.)  The Court highlights the following evidence regarding ownership of the

Marks Units because it is relevant to one of Petitioners' Objections:

> 15.    In . . . pre-trial litigation, the Defendant argued (in a motion
> filed by Mr. Klugh, as counsel for Alvaro) that he "concealed nothing"
> because the company records for Miamark "list the **defendant** as the ***owner***
> and give his **address** and **identifying information**." [ECF No. 75 (emphasis
> in original)]. Similarly, the motion represented that "every single property as
> to which an LLC was the purchaser was "identified by name with the
> defendant" and that "**all** of the LLCs and corporations go directly back to the
> defendant on the official Florida records sites. . . ." Id. (emphasis in original).
> . . .
>
> 17.    Alvaro and his personal attorney, Mr. Klugh, are the only
> representatives who Miamark has produced in this litigation, and they, and
> not Miamark, would benefit from the release of Forfeited Mark Units. Mr.
> Klugh represented at Alvaro's deposition that he, in effect, helped to manage
> the Forfeited Mark Units after Defendant's detention, by, for example,
> paying maintenance fees.[11]  See ECF No. 880-4.

(Report at 44 (footnote in original).)  After reciting this evidence, Judge Goodman paused

for a six page "Note About Deposition Behavior" in which he describes conduct by Mr.

---

[11]    Mr. Klugh blurted out this information as substantive factual information in
response to a deposition question asked of his client, Alvaro, who was appearing as Miamark's
corporate representative.

Klugh during Alvaro's deposition as, "to be diplomatic, frowned upon." (Id. at 46.) "Mr. Klugh did not merely interpose objections. He sometimes assumed the role of witness and volunteered a substantive answer, as if he were the deponent. This is impermissible." (Id.) Judge Goodman's "review of Alvaro's deposition transcript reveals that Mr. Klugh interrupted, gave answers himself (even though he was not under oath and was not the deponent), interposed inappropriate objections, and made comments designed to coach his client." (Id. at 47.) Judge Goodman quoted specific examples from the Deposition Transcript of such behavior. (Id. at 47-50.) Judge Goodman noted that that the Government did not adjourn the deposition and contact Judge Goodman's chambers to object to the behavior, but if it had, Judge Goodman would have entertained such objections. (Id. at 50.)

Ultimately, Judge Goodman found that "[t]he evidence establishes that Petitioners have, at best, nominal ownership to the real properties at issue. The mere fact that some family members may have at times stayed at the apartments is woefully inadequate to establish that the corporate entities (and not Alvaro) are the actual, real owners of the properties." (Id. at 57.) Judge Goodman then highlighted some (but not all) of the evidence that informed this conclusion:

> First, at trial, Alvaro's then-spouse, Sharon Cohen, testified that Alvaro owned the Mark Units and created LLCs to hold properties that actually belonged to him. Second, the LLCs' articles of organization list Alvaro as the managing member. Third, Alvaro's attorney, Mr. Klugh, represented in the underlying criminal case that Alvaro "**concealed nothing**" because the records of Miamark and Murano 908 **"list the defendant as the owner** and give his address and identifying information." [ECF No. 75 (emphasis added)]. Fourth, Alvaro admitted that the transfer of title to The Mark Units "weren't sales" because they merely "changed names to Miamark." [ECF

16

No. 880-50]. Fifth, both Miamark and Murano **selected** Alvaro to be its corporate representative for a deposition which the United States took of the corporate Petitioners. [ECF Nos. 825-3; 826, p. 3]. Miamark and Murano both designated the Defendant even though he was a convicted felon. Sixth, Alvaro often represented that he was the owner of Miamark and The Mark Units before his conviction. For example, in correspondence with The Mark's condominium association, he was identified as the "owner" of The Mark Units "through various entities." [ECF No. 825-8, p. 87].

Focusing on the specifics of the financial circumstances, Miamark did not pay any consideration to obtain title to The Mark Units. Instead, Defendant Alvaro executed purchase agreements to acquire Unit 2703 and Unit 202, and eventually, in or around 2001, Defendant Krentz, a convicted co-conspirator, acquired title to The Mark Units. See ECF No. 825. Defendant Krentz held title to The Mark Units for approximately five years, before transferring the properties, via quitclaim deeds, to Miamark. See id. at ¶ 6. As noted above, Defendant Alvaro admitted in Miamark's deposition, "They weren't sales . . . They changed names to Miamark." See id. at ¶ 7.

For the Murano unit, Ideal Properties, Inc. ("Ideal") conveyed title for Unit 908 to Murano, subject to a first mortgage, on January 25, 2006, after receiving two-installment payments. [ECF No. 826]. However, Murano did not make either of these payments. Rather, the first payment for $50,000 came from ***Alvaro's*** personal checking account that he held jointly with his convicted co-conspirator, Defendant Krentz, and the second payment for $460,000 came from loan proceeds Defendant Krentz obtained by refinancing a loan on a luxury condominium owned by Contion, LLC, for which Alvaro was Managing Member. See ECF No. 826-1.

Furthermore, Murano (the record title owner) did not make the payments to satisfy and release WAMU's first mortgage on Unit 908 either. Rather, Alvaro paid off WAMU's first mortgage between November and December 2008 using funds from personal checking accounts that he held either solely or jointly with his brother, Artemio Lopez Tardon, and his sister, Maria Tardon Lopez, despite requirements in Murano's Operating Agreement mandating payment of Murano expenses from a company account. See ECF No. 826-1, ¶¶ 12-13, 22. In fact, Murano was not able to pay off WAMU's first mortgage using company funds because Alvaro, as sole Managing Member, did not open a company account for Murano until June 1, 2009. Id. at ¶¶ 19, 20. As Murano's sole Managing Member, Alvaro opened Murano's only bank account – over which he had sole signature authority. Id. at ¶¶ 19, 22.

In addition, attorney Peter Lopez testified that realtor Daisy Martins first introduced him to Alvaro in order to create Alvaro could acquire the Murano unit. [ECF No. 826-14, p. 6]. According to Lopez's deposition testimony, Alvaro showed up in person in his office and asked him "to create the company, so that *he* could purchase that property." Id. at p. 7 (emphasis added).

(Id. at 57-60.)  For these reasons, Judge Goodman found that Miamark and Murano are not "other than the Defendant" and, as such, lacked statutory standing to challenge the Court's forfeiture order.  (Id. at 60.)

Next, Judge Goodman reviewed all of the evidence and arguments Petitioners relied on to establish their ownership in the Forfeited Vehicles.[12]  (Id. at 60-65.)  In addition to having record title to the vehicles, Petitioners asserted the following:

1.   They say the United States does not dispute that Alvaro and his family members were involved in car sales as part of Spanish and U.S. corporate entities about which there was substantial testimony at trial (including The Collection Motor Sports of  Madrid, Kyte Schooll, and The Collection Motor Sport of Miami, LLC). Similarly, they represent that the United States has acknowledged that the car business entities provided the funds to purchase the Mercedes (Kyte Schooll wire transfers, see ECF No. 550-6, p. 3) and the Rolls Royce (Spanish car companies provided the funding by wire transfer, see id.).

2.   Concerning the Mercedes, the United States introduced evidence showing that all of the purchase money for the car was provided by Petitioner Kyte Schooll in four wire transfers amounting to $343,700. [ECF No. 713, p. 60]. In fact, Petitioners note that the United States' motion for forfeiture attached a chart showing each of the payments by Kyte Schooll to purchase the Mercedes. [ECF No. 550-6, p. 3 (showing wire transfer payments from Kyte Schooll to Rick Case Honda on Feb. 21-23, 2007, for full price of Mercedes)].

---

[12]      For clarity, Maria Tardon and Artemio Tardon claim ownership of the Rolls Royce, while Maria Tardon and Kyte Schooll claim ownership of the Mercedes-Benz.  (D.E. 735.) Artemio's claim to the Mercedes-Benz was previously dismissed for lack of standing.  (D.E. 762.)

3.     Kyte Schooll has always been listed at least as a co-owner in the titling of the Mercedes.

4.     Concerning the Rolls Royce purchase, at the forfeiture jury trial, the United States sought to show improper sources for the funding of the purchase, explaining that two Spanish car companies with ties to the Tardon family had provided the funds. See ECF No. 713, pp. 47-48 (Agent Gaitan explains that car dealer Cars Boats Madrid SL wired $315,960 to Braman Motors to purchase the Rolls Royce); ECF No. 550-6 (noting additional $49,000 from The Collection Exotic Cars went to the purchase of the Rolls Royce); ECF No. 550-6, p. 3 (showing purchase funded by Cars Boats Madrid SL); ECF No. 536, p. 69 (counsel for the United States stating: "[W]e have two separate wires going to purchase an automobile [the Rolls Royce] -- a luxury automobile that was then titled in the name of a company.") (emphasis added).

5.     The trial testimony showed that while Alvaro was going through a divorce proceeding, he sought to ship various vehicles to Spain, and that Alvaro communicated with the general manager for The Collection Motor Sports regarding those proposed shipments. When it was ready to be shipped to Spain (where Maria and Artemio lived and whe[re] The Collection Motor Sports dealership did business), the Mercedes title included Maria, along with Kyte Schooll and Alvaro in the titles.

6.     The title for the Rolls Royce was originally in Alvaro's name, when the car was purchased in July 2010, less than a year before Alvaro's arrest. Title was transferred to Claimants Artemio Tardon and Maria Tardon when the car was to be shipped to Spain in 2011.

7.     Sharon Cohen's testimony, and the testimony of David Pollack [ECF No. 776-9, p. 18] showed that the reason for shipping cars to Spain was to advance the interest of the Tardon family's car business. That business was shown to have millions of dollars in sales and two showrooms, with a record that included highly profitable transactions. See ECF Nos. 531, pp. 6-62; 532, pp. 95-130.

8.     Alvaro, a co-owner of The Collection who worked without a salary, according to the financial evidence introduced at trial by the United States, purchased many used cars for shipment to the Spanish dealership he and his family owned. David Pollack testified that: "He would keep them for a few months, up to a year . . . And then he would ship them over to Spain to be sold in his dealership." [ECF No. 776-9, p. 18]. There was no evidence offered that any use or other action by Alvaro (including any delay in sending

the cars to Spain) caused any diminution of the value of the collectible cars that he worked to select for resale. To the contrary, when other collectible cars were auctioned for sale in this case by the United States, they were offered as being in excellent condition and they produced millions of dollars at auction.

9.    Even if the timing of the shipment of cars to Spain was affected by ongoing divorce proceedings, testimony by the United States' witness Pollack shows that the purpose of the shipment of the cars was so that they could "be sold in a dealership." [ECF No. 776-9, p. 18]. According to Petitioners, the United States failed to contest their interrogatory answers pertaining to the vehicles [ECF Nos. 776-3; 776-4; 776-5] that made that very point, that the transactions were conducted in the ordinary course of the family's car dealer operations that included permitting individual members of the family to personally own or co-own vehicles, including to facilitate handling and shipment.

10. The United States' effort to treat Artemio Tardon's interest in the cars as stemming just from the retitling of a vehicle ignores his other interrogatory answers [ECF No. 776-4] revealing his ownership of the car businesses and the assets of the dealer-use cars. Interrogatory answers by Artemio and Maria Tardon clearly state that "the cars were purchased for Kyte Schooll (the McLaren) and The Collection Motor Sports (Rolls Royce), were held in Miami for dealer use and then were to be transported to Europe for sale." [ECF Nos. 776-3; 776-4]. An interrogatory answer by Kyte Schooll explains that the cars were "under the control of agents of the company." [ECF No. 776-5].

Thus, the answers maintain that the cars were at all times destined for use in the family car businesses, Kyte Schooll and The Collection, or were to be used by dealer agents pending or prior to sale, and were titled accurately and validly. Kyte Schooll, which was initially owned by Artemio Tardon, Maria de las Nieves Tardon, Julio Cesar Fraile Garcia, and Maria Tardon Torrego, was a coordinating entity for assets of the Tardon car sales company, The Collection Motor Sports of Madrid. [ECF No. 525, pp. 91-92]. And Kyte Schooll paid in full for the Mercedes and was invoiced accordingly. [ECF No. 877-1, p. 110].

(Id. at 61-65.)

Judge Goodman then reviewed the following rebuttal evidence and arguments put forth by the Government:

1.      After several years of litigation, Petitioners' exclusive reliance on title documentation to support their claims to the Forfeited Vehicles demonstrates that Maria Tardon, Artemio Tardon, and Kyte Schooll hold only nominal title to the Mercedes Benz or the Rolls Royce.

2.      There is overwhelming evidence in the record that shows Alvaro's dominion and control over the Forfeited Vehicles *before* their seizure. Alvaro purchased, possessed, and insured the Forfeited Vehicles, while Petitioners gave nothing of extrinsic value in obtaining title and did not exercise any other form of dominion or control over either of them.

3.      In July 2010, Alvaro purchased the Rolls Royce for more than $330,000, and certified that he **personally** had automobile insurance then-in effect for the vehicle. See ECF Nos. 877-1 (Evidentiary Hr'g Tr. 119:4-120:5; 121:21-122:3); 880-80 (ADM135-00007 to ADM135-00008); 776-6, p. 104.

4.      In February 2007, the Mercedes Benz was purchased for approximately $343,201, initially shipped to Spain, and then returned to Alvaro. See ECF Nos. 877-1 (Evidentiary Hr'g Tr. 110:10-111:10); 880-83 (ANC001-00340); 776-6, p. 6, 12. In a letter to the tag agency upon the vehicle's return, Alvaro stated that the Mercedes Benz "was unregistered in Spain to its **owner,** Alvaro Lopez [the Defendant], who is also the owner of Kyte Schooll SL." [ECF No. 880-83, p. 13].

5.      The Defendant also personally insured the Mercedes under a policy held by him and his then-spouse, Sharon Cohen. See ECF No. 880-82.

6.      After their purchase, Alvaro registered and titled the Forfeited Vehicles in his name at his address at 2475 S. Bayshore Drive, Villa 3, Coconut Grove, Florida ("Bayshore residence"). See ECF No. 880-83.

7.      The Defendant drove the Mercedes Benz and the Rolls Royce and would "show [them] off" at restaurants or clubs, and he stored them at his various residences. See ECF Nos. 523 (Cohen Trial Tr. 83:11-14); 776; 519.

8.      In further demonstration of Alvaro's dominion and control, it was Alvaro who decided to transfer nominal title to the Forfeited Vehicles to his mother, Maria Tardon, and his brother, Artemio Tardon, because he feared that his then-spouse, Sharon Cohen, might try to obtain them in pending divorce proceedings. See ECF Nos. 884-2; 880-32. In fact, after a

domestic dispute with Sharon Cohen, Alvaro told David Pollack, a convicted co-conspirator, that he was going to ship approximately seven cars to Spain because he feared that Sharon Cohen would get the vehicles in divorce proceedings.  See ECF No. 520 (Pollack Trial Tr. 38:12-39:12). Indeed, the Defendant titled other vehicles and property he owned in the names of other persons, including Sharon Cohen and David Pollack, who did not exchange funds or sign paperwork to obtain the property.  See ECF Nos. 523 (Cohen Trial Tr. 80:23-82:25, 87:24-88:10); 776-7; 519 (Pollack Trial Tr. 182:19-190:1).

9.    Petitioners Maria Tardon and Artemio Tardon, who were not present at the evidentiary hearing, admitted in their interrogatory answers that they did not acquire title through a financial transaction, and no funds were exchanged when title to the Forfeited Vehicles was transferred to their names.  See ECF Nos. 880-77; 880-78; 776-2; 776-3.

10.   Significantly, Maria Tardon and Artemio Tardon have both asserted that their respective interests in the Forfeited Vehicles "arose from [their] expenditure of effort and money in arranging to help effectuate the resale of the vehicles." See ECF Nos. 776; 880-77; 880-78.

11.   When asked in interrogatories about specific instances of their dominion and control over the Forfeited Vehicles, Maria Tardon and Artemio Tardon in nearly identical fashion referenced only their **assistance with the transfer of title**, and nothing more.  See id.

12.   Petitioners also admitted that the Forfeited Vehicles were located in Miami, out of their possession.  See ECF Nos. 776-2; 880-77; 880-78.

13.   In interrogatory answers, both Maria Tardon and Artemio Tardon have acknowledged that they obtained their claimed interests in the Forfeited Vehicles "following the separation of [the Defendant] from his wife." See ECF Nos. 776; 880-77; 880-78. Accordingly, Maria Tardon and Artemio Tardon's only proffered instance of dominion and control over the Forfeited Vehicles was their limited interaction in transferring title to the Forfeited Vehicles for the benefit of Alvaro.

(Id. at 66-69 (footnote omitted).)

When weighing the evidence, Judge Goodman initially found that "Petitioners' interrogatory answers [are] largely detail-free, vague responses which appear designed to

22

provide as little information as possible.  In addition, the answers, nebulous as they are, are somewhat equivocal, and reveal unfamiliarity with the specific facts surrounding the very vehicles at issue in their Petitions."[13]  (Id. at 69.)  Ultimately, Judge Goodman concluded that Petitioners (1) lack statutory standing because they are not persons "other than the Defendant" for purposes of 21 U.S.C. § 853(n)(2), and (2) lack constitutional standing because they are mere naked title owners who are nominees for Alvaro.  (Id. at 71 (citations omitted).)  Judge Goodman opined:

> Petitioners have not claimed that they paid for the vehicles, ever used the luxury vehicles, or ever drove the vehicles. Indeed, they have not even said that they have ever been in the vehicles. Rather, their theory is that they traveled to Miami to help make arrangements for transfer of title. This is inadequate to offset Alvaro's substantial involvement in the purchase and use of the vehicles. . . .

> Framed by the evidence demonstrating Alvaro's dominion and control over the two luxury vehicles, comparing Petitioners' purported interests with a claimant who received a mere gift is analytically helpful (but unhelpful to their position).

(Id. at 72 (citations omitted).)

Therefore, Judge Goodman recommends that the Court deny and/or reject the Amended Petitions for Third-Party Interest in Forfeited Property (D.E. 734, 735) for lack

---

[13]     For example, "in response to an interrogatory asking for the date the vehicle was purchased and the contact information of the seller and buyer, Maria Tardon gave the following under-oath answer: 'My **understanding** is that the cars were purchased for Kyte Schooll (the McLaren) and The Collection Motor Sports (Rolls), were held in Miami for dealer use and then were to be transported to Europe for sale.  These **addresses are of record** in the case.  The principals in the sales companies are Artemio and Alvaro Lopez Tardon.'"  (Id. at 69-70 (citing D.E. 880-78 at 9).)

As another example, "in response to an interrogatory asking if the vehicle was a gift, Maria Tardon gave the following under-oath answer: 'It was my **understanding** that my interest in the property arose from my expenditure of effort and money in arranging to **help effectuate the resale** of the vehicles.'"  (Id. at 70 (citing D.E. 880-78 at 14).)

of standing.  (Id. at 73.)  He further recommends that the Court deny as moot the United

States' (1) Motion for Summary Judgment Against Petitioners Claiming Forfeited

Mercedes Benz and Rolls Royce, (D.E. 776); (2) Motion for Summary Judgment Against

Petitioner Miamark LLC Claiming Three Forfeited Condominium Units, (D.E. 825); (3)

Motion for Summary Judgment Regarding Murano 908, LLC's Petition Claiming

Ownership to Forfeited Real Property, (D.E. 826); (4) Motion for Order Compelling

Remaining Petitioners to Show Cause why they Have Standing to Proceed, or in the

Alternative, to Clarify Pending Petitions, (D.E. 760); and (5) Motion for Inquiry Regarding

Potential Conflict (because the Court already held a hearing on that matter, (see D.E.

717)).[14]

### b.    Objections

On March 19, 2020, Petitioners filed Objections to Judge Goodman's Report.  (D.E.

909.)   Therein, they initially argue (for the first time) that Judge Goodman lacked

jurisdiction to conduct ancillary forfeiture proceedings or make forfeiture decisions as to

Defendant's property interests that were not made in the criminal case.  (Id. at 4-7.)  They

further object to: the "procedural and substantive framework" Judge Goodman applied to

determining the issues, (id. at 7-10); Judge Goodman's reliance on post-indictment

---

[14]      Judge Goodman also recommends denying as moot the United States' Motion to
Dismiss the Artemio Lopez Tardon Petition Claiming an Interest in One (1) 2006 Mercedes-Benz
SLR McClaren, or in the Alternative, to Show Cause why his Petition Should not be Dismissed,
(D.E. 737).  (See Report at 6, 74.)  However, the Court already granted that Motion and dismissed
Artemio's claim for the Mercedes for lack of standing.  (D.E. 762.)  For this reason, Judge
Goodman's discussion as to whether Artemio has standing to challenge the forfeiture of the
Mercedes was unnecessary.

representations made by Defendant's trial attorney and Petitioners' former attorney, Richard Klugh, (<u>id.</u> at 10-13); Judge Goodman's reliance on authority from other circuits, (<u>id.</u> at 13-17); Judge Goodman's "[f]ailure to address Florida case law on LLC management and ownership and recognition/apportionment of member property interests as to LLC assets[,]" (<u>id.</u> at 17-19); Judge Goodman's alleged failure to make credibility findings regarding evidentiary hearing testimony and affidavits, (<u>id.</u> at 19-21); Judge Goodman's alleged failure to "undertake effective review of [the] criminal case record," (<u>id.</u> at 21-28); Judge Goodman's alleged failure to "adhere to the express terms of [the] stipulation for sale of Miamark Unit 202[,]" (<u>id.</u> at 28); and Judge Goodman's alleged failure to address the car purchase ownership interests of Kyte Schooll and Artemio Tardon, (<u>id.</u> at 28-31).

## II.    Legal Standards

### a.    Forfeiture

Following the entry of a preliminary order of forfeiture, "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States . . . may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). The petitioner must establish, by a preponderance of the evidence, that

> **(A)** the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section[.]

21 U.S.C. § 853(n)(6). In determining whether the petitioner has satisfied this burden, the Court must consider the evidence and witnesses presented by both parties at the hearing, as well as "the relevant portions of the record of the criminal case which resulted in the order of forfeiture." 21 U.S.C. § 853(n)(5). "If, after the hearing, the court determines that the petitioner has" satisfied this burden, "the court shall amend the order of forfeiture in accordance with its determination." 21 U.S.C. § 853(n)(6). The Court looks to state law to determine the nature of a petitioner's interest in the property, but federal law determines whether the petitioner's interest in the forfeited property is superior and requires an amendment to the forfeiture order. See United States v. Shefton, 548 F.3d 1360, 1364 (11th Cir. 2008) (citing United States v. Fleet, 498 F.3d 1225, 1231 (11th Cir. 2007)).

"Standing in forfeiture cases has 'both constitutional and statutory aspects.'" United States v. Timley, 507 F.3d 1125, 1129 (8th Cir. 2007) (quoting United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233 (hereafter, "Bulger"), 326 F.3d 36, 40 (1st Cir. 2003)). "As to constitutional standing, '[i]t is well established that a party seeking to challenge a forfeiture of property must first demonstrate an ownership or possessory interest in the seized property in order to have standing to contest the forfeiture.'" Id. (citing Bulger, 326 F.3d at 41); see also United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019) ("To establish standing in a

26

forfeiture proceeding, we have looked to whether the litigant has an interest in the property subject to the forfeiture because, absent an interest in that property, there is no case or controversy."). "Bare legal title, however, 'in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture.'" United States v. Coffman, 612 F. App'x 278, 286 (6th Cir. 2015) (citing United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 498 n.6 (6th Cir. 1998)). "This is so because 'people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name. . . . [C]ourts look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings of someone else." Id. (quoting United States v. Carrell, 252 F.3d 1193, 1204 (11th Cir. 2001)). See also Via Mat Int'l S. Am. Ltd. v. United States, 446 F.3d 1258, 1262 n.5 (11th Cir. 2006) ("'[S]traw owners' and persons who might have unknowingly been in possession of property that is seized do not necessarily suffer an injury that is sufficient to demonstrate standing."); United States v. Henry, 621 F. App'x 968, 972 (11th Cir. 2015). "Likewise, a person found to be acting as a nominee for others whose property is subject to forfeiture cannot have a vested interest in the property." Henry, 621 F. App'x at 972 (citing United States v. Weiss, 467 F.3d 1300, 1303 n.1 (11th Cir. 2006)). "Nominee connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him." Weiss, 467 F.3d at 1303 n.1 (citation and internal quotation marks omitted).

27

Statutory standing under 21 U.S.C. § 853(n)(2) requires a claimant to be "[a]ny person, <u>other than the defendant</u>, asserting a legal interest in property which has been ordered forfeited to the United States[.]" Thus, one aspect of statutory standing under Section 853(n)(2) requires the claimant to show that he is someone "other than the defendant." <u>See</u> <u>United States v. Parenteau</u>, 647 F. App'x 593, 595, 598 (6th Cir. 2016) (finding that corporate claimant in forfeiture proceedings lacked standing to petition for an amendment of the forfeiture order because it was not someone "other than" the defendant). "[T]he fact that an ancillary petition is not in the name of the criminal defendant is not, by itself, enough to conclude that the petitioner is a person other than the defendant." <u>Id.</u> at 596. Another aspect of standing under Section 853(n)(2) requires the claimant to show that he has a "legal interest" in the property. <u>United States v. Timley</u>, 507 F.3d 1125, 1129 (11th Cir. 2007).

### b.    Report and recommendation

Pursuant to Rule 59(b)(3) of the Federal Rules of Criminal Procedure and 28 U.S.C. § 636(b)(1)(B), the Court must consider <u>de novo</u> any objection to the magistrate judge's recommendation. "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." <u>Marsden v. Moore</u>, 847 F.2d 1536, 1548 (11th Cir. 1988). Those portions of a magistrate judge's report and recommendation to which no objection has been made are reviewed for clear error. <u>See</u> <u>Lombardo v. United States</u>, 222 F. Supp. 2d 1367, 1369 (S.D. Fla. 2002); <u>see also</u> <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006) ("Most circuits agree that [i]n the absence of a timely filed

objection, a district court need not conduct a <u>de novo</u> review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.") (internal quotation marks and citations omitted).  The Court "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."  Fed. R. Crim. P. 59(b)(3); <u>see also</u>  28 U.S.C. § 636(b)(1)(B).

"To the extent that the magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings."  <u>LoConte v. Dugger</u>, 847 F.2d 745, 750 (11th Cir. 1988).  The Eleventh Circuit has explained that "[c]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749 (11th Cir. 2002) (citing <u>Viehman v. Schweiker</u>, 679 F.2d 223, 227-28 (11th Cir. 1982)).  "[I]n evaluating the factual version of events," the Court "should defer to the magistrate judge's determinations unless his understanding of the facts appears to be 'unbelievable.'"  <u>Id.</u> (citing <u>United States v. Rivera</u>, 775 F.2d 1559, 1561 (11th Cir. 1985)); <u>see also</u> <u>United States v. Cravero</u>, 530 F.2d 666, 670 (5th Cir. 1976) ("We believe that for the testimony to be incredible it must be unbelievable on its face.").[15]

---

[15]     In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

## III.    Discussion

Petitioners initially argue that Judge Goodman lacked jurisdiction to conduct ancillary forfeiture proceedings or make forfeiture decisions as to Defendant's property interests that were not made in the criminal case. (Id. at 4-7.) Petitioners further object to: the "procedural and substantive framework" Judge Goodman applied to determine the issues, (id. at 7-10); Judge Goodman's reliance on post-indictment representations made by Defendant's trial attorney and Petitioners' former attorney, Richard Klugh, (id. at 10-13); Judge Goodman's reliance on authority from other circuits, (id. at 13-17); Judge Goodman's "[f]ailure to address Florida case law on LLC management and ownership and recognition/apportionment of member property interests as to LLC assets[,]" (id. at 17-19); Judge Goodman's alleged failure to make credibility findings regarding evidentiary hearing testimony and affidavits, (id. at 19-21); Judge Goodman's alleged failure to "undertake effective review of [the] criminal case record," (id. at 21-28); Judge Goodman's alleged failure to "adhere to the express terms of [the] stipulation for sale of Miamark Unit 202[,]" (id. at 28); and Judge Goodman's alleged failure to address the car purchase ownership interests of Kyte Schooll and Artemio Tardon, (id. at 28-31). The Court will discuss each in turn.

### a.    Magistrate Jurisdiction

As an initial matter, Petitioners argue—for the first time—that Judge Goodman lacked jurisdiction to determine whether Defendant, Alvaro Lopez Tardon, has an ownership interest in the subject real estate. (Obj. at 4 (citing United States v. Morgan, 224 F.3d 339, 343 (4th Cir. 2000)).) They further argue the Court made no findings

30

regarding Defendant's ownership interests in the subject real estate in prior proceedings or orders upon which Judge Goodman could rely. (Id.) They argue that there was no "jurisdictional basis for the magistrate judge to issue a report and recommendation on ultimate relief on ancillary forfeiture[.]" (Id. at 5 (discussing Gomez v. United States, 490 U.S. 858 (1989)).) They argue that the Eleventh Circuit has held that a magistrate judge lacks "authority, either independently or on a district court's referral for a report and recommendation, to conduct the evidentiary and fact-finding portions of a sentencing hearing in a felony case absent the defendant's consent." (Id. at 6 (citing United States v. Ruiz-Rodriguez, 277 F.3d 1281, 1293 (11th Cir. 2002)).) They appear to argue that these ancillary forfeiture proceedings are akin to proceedings under 28 U.S.C. § 2255, which the Eleventh Circuit has held are "not a 'civil matter' for purposes of [28 U.S.C. §] 636(c)." (Id. at 7 (citing Brown v. United States, 748 F.3d 1045, 1056, 1059, 1072 (11th Cir. 2014)).) Finally, they argue that "even if there were a provision for consent to delegation of ancillary forfeiture to the magistrate judge," Petitioners did not consent to such a delegation in this case, and consent cannot be implied. (Id. (citing Roell v. Winthrow, 538 U.S. 580, 586 (2003)).)

The Government argues that Petitioners never raised this issue to Judge Goodman and, as such, this is an untimely and improper objection that the Court should decline to consider. (Resp. at 2 (citing Disler v. Royal Caribbean Cruise Ltd., No. 17-23874-CIV, 2019 WL 1992929, at *1 n.1 (S.D. Fla. Mar. 15, 2019) (citing Williams v. McNeil, 557 F.3d 1287, 1292 (11th Cir. 2009)))).) It further argues that even assuming arguendo the objection is timely raised, it fails substantively because the Court properly referred the

forfeiture issues to Judge Goodman on May 14, 2018.  (Id. at 3 (citing Paperless Order of Referral (D.E. 813)).)  It argues that 28 U.S.C. § 636(b)(1) "provides for such a delegation, which Petitioners have tacitly acknowledged" by, for example, relying heavily on Magistrate Judge Alicia M. Otzao-Reyes's Report and Recommendation on a Petition for Third-Party Interest in Forfeited Property in United States v.Silva, 15-20727-Cr-Gayles (S.D. Fla. Sept. 6, 2018), "which involved precisely the same delegation." (Resp. at 3.)  It argues that the cases on which Petitioners rely are inapposite as they involved "criminal felony proceedings in which the magistrate court did not have jurisdiction to conduct an evidentiary hearing absent the parties' consent." (Id. at 4 (citing Obj. at 5-6 (citing Gomez, 490 U.S. 858; Ruiz-Rodriguez, 277 F.3d 1281; Brown, 748 F.3d 1045)).)  In this regard, the Government observes that

> It appears that Petitioners are mistakenly inferring that the Court delegated or referred the ancillary proceeding to the Magistrate Court in accordance with § 636(c), rather than § 636(b).  If this is the case, then Petitioners are clearly mistaken in this regard for two important and related reasons.  A referral under § 636(c), which does require consent of the parties, does not require a magistrate judge to issue a report and recommendation because § 636(c)(1) gives the magistrate court full authority to enter a judgment without district court review.  See 28 U.S.C. § 636(c).  Indeed, a magistrate court's judgment in cases referred under § 636(c) is final and not subject to appeal to a district court.  See 28 U.S.C. § 636(c)(3) ("Upon entry of judgment in any case referred under paragraph (1) of this subsection, an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court."); see also Roell v. Withrow, 538 U.S. 580, 585, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003) (A referral under § 636(c)(1) gives the magistrate full authority without district court review).

(Id. at 4-5 (footnote omitted).)  Finally, the Government argues that even if the Parties were required to consent to the Magistrate Judge conducting a hearing in this ancillary

proceeding, "Petitioners provided consent through their participation in the litigation," having "attended numerous status conferences, submitted exhibit and witness lists in preparation for the evidentiary hearing, attended the evidentiary hearing, and even drafted a proposed report and recommendation after the evidentiary hearing, without ever expressing or even implying an objection to the Court's referral to the Magistrate Court." (Id. (citing Roell, 538 U.S. at 584, 586-87).)

The Court finds that Petitioners failure to raise their jurisdictional arguments to Judge Goodman resulted in a waiver of those arguments.  See Knight v. Thompson, 797 F.3d 934, 937 n.1 (11th Cir. 2015) (finding that the plaintiffs' waived argument made for the first time in objections to a magistrate judge's report and recommendation because the district court did not consider the argument when it ruled on the report and recommendation).  Although the Court has discretion to consider the argument, the Court declines to consider it.  Williams, 557 F.3d at 1291 (holding that "a district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge").

   b.   **Procedural and substantive framework**

Petitioners next assert "[s]tatutory interpretation, due process, and other constitutional objections regarding the R&R's procedural and substantive framework for denying relief to" Petitioners.  (Id. at 7.)  First, they argue that Judge Goodman imposed an improper burden of proof, requiring them to establish "'their standing to the fullest degree at the evidentiary hearing.'"  (Id. at 8 (quoting Report at 73).)  They further object to Judge Goodman discounting Petitioners' recorded ownership interests in the property in

favor of focusing on Defendant Alvaro's exercise of dominion over the property to determine whether they have standing.  (Id. at 8-10.)  They argue that there is no precedent supporting the position that an owner who has "naked title" to a property "lack[s] standing to petition to show that the record title ownership interest is greater than any interest a non-owner," and such a position is particularly unreasonable when the property is "untainted real estate."  (Id. at 8.)  They argue that "any party who has properly recorded title to the real estate, and is subject to taxation and other liability due to such recorded ownership, has standing to pursue that ownership interest in ancillary proceedings."  (Id. at 9 (citing United States v. Kennedy, 201 F.3d 1324, 1334 (11th Cir. 2000)).)  They argue that under Florida law, an LLC is permitted to have a manager (like Alvaro) who acts with the authority of the members and "properly exercises the dominion and control of the members."  (Id. at 9-10.)  They further argue that Judge Goodman's "constricted conception of ownership interests, entirely discarding state property law, violates due process.  To say that a record owner of real estate has no standing based on forfeiture statutes would render the forfeiture statutes unconstitutional."  (Id. at 10.)  Finally, they argue that the forfeiture of all interest in an LLC due to mismanagement or misnomers in a corporate document would create unacceptable tension with the Eighth Amendment . . . ."  (Id. (citing Austin v. United States, 509 U.S. 602, 604 (1993)).)

The Government argues that Petitioners' "do not distinguish the ample precedential case law cited in the R&R, nor do they cite to any controlling authority to support their conclusory statements."  (Resp. at 7.)  They argue that Judge Goodman correctly observed that "the Eleventh Circuit has made it clear that the purpose of the ancillary proceeding is

to determine the ownership of the forfeited property, which makes it akin to a quiet title

proceeding."  (Id. (citing Report at 30-31 (citing United States v. Gilbert, 244 F.3d 888,

911 (11th Cir. 2001))).)  And

> [r]egardless of whether forfeited assets are so-called "untainted" property or
> facilitating or derived "tainted" property, a petitioner in an ancillary
> proceeding has the same threshold burden of establishing that petitioner has
> standing to contest the forfeiture.  Once standing is established, petitioner has
> the burden of meeting one of the two criteria listed in 21 U.S.C. § 853(n)(6)
> by a preponderance of the evidence.  In these ancillary proceedings,
> addressing the threshold question of standing would lead to the same result
> if the "merits" question of ownership under § 853(n)(6) were also addressed.
> As the R&R observed, if "Petitioners lack statutory standing because their
> record title ownership is insufficient to establish that they are 'other than the
> defendant' or . . . Petitioners are mere naked title holders and cannot establish
> Article III constitutional standing, then they lack the requisite 'legal interest'
> to amend the forfeiture order."  See R&R, ECF No. 906:32-33 (also
> referencing United States v. Morgan, 224 F.3d 339, 334 (4th Cir. 2000) and
> United States v. Weiss, 467 F.3d 1300, 1300 n.1, 1311 (11th Cir. 2006)).  See
> also United States v. Masilotti, 510 F. App'x 809, 2013 WL 646375, at *1
> n.2 (11th Cir. 2013) (no need to address substantive merits of third-party
> claim if petitioner lacks standing) (cited in R&R, ECF No. 906:15-16).

(Resp. at 8.)  The Government further argues that Judge Goodman's finding that Petitioners

lack standing does not violate procedural due process or implicate the Excessive Fines

Clause of the Eighth Amendment.  (Id. at 8-12.)

The Court overrules Petitioners' statutory interpretation and constitutional

objections regarding the Report's procedural and substantive framework for determining

whether Petitioners have standing.  First, the Court finds that Judge Goodman did not

impose an improper burden of proof.  In the "Conclusion" Section of the Report, Judge

Goodman states: "Even if the United States had elected to not present evidence at the

evidentiary hearing, the Undersigned would have reached the same conclusion, as

35

Petitioners bear the burden of establishing their standing <u>to the fullest degree</u> at the evidentiary hearing." (Report at 73 (emphasis added).) However, the Court finds that this was not a recitation of the standard of proof Judge Goodman required of Petitioners, as no such standard exists in American law. Rather, Judge Goodman was observing that at an evidentiary hearing, claimants in forfeiture proceedings cannot rely solely on record title ownership and must establish dominion and control over the property in order to establish standing. (<u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 17-18.) Indeed, this is <u>precisely</u> what Judge Goodman stated when discussing the principles of statutory and constitutional standing, and when identifying the correct burden of proof: "[A]t an evidentiary hearing, as opposed to a hearing on a motion to dismiss or one seeking summary judgment, a third-party petitioner must demonstrate, <u>by a preponderance</u>, '***primary*** dominion or control' over the property to establish standing." (<u>Id.</u> at 18 (quoting <u>Coffman</u>, 612 F. App'x at 286 (underlined emphasis added)).) Thus, Judge Goodman applied the "preponderance of the evidence" standard, and Petitioners do not object to the application of that standard. Nor is Judge Goodman's application of the preponderance standard clearly erroneous or contrary to law. <u>See</u> <u>United States v. ADT Servs., Inc.</u>, 522 F. App'x 480, 491 (11th Cir. 2013) (finding that the district court "correctly" found that in a civil forfeiture proceeding the claimant "has the burden to demonstrate standing by a preponderance of the evidence") (quoting <u>United States v. All Funds in the Account of Property Futures, Inc.</u>, 820 F. Supp. 2d 1305, 1325 (S.D. Fla. 2011)); <u>see also</u> <u>Property Futures, Inc.</u>, 820 F. Supp. 2d at 1331 ("Claimants would do well to remember that the burden in this case to show standing is on them. In this regard, the burden is a heavy one, requiring Claimants to show standing by a preponderance of the

evidence.") (citing <u>United States v. $38,000.00 in U.S. Currency</u>, 816 F.2d 1538, 1543 n.11 (11th Cir. 1987)).

Next, the Court finds that Judge Goodman did not improperly discount Petitioners' recorded ownership interests in the property. In fact, he explicitly acknowledged that title ownership "is, to be sure, <u>a</u> factor to consider . . . ." (Report at 28.) Judge Goodman merely found it appropriate to "look behind title . . . to see whether Petitioners have met their burden of establishing statutory standing by demonstrating that they are parties 'other than the defendant.'" (<u>Id.</u>)

Next, the Court rejects Petitioners' argument that there is no precedent supporting the position that an owner who has "naked title" to a property "lack[s] standing to petition to show that the record title ownership interest is greater than any interest a non-owner . . . might claim[.]" (<u>Id.</u> at 8.) There is such precedent, and Judge Goodman cited it. (<u>See</u> Report at 28 (citing <u>United States v. Gamory</u>, Criminal File No. 1:08–CR–153–1–TWT, 2010 WL 3880880, at *4-5 (N.D. Ga. Sept. 28, 2010) (finding that although it was "undisputed that [the petitioner] is the record titleholder of the Mercedes[,]" he did not pay for the Mercedes, never drove the Mercedes, never possessed the Mercedes, and therefore, he was a mere nominee who could not challenge the forfeiture order); <u>United States v. Hovind</u>, No. 3:06cr83/MCR, 2009 WL 2369340, at *5-6 (N.D. Fla. July 29, 2009) (finding that although the petitioner held legal title to the properties in his capacity as corporate trustee, the petitioner was a mere nominee title holder for the defendants who lacked standing to challenge the court's forfeiture orders); <u>United States v. Gomez</u>, No. CR98-3002, 2000 WL 34029288, at *2-3 (N.D. Iowa Aug. 3, 2000) ("Possession of mere legal

title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture.");[16] <u>United States v. Rogers</u>, No. 94-CR-138 (FJS), 93-CV-156 (FJS), 1996 WL 252659, at *5-6 (N.D.N.Y. May 8, 1996) (finding that the petitioner's "holding of the title to the Mercedes was nothing more than a sham designed to protect the true owner" and finding that she therefore lacked standing to challenge the civil forfeiture).)   These cases refute Petitioners' argument that any party with properly recorded title has standing to pursue an ownership interest in ancillary proceedings.   The case to which Petitioners cite for this proposition, <u>United States v. Kennedy</u>, 201 F.3d 1324, 1335 (11th Cir. 2000), does not even mention standing.

Next, the Court rejects Petitioners' argument that Judge Goodman's framework violates procedural due process rights under the Fifth and Fourteenth Amendments and the Excessive Fines Clause of the Eighth Amendment.  (<u>See</u> Obj. at 10.)  These objections are vague, general, and conclusory, (<u>see</u> <u>id.</u>), and therefore need not be considered by the Court. <u>See</u> <u>Marsden</u>, 847 F.2d at 1548 ("Frivolous, conclusive, or general objections need not be considered by the district court.").  Regardless, the objections are meritless.

"Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest."  <u>Zipperer v. City of Fort Myers</u>, 41 F.3d 619, 623 (11th Cir. 1995) (citing <u>Donaldson v. Clark</u>, 819 F.2d 1551, 1558 (11th Cir. 1987) (en banc) (citing <u>Boddie v. Connecticut</u>, 401 U.S. 371, 378-79 (1971))).  Here, Petitioners

---

[16]      In <u>Gomez</u>, the magistrate judge found that although the petitioners (who were the defendant's parents) held title to a residential property, the evidence showed that the petitioners "have no interest in the property in question[,]" "are nominal or straw owners of that residence[,]" and therefore lacked standing to challenge the forfeiture order.

received notice and the opportunity to be heard before the Court determines their interest in the property.  As the Government puts it:

> Since the Court entered its orders of forfeiture [ECF Nos. 601, 613] more than five years ago, Petitioners have known of the forfeiture and had a full, unimpeded opportunity to conduct civil discovery pursuant to Fed. R. Crim. P. 32.2(c)(1)(B), and to present their case at an evidentiary hearing in accordance with 21 U.S.C. § 853(n)(6).

(Resp. at 8.)  Petitioners do not identify how Judge Goodman's standing analysis violated their rights to procedural due process.

The Eighth Amendment prohibits the imposition of excessive fines.  U.S. Const., Amend VIII.  The Supreme Court has held that the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"   Austin v. United States, 509 U.S. 602, 609-10 (1993).  The Supreme Court has also held that "[f]orfeitures—payments in kind—are thus 'fines' if they constitute punishment for an offense."  United States v. Bajakajian, 524 U.S. 321, 328 (1998).

In this case, the Court imposed forfeiture against Alvaro Lopez Tardon, not Petitioners.  Therefore, the Court did not fine Petitioners, excessively or otherwise, and the Eighth Amendment is therefore not implicated by Judge Goodman's standing analysis.

In sum, the Court overrules Petitioners' statutory interpretation, due process, and other constitutional objections regarding the Report's procedural and substantive framework for determining whether Petitioners have standing.

### c.     Post-Indictment Actions by Defendant's Trial Attorney

Next, Petitioners argue that Judge Goodman erroneously relied "on post-indictment actions of criminal defense counsel [Richard Klugh] . . . thereby penalizing the defendant's Sixth Amendment rights."  (Obj. at 10.)  They argue that the Report "should not address anything to do with the handling of the real estate to pay expenses of criminal representation.  The implications of such a focus misses the point of the entire forfeiture analysis and puts a strain on privileged communications with the defendant and the defendant's family."  (Id. at 11.)  They argue that "intruding in that area of funding the criminal defense as a means of thwarting standing fundamentally interferes with the right to retain counsel with untainted funds."  (Id.)  They assert that any rental income used to pay defense counsel's attorneys' fees was "expressly authorized by, and of benefit to," the Petitioners.  (Id.)  And "even if there had been no direct benefit to the family members from spending their money to help their brother/son, the defendant, it would be reasonable for a family to take such action, just as it would for them to simply take money out of their pockets to fund the defense."  (Id.)  Thus, they argue that "no adverse inference can be drawn from such expenditures[.]"  (Id.)

Petitioners further argue that Judge Goodman's "note" regarding Mr. Klugh's questionable behavior during Defendant's deposition as corporate representative for the LLC Petitioners should be stricken because the Government did not object to counsel's behavior during the deposition, and counsel was representing Defendant in a dual role as corporate representative and defendant, and therefore had a responsibility to protect Defendant's rights.  (Id. at 12.)  They argue that the Report's discussion of defense

40

counsel's behavior during the deposition "distort[s] unfairly the record[.]"  (Id. at 13.)

Finally, they argue that the Report "mistakes the import of a suppression motion filed by

criminal defense counsel, in which counsel argued that the corporate business records for

entities that the government had searched were publicly available and showed a clear link

to Alvaro."  (Id.)

The Government argues that any reliance on defense counsel's post-indictment

actions and statements was appropriate.  (Resp. at 13.)  It argues that "Petitioners do not

explain how the R&R's current observations of evidence in the public record deprives

Alvaro, who was convicted and sentenced in 2014, of his Sixth Amendment right to

counsel, nor is that issue relevant to these ancillary proceedings."  (Id.)  The Government

argues that the Report "correctly relied upon Alvaro's defense counsel's representations in

demonstrating that the Petitioners were not 'other than Alvaro.'"  (Id.)

> For example, the R&R correctly pointed out that approximately $70,000 of
> rental income for Murano Unit 908, that should have be [sic] going to
> Murano 908 LLC, went to Alvaro's defense counsel, Mr. Klugh instead. See
> ECF No. 906:55. Petitioners fail to demonstrate in their objection how such
> evidence is not relevant to the standing issue presented here.

(Id.)

The Court overrules Petitioners' objection.  First, Petitioners do not explain, and it

is not otherwise apparent, how the statements made by Mr. Klugh "penalize the defendant's

Sixth Amendment rights."  (Obj. at 10.)  The Court finds this to be a vague, general, and

conclusory objection that need not be considered by the Court.  See Marsden, 847 F.2d at

1548 ("Frivolous, conclusive, or general objections need not be considered by the district

court.").  Regardless, the Court finds nothing inappropriate in Judge Goodman relying on

the record when determining whether Petitioners established an ownership interest in the at-issue property, see 21 U.S.C. § 853(n)(5) (stating that in criminal forfeiture proceedings, "the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture"), including statements made by Mr. Klugh regarding ownership of the at-issue property. (See Report at 44 (citing Mot. to Suppress, D.E. 75 at 6 (stating that exhibits attached to motion "list the *defendant* as the *owner* and give his *address* and *identifying information*.") (emphasis in original)).) That Mr. Klugh's attorneys' fees were paid out of rental monies generated by the properties is also evidence in the record relevant to ownership of the at issue properties. (See D.E. 880-97, 880-85.) Finally, the Court sees no basis for striking Judge Goodman's "note" regarding Mr. Klugh's behavior during Defendant's deposition.

### d.    Reliance on Authority from other Circuits

Next, Petitioners argue that Judge Goodman erroneously relied on "non-precedential language from another circuit that also does not address recorded real estate interests." (Obj. at 13 (citing Report at 15-18 (citing United States v. Coffman, 612 F. App'x 278 (6th Cir. 2015)))).) Petitioners distinguish Coffman (and its citation to the Eleventh Circuit's decision in United States v. Carrell, 252 F.3d 1193, 1204 (11th Cir. 2001)) on the grounds that it involved the defendant's directly-forfeited bank account that was used to launder money. (Id. at 13-14.) They argue that

> [t]he jury verdict, conclusively acquitting the property in this case, such that any bare-title argument that may be relevant to an innocent owner defense is irrelevant here (for multiple reasons, including that the property was obtained through expenditures of funds from the LLC members). Nothing in Eleventh

Circuit case law suggests that valid legal title to <u>innocent</u> real estate is insufficient to establish standing. . . .

Given the recorded real estate records, deeds, mortgages, and corporate records in this case—which the government and claimants both introduced in evidence—there is no question that the LLCs offered evidence that they alone own the real estate at issue, that the ownership interests of the LLCs are divided one-third each to Tardon family members (Maria, Artemio and Nieves); that the LLCs have the power and authority under Florida law to dispose of the real estate; and that the forfeiture order adversely affects them and impedes the exercise of their property rights. <u>See</u> <u>United States v. Henry</u>, 621 F. App'x 968, 972 (11th Cir. 2015) ("'State law determines the nature of a claimant's interest in forfeited property.'"). The real estate and corporate records in this case show a superior (and exclusive) interest by the LLC entities in the condominiums at issue, and thus the government has abandoned merits arguments. <u>Cf.</u> <u>Henry</u>, 621 F. App'x at 973 ("'certificate of title'" to forfeited automobile was "'prima facie evidence'" of ownership).

(<u>Id.</u> at 14.)  Petitioners further object to Judge Goodman's reliance on <u>United States v. Morgan</u>, 224 F.3d 339 (4th Cir. 2000) because "<u>Morgan</u> is a merits case" and not a standing case, and is distinguishable on the facts.  (<u>Id.</u> at 15.)

In a separately-numbered but related objection, Petitioners assert that Judge Goodman "mistakenly relied on unpublished, non-precedential decisions from the Sixth Circuit addressing tainted, criminally-involved property"—specifically, <u>Coffman</u>, 612 F App'x 278 (6th Cir. 2015) and <u>United States v. Parenteau</u>, 647 F. App'x 593, 596 (6th Cir. 2016).

The Government argues that Petitioner's attempt to distinguish <u>Coffman</u>, <u>Parenteau</u>, and <u>Carrell</u> on the ground that it involved different property (i.e., substitute property versus directly forfeited, or "tainted" property) is unavailing and does not displace the holdings in those cases that the third-party Petitioners lacked standing to proceed on their claims. (Resp. at 13-15.)  They argue that <u>Coffman</u>, <u>Carrell</u>, <u>Morgan</u>, and <u>Parenteau</u> are applicable,

43

support Judge Goodman's findings, and compel the conclusion that Petitioners here lack standing to contest the forfeiture of the at-issue property.  (Id.)

The Court overrules Petitioners' objections.  Coffman and Carrell dealt with Constitutional standing.  In Coffman, the Sixth Circuit held that "[b]are legal title, . . . 'in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture.'" 612 F. App'x at 286 (citing $515,060.42 in U.S. Currency, 152 F.3d at 498 n.6).  "This is so because 'people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name. . . . [C]ourts look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings of someone else."  Id. (quoting Carrell, 252 F.3d at 1204). Although Coffman involved directly forfeitable property that was "involved in" or "traceable to" the underlying criminal prosecution under 21 U.S.C. § 982(a)(1), as opposed to substitute property under 21 U.S.C. § 853(p), Petitioners have cited no authority holding (or even suggesting) that bare legal title is sufficient to establish ownership in substitute property at an evidentiary hearing.  Nor have they adequately explained why the Sixth and Eleventh Circuit's concerns regarding strawmen and nominees are any less relevant when the property subject to forfeiture is substitute property (or, for that matter, real estate). Petitioners appear to argue that Judge Goodman should have found that they established standing despite finding that "they are mere nominee owners . . . ."  (Report at 5.)  This makes no sense to the Court, and the Court overrules their objection to Judge Goodman's reliance on Coffman and Carrell.

In Parenteau, the Sixth Circuit dealt with statutory standing. 647 F. App'x at 595-98. Statutory standing under 21 U.S.C. § 853(n)(2) requires a claimant to be "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States[.]" (Emphasis added.) The Sixth Circuit in Parenteau held that a petitioning corporation which was owned and completely controlled by the defendant was not a person "other than the defendant" with statutory standing to challenge the forfeiture order. Id. at 596, 98. Although Parenteau, like Coffman, involved directly forfeitable property that was "involved in" or "traceable to" the underlying criminal prosecution under 21 U.S.C. § 982(a)(1), Petitioners have not explained why a different rule should apply to substitute property. It would make no sense to find that a corporation that is wholly owned and controlled by a defendant is a person "other than the defendant" simply because the at-issue property is substitute property (or, for that matter, real estate). Accordingly, the Court overrules Petitioners' objection to Judge Goodman's reliance on Parenteau.

Finally, Judge Goodman (see Report at 24, 33 n.9) relies on the following quote from Morgan: "Failing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity." 224 F.3d at 343 (citing United States v. 526 Liscum Drive, Dayton, Montgomery Cnty., Ohio, 866 F.2d 213, 217 (6th Cir. 1989)). Although Morgan is a merits case, the Sixth Circuit case to which it cites for this principle is a standing case. Specifically, in 526 Liscum Dr., the Sixth Circuit noted that in forfeiture proceedings under 19 U.S.C. § 1615, the burden is on "the claimant to show by a preponderance of the

45

evidence that the property is not subject to forfeiture."  866 F.2d at 216.  "As an element

of this burden, claimant has the burden of proving an interest in the property sufficient to

establish her standing under the statute to contest the seizure and resulting forfeiture." Id.

The Sixth Circuit held:

> [W]hen the government establishes probable cause to believe that a claimant
> is merely a nominal or straw owner, as it has done here, a claimant cannot
> meet its burden of establishing standing to challenge a forfeiture by
> presenting proof of legal title alone.  The claimant must also present evidence
> of dominion and control or other indicia of true ownership.  Since the
> government has established probable cause to believe that Booker is not the
> true owner, we do not decide the issue of whether a claimant is required to
> show more than legal title in the absence of such a probable cause showing
> of lack of true ownership.

Id. at 217.  Accordingly, the Sixth Circuit found that the claimant lacked standing to contest

the forfeiture.  Id.  As such, the at-issue quote from Morgan is relevant and applicable to

issues before the Court, and Judge Goodman did not improperly rely on it.

### e.   Failure to address Florida case law on LLC management and ownership

Next, Petitioners object to Judge Goodman's failure to address Florida case law

addressing LLC management and ownership, like Judge Otazo-Reyes did in her R&R in

Silva.  (Obj. at 17.)  Petitioners argue that Judge Goodman's concerns about the Silva

decision are alleviated by Petitioners' reliance on the record in the criminal case and the

forfeiture trial.  (Id.)  They argue that this Court's prior finding that Artemio lacked

standing to challenge forfeiture of the 2006 Mercedes-Benz SLR McLaren properly relied

on Florida law and, as such, is consistent with the Silva decision.  (Id. at 17-18.)  They

argue that Judge Goodman's reasoning is not supported by Florida law.  (Id. at 19.)

The Government argues that Judge Goodman correctly found the reasoning in <u>Silva</u> unpersuasive.  (Resp. at 16.)  It argues that Judge Goodman correctly relied on the Sixth Circuit's reasoning in <u>Parenteau</u> which interprets 21 U.S.C. § 853(n)(2)'s requirement that a petitioner be a person "other than the defendant" as one of "ordinary statutory construction," and not governed by federal common law or state law.  (<u>Id.</u> (quoting <u>Parenteau</u>, 647 F. App'x at 598-99).)  "The issue 'is not whether [petitioner] has a property right in the first place but rather <u>who</u> is eligible to petition for relief . . . .'"  (<u>Id.</u> at 17 (quoting <u>Parenteau</u>, 647 F. App'x at 598).)

The Court overrules Petitioners' objection.  The Court only applies state law to determine a petitioner's interest in forfeited property after that petitioner establishes standing.  <u>See</u> <u>Shefton</u>, 548 F.3d at 1364 (stating that courts apply state law to determine the nature of a petitioner's interest in forfeited property, but federal law determines whether the petitioner's interest in the forfeited property is superior and requires an amendment to the forfeiture order) (citing <u>Fleet</u>, 498 F.3d at 1231).  Because Petitioners did not establish standing, Judge Goodman did not need to apply Florida law to determine their interest in the forfeited property.  <u>Parenteau</u>, 647 F. App'x at 594 (finding that the "application of state law" was not required because the petitioner did not establish statutory standing to challenge the forfeiture).

Judge Goodman properly rejected the reasoning in <u>Silva</u>, where Judge Otazo-Reyes found that the petitioning LLC was a person "other than the defendant" for purposes of 21 U.S.C. § 853(n)(2) based only on the fact that it held record title to the at-issue properties, even though the Government had submitted significant evidence that the defendant "was

in total control of the entity, that no one else played a role in its activities and that no corporate formalities were followed." (Report at 20.) Judge Goodman found that: (1) he was not bound by Silva, (id. at 23); (2) neither the Report and Recommendations nor the Order adopting it cite to any law to support the notion that a corporate filing is always sufficient to, by itself, establish statutory or Article III standing at an evidentiary hearing in an ancillary forfeiture proceeding, (id. at 24); (3) "if the Silva ruling were to be followed by this Court (or other Courts), the United States would be foreclosed from challenging the standing of all corporate petitioners and claimants who took the strategic step of filing incorporation records with the State[,]" (id.); and (4)

> Silva would permit criminals to act with impunity and protect their assets and substitute assets by simply taking the administrative step of incorporating (while still maintaining dominion and control of the assets technically listed in the name of another). That one strategic step would be sufficient to establish standing and prevent further inquiry -- because corporate records would show the entity as technically separate from the convicted criminal defendant. See generally United States v. Morgan, 224 F.3d 339, 343 (4th Cir. 2000) ("Failing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity.").

(Id. at 24.) To Judge Goodman, this "makes no sense" and "would render superfluous the statutory requirement that a petitioner be someone "other than the defendant." (Id.)

The Court adopts these findings. Judge Otazo-Reyes's determination that a petitioner with bare legal title has standing to challenge an order of forfeiture does not adequately address the Eleventh Circuit's concern about strawmen and nominees challenging forfeiture orders. See Weiss, 467 F.3d at 1303 n.1 (dismissing appeal of petitioning corporation because it was a mere nominee which lacked standing to challenge

48

forfeiture); <u>United States v. A Single Family Residence & Real Prop. Located at 900 Rio Vista Blvd., Ft. Lauderdale</u>, 803 F.2d 625, 630 (11th Cir. 1986) (observing that "possession of bare legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture[,]" and affirming the district court's finding that the petitioner was a "strawman" who lacked standing to challenge the forfeiture).  Also, it does not address <u>Parenteau</u>'s observation that statutory standing is a matter of ordinary statutory construction, and a district court need not apply state law to determine a petitioner's interest in forfeited property if the petitioner lacks standing.[17]  647 F. App'x at 594, 596, 598-99.  Thus, Petitioners' objection is overruled.

f.      **Failure to Make Credibility Findings**

The heading of Petitioners' next objection is: "Failure to make credibility findings regarding evidentiary hearing testimony."  (Obj. at 19.)  In this section, they discuss the testimony of Peter Lopez—the attorney who met with Defendant and others and prepared the corporate paperwork for Murano 908 LLC and Miamark LLC.  (<u>See</u> <u>id.</u>)  However, as the Government correctly observes, "Peter Lopez did not testify at the evidentiary hearing, as Petitioners failed to call him as a witness."  (Resp. at 17.)  Accordingly, to the extent that Petitioners object to Judge Goodman's failure to make credibility findings as to Peter Lopez's evidentiary hearing testimony, the objection is overruled.

_____

[17]     The Government discussed <u>Parenteau</u> in a memorandum submitted to Judge Otazo-Reyes.  <u>See</u> <u>United States v. Silva</u>, Case No. 15-20727-Cr-Gayles, D.E. 113 at 6-7 (S.D. Fla. June 20, 2018).

However, construed together with Petitioners' next objection, Petitioners appear to argue that Judge Goodman "omits crucial [deposition] testimony by" Peter Lopez explaining that the term "managing member," as it applies to Alvaro, refers to a manager who has no ownership interest in the LLC, and this omission must mean that Judge Goodman found that testimony to be incredible. (<u>Id.</u> at 19-20.) Thus, Petitioners object to Judge Goodman's "failure to make any findings as to attorney Peter Lopez's credibility, or indeed as to any witness, deponent, or affiant in this case . . . ." (<u>Id.</u> at 20.)

The Government argues that although "Petitioners appear to complain that the R&R implicitly made a finding based on Peter Lopez' deposition testimony that he was not credible[,] . . . the only citation in the R&R to Peter Lopez' testimony assumes the truth of his statements that cut against Petitioners' position[.]" (<u>Id.</u> (citing Report at 60).)

The Court overrules Petitioners' objection. First, Judge Goodman acknowledged <u>both</u> the Government's argument that Alvaro's position as "managing member" of the LLCs was evidence that he owned the LLCs, (<u>see</u> Report at 42, 54), and Petitioners' rebuttal argument that Alvaro's position as a "managing member" of Miamark LLC was a "misnomer," (<u>id.</u> at 43-44). Ultimately, Judge Goodman did not find that Alvaro's position as "managing member" was evidence that he owned the LLCs as a matter of state law, but rather considered it as evidence that he <u>controlled</u> the LLCs, and therefore "that Petitioners have, at best, nominal ownership to the real properties at issue." (<u>Id.</u> at 57.) Thus, Judge Goodman did not reject Mr. Lopez's testimony regarding the meaning of "managing member," and no credibility finding was necessary. Even assuming the veracity of Mr. Lopez's testimony that "managing member" simply means "manager"-with-no-ownership-

interest, it does not overcome the other overwhelming evidence Judge Goodman relied upon when finding that Petitioners lacked standing to challenge the forfeiture order.  (See Report at 56-60.)  Therefore, this objection is overruled.

### g.    Failure to Effectively Review the Criminal Record

In their next objection, Petitioners appear to argue—albeit confusingly—that although Judge Goodman acknowledged that Petitioners were relying on the exhibits introduced at the evidentiary hearing and on "evidence from the criminal trial and other pre-hearing evidence[,]" (Obj. at 22 (citing Report at 14 n.2)), Judge Goodman must have only considered the newly-introduced exhibits when considering their claims because the record evidence establishes that Murano and Miamark are persons "other than the Defendant" who own the at-issue condominiums, (id. at 21-22).  They then offer argument regarding portions of the record that they believe establish that the LLCs own the forfeited condominium units.  (Id. at 22-28.)  Thus, Petitioners are essentially arguing that if Judge Goodman had "effective[ly] reviewed" the record in the underlying criminal case he would have determined that Petitioners have standing to challenge the Court's forfeiture order. (See Obj. at 21-28.)

The Government argues that this is an improper objection that the Court should decline to consider because Petitioners fail to identify any part of the Report to which they object.  (Resp. at 18 (citing Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987)).)  The Government further argues that the objection is meritless because Judge Goodman "recites or references relevant portions of the criminal record throughout, including, for example, the testimony of Sharon Cohen, and David Pollack at Alvaro's

criminal trial regarding the Forfeited Mark Units and the Murano 908." (Id. (citing Report at 40-44, 51-55).)

The Court overrules the objection because Judge Goodman properly considered all of the evidence proffered by Petitioners. Judge Goodman explicitly identifies the portions of the underlying criminal case upon which Petitioners rely. (See, e.g., Report at 62 (discussing Agent Gaitan's testimony at the forfeiture jury trial); id. at 63 (discussing trial testimony regarding reason Alvaro sought to ship the Mercedes to Spain); id. (discussing Sharon Cohen and David Pollack's trial testimony); id. at 64 (discussing David Pollack's testimony). However, Judge Goodman correctly observed that "Petitioners rely mostly on contentions and theories, as opposed to actual evidence." (Id. at 56.) Judge Goodman ultimately relied (in part) on portions of record in the underlying criminal case cited by the Government. (See, e.g., Report at 57 (referencing Sharon Cohen's trial testimony); id. at 57-58 (referencing Mr. Klugh's representations in the underlying criminal case).) That Judge Goodman was more persuaded by the evidence cited by the Government than Petitioners' contentions and theories does not mean that he failed to effectively review the record.

### h.    Failure to Adhere to the Stipulation for Sale of Miamark Unit 202

Next, Petitioners argue that the Report "relies on an unwarranted misinterpretation of the agreed sale of Miamark 202 and transfer of the sale proceeds to escrow pending resolution of the criminal case." (Obj. at 28 (citing Report at 42-43).) They argue that

> the R&R notably ignores the express language of the stipulation for sale which bars reliance on the terms and agreements in the stipulation for sale in any aspect of the criminal case. See 403-1 ("This Stipulation to Sell Property

does not constitute a representation, agreement or admission by any of the Parties as to the merits, or lack thereof, of any matter at issue in the instant action.").  That provision was meant to do exactly what it said, and it allowed the parties to proceed without risk of exactly the misuse the R&R proposes to make of it, to turn it into an admission of some sort—the very thing that cannot be done according to the government's agreement.  The manager's title was not what gave him authority; it was his status as manager; because Florida law requires a management structure, compliance with the law by having the local family member be the manager did not to diminish the dominion and control the equity members of the LLC exercised, including the power to hire or fire Alvaro at will.

(Id.)

The Government argues that "[t]he R&R does not even reference the Stipulation to Sell Property."  (Resp. at 18.)

Rather, the R&R specifically cites to supplemental filings, ECF Nos. 406 and 406-3, which the Court required the Parties to submit affirmatively establishing Alvaro's authority to act consistent with the terms of the Stipulation to Sell Property, and his counsel's authority to act on his behalf. See Paperless Order, ECF 404, dated January 9, 2014; R&R, ECF No. 909:42 (citing Joint Suppl. to Mot. for Court Appr'l of Stip. to Sell Property, ECF No. 406, and Sworn Decl. of Richard C. Klugh, ECF No. 406-3). These supplemental filings are not part of the Stipulation to Sell Property itself, but instead were provided to the Court to support that Alvaro and/or his counsel, Mr. Klugh, had the requisite authority to sell Mark Unit 202 in accordance with the Stipulation to Sell Property. Therefore, these submissions are not subject to the prohibition referenced by the Petitioners. Additionally, the Magistrate Court's recitation of this authority in the R&R was perfectly appropriate and highly relevant.

(Id. at 18-19.)

The Court overrules this objection.  In the Report, Judge Goodman included the following in his recitation of the evidence the Government offered in opposition to Petitioner's claims:

14.   After Alvaro was criminally charged in 2011, Miamark submitted a 2013 restatement and 2014 annual report indicating that he was

> its managing member.  See ECF No. 880-96.  Furthermore, in support of the interlocutory sale of Mark Unit 202, Richard Klugh, criminal defense counsel for the Defendant, submitted a sworn declaration to the Court that verified Defendant's status as Miamark's "managing member."  See ECF Nos. 406; 406-3.1.[18]

(Report at 42-43 (footnote in original).)  Although Judge Goodman appears to rely on this evidence, (see id. at 57 ("[t]he myriad factors listed above convincingly demonstrate that Petitioners lack statutory standing")), he does not specifically discuss it in his findings and conclusion, (see id. at 57-60).

Regardless, Judge Goodman does not find—or even suggest—that the Stipulation to Sell Property is evidence that Alvaro owned the Mark Unit 202.  Indeed, the Report does not even reference the Stipulation to Sell Property.  The Report references only the "Sworn Declaration of Richard C. Klugh," and only to note that Alvaro was a "managing member" of Miamark LLC with authority to approve its sale.  (See id. at 42-43.)  This is hardly improper considering that Petitioners do not deny that Alvaro was Miamark's "managing member"; indeed, two of the nine exhibits Petitioners introduced in support of their claims at the evidentiary hearing—Miamark's Articles of Organization, (D.E. 880-96 at 4) and Miamark's Operating Agreement, (D.E. 880-95 at 4)—identify Alvaro as Miamark's

---

[18]    In particular, Mr. Klugh's sworn declaration said:

The undersigned, attorney for Alvaro Lopez Tardon, has verified the authenticity of the documentation of the **defendant's stipulation to sell property** in this case [D.E. 403-1], of the power of attorney from the defendant to the undersigned granting the undersigned authority to conduct transactions including the present property sale (attached as Ex. A to the joint supplement to joint motion to approve stipulated sale), and of the **defendant's status as managing member of MiaMark LLC** (Ex. B to the joint supplement to joint motion to approve stipulated sale).

[ECF No. 406-3 (emphasis added)].

"managing member." (<u>See</u> Tr. of Evid. Hr'g, D.E. 876 at 43:18-25.) As such, the Court finds this objection to be borderline frivolous, and is overruled.

### i. Failure to Address Car Purchase Ownership Interests

Finally, Petitioners object to Judge Goodman's alleged "[f]ailure to address car purchase ownership interests of record title holders Kyte School and Artemio Tardon."[19] (Obj. at 28.) They argue that at the forfeiture trial, "Agent Gaitan conceded that Kyte Schooll provided the funding for the purchase of the Mercedes McLaren automobile at issue, while other car business provided funds for the Rolls Royce automobile." (<u>Id.</u> at 29.) They further argue that "[b]ecause Alvaro is a partner in the Kyte Schooll entity, his apparently minimal dealer use of the car did not divest Kyte Schooll of its ownership interest that has always been reflected on the title records for the Mercedes." (<u>Id.</u>; <u>see also</u> <u>id.</u> at 30.)

The Government argues that, in fact, the Report "exhaustively details the facts and circumstances of record regarding the purchase, storage, maintenance, use, titling and registration of the Forfeited Vehicles, and correctly concludes, based on overwhelming evidence in the record, that the Petitioners, Maria Tardon, Artemio Tardon and Kyte Schooll, hold only nominal title to the Forfeited Vehicles and therefore lack standing to contest their forfeiture." (Resp. at 19-20.)

The R&R specifically details the facts that Alvaro personally purchased the Rolls-Royce and that he personally wrote a letter to the Florida Tag Agency

---

[19]     The Court summarily overrules Petitioners' apparent argument in this section that Artemio is a person "other than" Alvaro because they are not physically the same person. (<u>See</u> Obj. at 28.) Obviously, the question is not whether Artemio and Alvaro are different human beings, but whether Artemio is a strawman or nominee owner of the at-issue forfeited property.

in which he stated that he owned both the Mercedes-Benz and Kyte Schooll. See R&R, ECF No. 906:66-67. Additionally, the R&R goes on to recite the facts of record showing that Alvaro registered, titled, and insured the Forfeited the Vehicles in his name using his home address, drove them and showed them off at restaurants and clubs, stored them at his various residences, and transferred nominal title to them to the Petitioners when he feared his then-spouse, Sharon Cohen, would acquire them in a pending divorce proceeding. See id. at 67-68. Importantly, the R&R explains that Petitioners Maria Tardon and Artemio Tardon admitted in their interrogatory answers that they did not acquire title to the Forfeited Vehicles through a financial transaction, that they did not exchange anything of extrinsic value when nominal title to the Forfeited Vehicles was transferred to their names, and that they acquired their claimed interests in the Forfeited Vehicles "following the separation of [Alvaro] from his wife. See id. at 68-69. The R&R is replete with facts of record specifically showing that Alvaro, not the Petitioners, exercised complete dominance and control of the Forfeited Vehicles from their purchase until their seizure, while the Petitioners gave nothing of extrinsic value in exchange for title changing in their names, nor exercised any form of dominion or control over them at any time.

(Id. at 20.)

The Court finds that Judge Goodman correctly found that Artemio Lopez Tardon, Maria Torrego Tardon, and Kyte Schooll are not persons "other than" Alvaro for purposes of 21 U.S.C. § 853(n)(2) (and therefore lack statutory standing), and are "mere naked title owners who are nominees for Alvaro" (and therefore lack Article III standing).[20]  (Report at 69-70.)  The Court need not recite the overwhelming evidence establishing that Alvaro owned both vehicles, as that evidence is recounted in Judge Goodman's Report and reproduced above in Section I(b).  Petitioners arguments to the contrary are unavailing.

---

[20]     As previously stated, (see Note 12, supra), Maria Tardon Torrego and Artemio Lopez Tardon claim ownership of the Rolls Royce, while Maria Tardon Torrego and Kyte Schooll claim ownership of the Mercedes-Benz.  (D.E. 735.)  Artemio's claim to the Mercedes-Benz was previously dismissed for lack of standing.  (D.E. 762.)

Petitioners argue that there is evidence that "two Spanish car companies with ties to the Tardon family or businesses provided the funds" for the Rolls Royce. (Obj. at 30 (citing Trial Tr. (June 11, 2014), D.E. 713 at 13:47-48, 56).) This is true: Agent Gaitan testified during the forfeiture phase of the trial that Cars Collection Sports, SL transferred $21,532.50 to Braman Motors, and Car Boats Madrid, SL transferred $315,960.53. (D.E. 713 at 47.) Agent Gaitan further testified that Spanish police had intercepted telephone calls between the husband of the owner of Cars Collection Sports, SL and the Tardon brothers discussing drug activity and being followed by police. (Id. at 55:22 – 57:17.) However, this evidence does not show, or tend to show, that Petitioners have any ownership interest in the Rolls Royce.

Petitioners also cite the fact that Alvaro shipped the Rolls Royce to The Collection Motor Sports in Spain and transferred title to Artemio Tardon and Maria Tardon. (Obj. at 30-31.) Although they argue that "Sharon Cohen's testimony, and that of David Pollack, DE:776-9:18, showed the reason for shipping cars to Spain was to advance the Tardon family's car business," they cite only to David Pollack's testimony, which was inconsistent. (See id.) Pollack initially testified that he did not know why Alvaro sent cars (including the Rolls Royce) to Spain. (D.E. 776-9 at 14:3-5 ("Q. What would be the triggering event, if you know, to have one of those cars, 'Okay. Let's send it off to Spain'? A. I don't know, unless he got bored.").) He then testified that Alvaro sent cars to Spain "[t]o be sold in a dealership" and "[a]lso because he was fearing divorce with Sharon and wanted to get rid of some of his assets in case she was coming after them." (Id. at 18:19-24.) However, Pollack never testified that Alvaro shipped cars to Spain "to advance the family's car

57

business."  The Court finds that Judge Goodman correctly credited the evidence showing that Alvaro shipped the Rolls Royce to Spain and transferred title to his brother and mother "because he feared that his then-spouse, Sharon Cohen, might try to obtain them in pending divorce proceedings."  (Report at 67 (citing Transcribed Conversation between Alvaro Lopez Tardon and Patricia Scheel, D.E. 880-32, 884-2; Trial Tr. (May 6, 2014), D.E. 520 at 38:12 – 39:12 (testimony of David Pollack)[21]).)

As to the Mercedes, Petitioners appear to argue that Kyte Schooll has established a "business ownership" interest because it paid for the vehicle.  (Obj. at 29.)  They argue that "[b]ecause Alvaro is a partner in the Kyte Schooll entity, his apparently minimal dealer use of the car did not divest Kyte Schooll of its ownership interest that has always been reflected on the title records for the Mercedes."  (Id.)

---

[21]    Q. After Mr. Tardon's domestic issues, did you have any conversations with him concerning the cars that he had?
A. Yes.
Q. What was that conversation?
A. He was going to ship -- I think it was seven of the cars to Madrid.
Q. Did he tell you why he wanted to do that?
A. To be sold in a dealership.
Q. Did he tell you why he wanted to do it then and there versus any other time?
A. Also because he was fearing divorce with Sharon and wanted to get rid of some of his assets in case she was coming after them.
Q. Did he have any conversations with you at all about any problems he was having getting the cars out of the country?
A. Yes. Once I put all the cars on two trucks to be driven to wherever they were to be transported out of the country, they were stuck there. They were not leaving.
Q. Did he tell you why?
A. No. He did not know why.
Q. Do you know whether or not there were any issues with the names that the cars were titled under?
A. No.
Q. Now, in all the time that you've known Mr. Tardon, did he ever tell you that his money came from anything other than trafficking in drugs?
A. No.

58

It appears undisputed that Kyte Schooll paid for the Mercedes (at least nominally), (see D.E. 550-6 at 3, Trial Tr. (June 11, 2014), D.E. 713 at 59:24 – 60:25), and that the Mercedes was shipped to Kyte Schooll in Spain after it was purchased, (see id. at 61:1-3; D.E. 776-6 at 6, 10, 12).  However, it is also undisputed that Alvaro is a part owner of Kyte Schooll, (see Obj. at 29), and Alvaro's name is listed with Kyte Schooll as a "Buyer" of the Mercedes on the Motor Vehicle Dealer Title Reassignment Supplement, (D.E. 776-6 at 10).  The evidence also shows that in 2010, Kyte Schooll shipped the Mercedes back to Alvaro at his personal residence in Miami.  (Id. at 7; see also Trial Tr. (June 11, 2014), D.E. 713 at 61:1-3.)  By letter dated April 13, 2010, Alvaro notified Trail Tag Agency that the Mercedes "was unregistered in Madrid Spain to owner, Alvaro Lopez, who is also owner of Kyte Schooll."  (Id. at 9.)  The April 19, 2010 Certificate of Title lists "Alvaro Lopez Tardon or Kyte Schooll" as the owners of the Mercedes, and lists Alvaro's personal address.  (Id. at 15.)  Alvaro (in a joint policy with his wife, Sharon Cohen) personally insured the Mercedes with State Farm Insurance.  (D.E. 880-82.)  Sharon Cohen testified that Alvaro drove the Mercedes.  (Trial Tr. (May 13, 2014), D.E. 523 at 83:3-4, 16-17.)  And, as with the Rolls Royce, the evidence shows that Alvaro personally decided to ship the Mercedes back to Spain because he feared that Sharon may try to obtain it in their divorce proceedings.  (See D.E. 884-2; D.E. 520 at 38:12 – 39:12.)  Consequently, the Court adopts Judge Goodman's conclusion that Kyte Schooll had nominal ownership in the Mercedes, and was not a person "other than" Alvaro for purposes of asserting an ownership interest in the Mercedes.

The Court further adopts Judge Goodman's conclusion that Maria Tardon has not established any ownership interest in the Mercedes (outside any ownership interest she may have had in Kyte Schooll, which the Court has just found held mere nominal ownership).  In her Answers to Interrogatories, Maria asserted that she acquired ownership in the vehicles through "arranging for proper paper work for resale of the cars in Spain." (D.E., 880-78 at 6.)  The only instances of Maria exercising possession, dominion and control over the vehicles was placing the vehicles "into transfer for resale and [insuring] appropriate handling of the cars . . . ."  (D.E. 880-77 at 12; D.E. 880-78 at 12.)  In other words, Maria's only assertion of dominion and control over the vehicles was helping Alvaro transfer the cars to Spain so that Alvaro would not lose them in the divorce.  As such, the Court finds that, at best, Maria had nominal ownership in the Mercedes, and was not a person "other than" Alvaro for purposes of asserting an ownership interest in the Mercedes.

In sum, the Court overrules Petitioners' objections to Judge Goodman's findings and conclusions regarding the forfeited Rolls Royce and Mercedes.

V.      **Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.      The Report and Recommendations on Petitions to Set Aside Forfeiture of Substitute Assets (D.E. 906) is **ADOPTED AND SUPPLEMENTED** consistent with this Order;

2.      The Amended Petition for Third-Party Interest in Forfeited Property filed by
Miamark LLC and Murano 908 LLC (D.E. 734) is **DISMISSED** for lack of
standing;

3.      The Amended Petition for Third-Party Interest in Forfeited Property filed by
Kyte Schooll (a Spanish Corporation), Maria Tardon Torrego, and Artemio
Lopez Tardon (D.E. 735) is **DISMISSED** for lack of standing;

4.      The United States' Motion for Summary Judgment Against Petitioners
Claiming Forfeited Mercedes Benz and Rolls Royce (D.E. 776) is **DENIED
AS MOOT**;

5.      The United States' Motion for Summary Judgment Against Petitioner
Miamark LLC Claiming Three Forfeited Condominium Units (D.E. 825) is
**DENIED AS MOOT**;

6.      The United States' Motion for Summary Judgment Regarding Murano 908,
LLC's Petition Claiming Ownership to Forfeited Real Property (D.E. 826) is
**DENIED AS MOOT**;

7.      The United States' Motion for Order Compelling Remaining Petitioners to
Show Cause Why They Have Standing to Proceed, or in the Alternative, to
Clarify Pending Petitions (D.E. 760) is **DENIED AS MOOT**;

8.      The United States' Motion for Inquiry Regarding Potential Conflict (D.E.
714) is **DENIED AS MOOT**;[22] and

---

[22]      See Note 6, supra.

9.    James Rubin's and Olga Rubin's Verified Petition to Adjudicate Claimed Interest in Property Subject to Forfeiture (D.E. 620) is **DENIED AS MOOT**.[23]

**DONE AND ORDERED** in Chambers at Miami, Florida this 8th day of October, 2020.


                                        _Joan A. Lenard_
                                   **JOAN A. LENARD**
                                   **UNITED STATES DISTRICT JUDGE**

---

[23]    See Note 7, supra.